BENJAMIN M. LEVITAN (NY Bar #5215058)
(*pro hac vice*)
Earthjustice
48 Wall Street, Floor 15
New York, NY 10005
T: (202) 797-4317
blevitan@earthjustice.org

ANDREA A. TREECE (CA Bar #237639)
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
T: (415) 217-2000
atreece@earthjustice.org

KRISTEN L. BOYLES (CA Bar #158450)
CHARISA GOWEN-TAKAHASHI (CA Bar #342937)
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T: (206) 343-7340
kboyles@earthjustice.org
cgowentakahashi@earthjustice.org

*Counsel for Plaintiffs*
*[Additional counsel listed at end]*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB, and WILDEARTH GUARDIANS<br><br>     *Plaintiffs*,<br><br>  v.<br><br>U.S. DEPARTMENT OF THE INTERIOR, U.S. FISH AND WILDLIFE SERVICE, U.S. DEPARTMENT OF COMMERCE, and NATIONAL MARINE FISHIERIES SERVICE,<br><br>     *Defendants*. | Case No. 3:24-cv-04651-JST<br><br>Related Case: No. 4:19-cv-05206-JST<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Administrative Procedure Act, National Environmental Policy Act, Endangered Species Act) |

Plaintiffs Center for Biological Diversity et al., file this First Amended Complaint to add claims for which they provided 60 days' notice of intent to sue pursuant to 16 U.S.C. § 1540(g) on July 31, 2024. Plaintiffs have also attached full declarations of their individual members (Exhibits B–L) describing their interests in the protection of particular threatened and endangered species and their geographic habitat, as well as the injury and risk of injury to Plaintiff groups and their members from the promulgation of the challenged regulations. These interests and injuries were summarized in the initial complaint. The following paragraphs of this amended Complaint contain amended language: 11 (previously numbered as paragraph 12 in the initial Complaint), 13 (previously 14), 48 (previously 50), and 84–85 (previously 86–87). The first Claim for Relief is newly added. Paragraphs 10, 27, and 93 were deleted.

## INTRODUCTION

1.      This suit challenges regulations that purport to implement Sections 4 and 7 of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, but instead threaten to reverse decades of progress in preserving our nation's natural heritage. At a time when species and their habitats face accelerating threats from human activities, the challenged regulations severely weaken the very bulwarks Congress built to hold those threats in check.

2.      For over 50 years, the ESA has served as the nation's most effective conservation law, saving numerous species from extinction and moving them toward recovery. In the ESA, Congress affirmed our nation's commitment to the conservation of threatened and endangered species and their habitats—the forests, grassland, prairies, rivers, and seas these species need to survive. Congress specifically gave "conservation" a sweeping definition—the use of all methods and procedures necessary to recover threatened and endangered species so that they no longer need the Act's protections. 16 U.S.C. § 1532(3). The ESA works, in part, by placing the survival and recovery of imperiled wildlife, fish, and plants at the forefront of every federal action and decision.

3.      The core of the ESA lies in Section 4's requirements for listing species and

designating critical habitat and Section 7's mandate that all agencies "insure" that no action they fund, authorize, or carry out is likely to impede a species' ability to survive and recover.

4.    The Departments of the Interior and Commerce, acting through the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (collectively "the Services"), administer the ESA through duly promulgated joint regulations. In 2019, the Services veered sharply from their nearly four-decade history of carrying out the ESA's imperatives and issued sweeping changes to the regulations implementing Sections 4 and 7 that eviscerated their effectiveness and dimmed recovery prospects for hundreds of listed species.

5.    Plaintiffs, along with others, challenged the 2019 Regulations. *E.g.*, *Ctr. For Biological Diversity v. Bernhardt*, No. 3:19-cv-05206 (N.D. Cal. Aug. 21, 2019), ECF No. 1. More than two years later, in late 2021, Federal Defendants moved this Court to remand the regulations without vacatur, citing "substantial concerns" with the challenged regulations, which the Services intended to revise. Mot. for Voluntary Remand 20, 22, *Ctr. For Biological Diversity v. Haaland*, No. 3:19-cv-05206 (N.D. Cal. Dec. 10, 2021), ECF No. 146. The Court ultimately granted Federal Defendants' requested relief. Am. Order Granting Mot. Remand, *Ctr. For Biological Diversity v. Haaland*, No. 3:19-cv-05206 (N.D. Cal. Nov. 16, 2022), ECF No. 198.

6.    On April 5, 2024, having at least implicitly admitted that many of the prior changes were ill-advised and even indefensible, the Services issued revised regulations implementing ESA Sections 4 and 7. While the 2024 Regulations reversed parts of the 2019 Regulations, they left other elements in place and introduced harmful new provisions.

7.    This action challenges the four regulatory revision packages issued in 2019 and 2024: two packages amending the regulations that implement ESA Section 4, 16 U.S.C. § 1533, that govern listing, delisting, and designation of critical habitat (generally codified under 50 C.F.R. § 424); and two packages amending the regulations that implement ESA Section 7, 16 U.S.C. § 1536, that govern consultations on federal actions that may affect listed species or critical habitat (generally codified under 50 C.F.R. § 402). *See* Listing Endangered and Threatened Species and Designating Critical Habitat, 89 Fed. Reg. 24300 (Apr. 5, 2024); Regulations for Listing Species and Designating Critical Habitat, 84 Fed. Reg. 45020 (Aug. 27,

2019); Regulations for Interagency Cooperation, 89 Fed. Reg. 24268 (Apr. 5, 2024); Regulations for Interagency Cooperation, 84 Fed. Reg. 44976 (Aug. 27, 2019). Another regulatory package from 2019, changing how FWS accords protections to threatened species, has been fully rescinded and is not at issue in this Complaint. *See* Regulations Pertaining to Endangered and Threatened Wildlife and Plants, 89 Fed. Reg. 23919 (Apr. 5, 2024).

8.      Taken together, the 2019 and 2024 regulatory changes undermine the fundamental purpose of the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species …." 16 U.S.C. § 1531(b). The revised regulations violate the plain language and overarching purpose of the ESA; they also lack any reasoned basis and are arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*

9.      Additionally, the Services failed to consider and disclose the significant environmental impacts from these regulations in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* The final regulatory revisions are major federal actions, none qualify for categorical exclusions from NEPA compliance, and each will have significant impacts on the human environment by undermining the ESA's purpose and protections.

10.     To remedy these violations of law, Plaintiffs seek an order (1) declaring the revised ESA regulations invalid, (2) vacating and remanding the revised ESA regulations, (3) enjoining reliance on the revised ESA regulations, and (4) reinstating the pre-2019 ESA regulations.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

11.     This action is brought pursuant to the APA, 5 U.S.C. §§ 701–706, and the ESA, 16 U.S.C. § 1540(g)(1). This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 16 U.S.C. § 1540(g)(1).  To the extent required by the ESA, 16 U.S.C. § 1540(g), Plaintiffs provided 60 days' notice of intent to sue on July 31, 2024, to Federal Defendants. A copy of the notice is appended as Exhibit A.

12.     Venue is properly vested in this Court under 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3), as a number of the Plaintiffs reside in this district, Plaintiffs have members and offices in California, and many of the consequences of the Federal Defendants' violations of the law giving rise to the claims occurred or will occur in this district. This case is properly assigned to the San Francisco Division or the Oakland Division under Civil L.R. 3-2(c) because many of the Plaintiffs and their members are located in counties within those districts. The prior litigation challenging the 2019 Regulations was properly brought in this district.

## PARTIES

13.     The Plaintiffs in this action are:

A.  **Center for Biological Diversity**, a non-profit environmental organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center is incorporated in California and headquartered in Tucson, Arizona, with field offices throughout the United States and Mexico, including in Oakland, California. The Center has 79,143 members. The Center and its members are concerned with the conservation of imperiled species, including ones that will be affected by the regulations at issue in this suit, and with the effective implementation of the ESA. The Center submitted extensive comments on the 2019 and 2024 proposed ESA regulatory revisions, as well as worked as part of a coalition that delivered nearly 1 million public comments to the Services opposing these regulations.

i.     The Center's individual members, including Oregon resident and staff member Noah Greenwald, Texas resident William Foster, Mississippi resident Andrew Whitehurst, Alaska resident and staff member Cooper Freeman, Arizona resident and staff member Brett Hartl, and Arizona resident Robin Silver, have visited, studied, worked, and recreated on lands that are home to threatened and endangered species, and they have specific intentions to continue to do so frequently and on an ongoing basis. The Center's members derive recreational, professional, commercial, scientific, educational, and aesthetic benefits from their interactions with threatened and endangered species and their critical habitat across the United States.

ii.     As the Endangered Species Director, Mr. Greenwald directs the Center's efforts to protect species under the ESA and will be harmed by several aspects of the revised regulations. For example, under the revised regulations, FWS determined that it was "not prudent" to designate critical habitat for species Mr. Greenwald has a personal interest in, such as the Mt. Rainier white-tailed ptarmigan (*Lagopus leucura rainierensis*), whitebark pine (*Pinus albicaulis*), and the Sierra Nevada population of the Sierra Nevada red fox (*Vulpes vulpes necator*). FWS also declined the Center's petition to list the Virgin River spinedance (*Lepidomeda mollispinis mollispinis*) based on the Services' unlawfully narrow definition of "foreseeable future." And Mr. Greenwald is concerned that this definition will result in future listing denials of imperiled but not-yet-listed species such as the Cascade population of the Sierra Nevada red fox, Olympic marmot (*Marmota Olympus*), and Wilson's phalarope (*Phalaropus tricolor*). Mr. Greenwald also enjoys seeing the narrow-headed gartersnake (*Thamnophis rufipunctatus*) in its habitat and is dismayed that it will be displaced by the application of the unlawful definition of "environmental baseline" in a Biological Opinion about Arizona fish stocking. And he is concerned about the refusal to consider piecemeal destruction of critical habitat in a Biological Opinion about northern spotted owls (*Strix occidentalis caurina*) affected by hazard tree cutting. Mr. Greenwald frequently recreates in endangered species habitats, including the montane habitats of the Sierra Nevada red fox, Olympic marmot, and whitebark pine, the aquatic habitats of the Wilson's phalarope and the narrow-headed gartersnake, and the old-growth habitats of the northern spotted owl, and has definite plans to continue. *See* Ex. B (Greenwald Decl.).

iii.     Mr. Foster is a resident of Port Aransas, Texas, who volunteers for the local Turtle Patrol and has an affinity for ESA-listed sea turtle species, such as the Kemp's ridley sea turtle (*Lepidochelys kempii*). He regularly recreates in the Gulf of Mexico and enjoys seeing sea turtles and sharing those experiences with his daughter. He participates in authorized capture and release of injured sea turtles and cares deeply about healthy sea turtle populations. The challenged regulations harm Mr. Foster's interest in sea turtles by allowing unchecked reliance

1    on mitigation promises in a Biological Opinion for oil and gas activities in the Gulf of Mexico.

2    *See* Ex. C (Foster Decl.).

3              iv.    Mr. Whitehurst has worked for many years to protect the Gulf of Mexico

4    and its waters and has advocated against the One Lake Project, which would involve dredging

5    critical habitat for Gulf sturgeon (*Acipenser oxyrhynchus desotoi*). As someone who regularly

6    recreates along the Pearl River, Mr. Whitehurst also has a personal interest in seeing Gulf

7    sturgeon in the wild. The refusal to consider piecemeal destruction of critical habitat, and instead

8    requiring diminishment of critical habitat "as a whole," in a Biological Assessment about Gulf

9    sturgeon affected by the One Lake project harms Mr. Whitehurst's interests. *See* Ex. D

10   (Whitehurst Decl.).

11             v.    Mr. Freeman lives in Alaska and is the Center's Alaska Director. Mr.

12   Freeman has a deep interest in the Pacific walrus (*Odobenus rosmarus divergens*) and hopes to

13   see one in its natural habitat one day. He is concerned about the rapidly melting sea ice—which

14   walruses depend on as a place to rest, breed, and avoid predators—among other forms of

15   degradation to walrus habitat. Mr. Freeman believes that an ESA listing of the walrus is crucial,

16   given this loss of habitat, but fears that the Services' challenged definition of "foreseeable

17   future" will unlawfully prevent such a listing. *See* Ex. E (Freeman Decl.).

18             vi.    Mr. Hartl's interest in the lesser prairie-chicken (*Tympanuchus*

19   *pallidicinctus*) is harmed by the Services' regulation eliminating an agency's duty to reinitiate

20   consultation on a land management plan following the listing of a new species or designation of

21   new critical habitat. Such consultations are essential to ensuring that land management plans do

22   not jeopardize the survival or recovery of newly listed species or result in the destruction or

23   adverse modification of their critical habitat. Specifically, agencies have failed to reinitiate

24   consultation on numerous plans within the range of the lesser prairie-chicken following its

25   listing, including the Bureau of Land Management's 1988 Carlsbad Resource Management Plan

26   ("RMP"), the 1997 Carlsbad RMPA, and the 1997 Roswell RMP. Mr. Hartl has visited the areas

27   covered by these management plans to view the lesser prairie-chicken and has plans to do so

28   again next spring. *See* Ex. F (Hartl Decl.).

vii.    Dr. Silver is a co-founder and board member of the Center who specializes in photographing imperiled wildlife and the habitats required for their survival and recovery. He uses his photography to call attention to the extinction crisis, particularly to the impacts of domestic livestock grazing on riparian habitats. Livestock grazing impacts the critical habitat of many species Dr. Silver worked to get listed under the ESA, including the New Mexico jumping mouse (*Zapus hudsonius luteus*), loach minnow (*Tiaroga cobitis*), spikedace (*Meda fulgida*), narrow-headed gartersnake (*Thamnophis rufipunctatus*), northern Mexican gartersnake (*Thamnophis eques megalops*), Chiricahua leopard frog (*Rana chiricahuensis*), Mexican spotted owl (*Strix occidentalis lucida*), southwestern willow flycatcher (*Empidonax traillii extimus*), and yellow-billed cuckoo (*Coccyzus americanus*). The unlawful dismissal of the Services' own duty to reinitiate Section 7 consultation undermines the ESA and harms Dr. Silver's interest in these species, as it allows action agencies to avoid ESA mandates, as the Forest Service did following a settlement about grazing allotments and their impacts on many of these ESA-listed species. Dr. Silver has definitive plans to continue to visit the habitats of the species he works closely on. *See* Ex. G (Silver Decl.).

B. **Sierra Club**, one of the oldest environmental organizations in the United States. Sierra Club is incorporated in the State of California as a Nonprofit Public Benefit Corporation with headquarters in Oakland, California. The organization has over 647,600 members nationwide, and local chapters across the country. Sierra Club is dedicated to protecting and preserving the natural and human environment, and its purpose is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments. Its mission includes engaging its members and the public to protect public lands, wildlife habitat, and wildlife, and it has been a longtime, active public advocate for imperiled wildlife. When the Services proposed the challenged revisions to the ESA's regulations in 2019 and 2024, the Sierra Club submitted comments not only on behalf of itself, but also as part of a coalition that delivered nearly 1 million public comments to the Services opposing these regulatory changes.

1           i.     The Sierra Club has individual members, including Washington resident

2    and volunteer chair Bill Arthur, Washington resident and Conservation Campaign Director Dan

3    Ritzman, and California resident Scott Webb, who regularly visit, study, work, photograph, or

4    recreate on lands that are protected habitat for threatened and endangered species. In addition,

5    Mississippi resident and Center for Biological Diversity member Andrew Whitehurst is also a

6    member of Sierra Club, and his interest supports the standing of both organizations. Each of the

7    members has specific intentions to continue to interact with threatened, endangered, or imperiled

8    species and their habitat frequently and on an ongoing basis. Sierra Club members and staff

9    derive recreational, professional, scientific, educational, and aesthetic benefits from their

10   interactions with threatened and endangered species and their critical habitat.

11           ii.     As the chair of the Sierra Club's Columbia/Snake River Salmon

12   campaign and a fisher, Mr. Arthur has worked for decades to protect listed salmon (Chinook:

13   *Oncorhynchus tshawytscha*, and Sockeye: *Oncorhynchus nerka*) and steelhead (*Oncorhynchus*

14   *mykiss*)—particularly those harmed by the lower Snake River dams. His work was affected by

15   the truncated analysis in a 2020 Biological Opinion addressing harm to listed salmon from the

16   dams due to the application of the challenged definition of "environmental baseline." He also

17   enjoys observing these species while fishing, has definite plans to continue his fishing trips, and

18   would derive less enjoyment if these species decline or disappear under weakened ESA

19   protections. *See* Ex. H (Arthur Decl.).

20           iii.     Mr. Ritzman is the Conservation Campaign Director at the Sierra Club

21   and works to protect polar bears (*Ursus maritimus*) in the Arctic National Wildlife Refuge. He

22   also works as a professional polar bear expedition guide and has definite plans to continue to

23   enjoy seeing polar bears in the wild. He is concerned that the challenged regulations will

24   undermine Section 7 consultation with the Services regarding impacts to polar bears from the oil

25   and gas program for the Coastal Plain of the Refuge, which the Department of the Interior is in

26   the process of revising in advance of an upcoming 2024 lease sale. As just one example,

27   protections for polar bears will be hindered by the challenged interpretation of "adverse

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:24-cv-04651-JST

1  modification," which would allow for the piecemeal destruction of critical habitat. *See* Ex. I

2  (Ritzman Decl.).

3          iv.    Mr. Webb is the Director of Advocacy and Engagement at the Resource

4  Renewal Institute and has worked for years in ocean education and conservation. As an active

5  surfer, Mr. Webb looks forward to continued encounters with humpback whales (*Megaptera*

6  *novaeangliae*) and is concerned that weakened ESA protections threaten his enjoyment of this

7  species. *See* Ex. J (Webb Decl.).

8          C.    **WildEarth Guardians**, a non-profit environmental organization dedicated to

9  protecting and restoring the wildlife, wild places, wild rivers, and health of the American West.

10  Guardians is incorporated in New Mexico and headquartered in Santa Fe, New Mexico, with

11  additional offices in Denver, CO; Missoula, MT; Portland, OR; and Tucson, AZ. Guardians has

12  approximately 231,000 members and supporters nationwide. Guardians and its members are

13  concerned about protecting threatened and endangered species from extinction and extensively

14  rely upon the ESA to ensure imperiled species receive the protections they need to survive and

15  recover. Guardians submitted comments on the proposed ESA regulatory revisions in 2019 and

16  2024 and was part of the coalition that delivered nearly 1 million comments to the Service

17  opposing these regulations.

18          i.    Guardians has individual members, including Colorado resident and

19  Conservation Director Lindsay Larris and New Mexico resident and Wildlife Program Director

20  Chris Smith, who have visited, studied, worked, and recreated on lands that are home to

21  threatened and endangered species, and they have specific intentions to continue to do so

22  frequently and on an ongoing basis.

23          ii.    Ms. Larris is the Conservation Director at Guardians and has worked to

24  protect apex predators including gray wolves (*Canis lupus*), grizzly bears (*Ursus arctos*

25  *horribilis*), and Canada Lynx (*Lynx canadensis*). Ms. Larris is actively involved in ongoing

26  lawsuits regarding Section 7 consultation challenges and the new regulations harm her work to

27  protect imperiled species. Ms. Larris also enjoys hearing Mexican wolves (*Canis lupus baileyi*)

28

1  howl in the Gila National Forest, has definite plans to return to look for Mexican wolves, and

2  hopes to hear and see gray wolves at home in Colorado. *See* Ex. K (Larris Decl.).

3          iii.   Mr. Smith is the Wildlife Program Director at Guardians and has worked

4  to protect Mexican wolves (*Canis lupus baileyi*) and has advocated for the reintroduction of gray

5  wolves (*Canis lupus*) in Colorado. Mr. Smith has gone to the Greater Gila Bioregion eight times

6  with hopes to see or hear Mexican wolves and the presence of these wolves is essential to his

7  enjoyment of the Gila. The challenged regulations threaten his interest in these wolves and

8  hinders his work to protect listed species. *See* Ex. L (Smith Decl.).

9       14.   The Plaintiff groups and their members use threatened and endangered species

10  and their critical habitat located in California and other states nationwide for recreational,

11  scientific, professional, commercial, and aesthetic purposes. Plaintiffs have members who reside

12  near, visit, or otherwise use and enjoy threatened and endangered species and their critical

13  habitat in a variety of ways, including wildlife viewing, education, and aesthetic enjoyment.

14  Plaintiffs have members who reside, work, travel, and recreate in places where imperiled plants

15  and animals protected by the ESA are found, along with designated critical habitat, federal lands,

16  and non-federal facilities and activities requiring federal permits and licenses subject to the

17  ESA's Section 7 consultation requirements.

18       15.   Plaintiffs have a concrete interest in the Services' lawful implementation of the

19  ESA and its role in preventing harm to and promoting recovery of imperiled wildlife, and the

20  regulatory revisions challenged in this lawsuit fundamentally undermine and contradict the

21  requirements of the ESA. The ESA expressly declares that endangered and threatened "species

22  of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and

23  scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). The harms that would

24  result from the loss of biological diversity are enormous, and the nation cannot fully apprehend

25  their scope because of the "*unknown* uses that endangered species might have and … the

26  *unforeseeable* place such creatures may have in the chain of life on this planet." *Tenn. Valley*

27  *Auth. v. Hill*, 437 U.S. 153, 178–79 (1978) (the value of this genetic heritage is "quite literally,

28  incalculable"). The aesthetic, conservation, organizational, recreational, professional, and

scientific interests of Plaintiff groups and their members in threatened and endangered species and their critical habitat have been, are being, and, unless the relief prayed for is granted, will continue to be directly and adversely affected by the failure of Federal Defendants to comply with the law. Plaintiffs' concrete interests are also injured by the Services' violation of procedural duties under NEPA, the ESA, and the APA.

16.    The past, present, and future enjoyment of benefits that Plaintiff groups and their members derive from endangered species and their critical habitat has been, is being, and will continue to be imminently and irreparably harmed by the Services' disregard of their statutory duties and by the unlawful injuries and risk of injuries imposed on imperiled species and their critical habitat by the Services' actions.

17.    The Defendants in this action are:

A.    **U.S. Department of the Interior**, a federal agency charged with administering the ESA with respect to threatened and endangered terrestrial and freshwater plant and animal species;

B.    **U.S. Fish and Wildlife Service**, an agency within the U.S. Department of the Interior, charged with administering the ESA with respect to threatened and endangered terrestrial and freshwater plant and animal species;

C.    **U.S. Department of Commerce**, a federal agency responsible for administering the ESA with respect to threatened and endangered marine species and anadromous fish species; and

D.    **National Marine Fisheries Service,** an agency within the U.S. Department of Commerce, responsible for administering the ESA with respect to threatened and endangered marine species and anadromous fish species.

## BACKGROUND

I.    **THE ENDANGERED SPECIES ACT MAKES CONSERVATION OF IMPERILED SPECIES AND THEIR HABITAT A NATIONAL PRIORITY**

18.    Congress passed the ESA in 1973 in response to the extinction crisis to "provide a means whereby the ecosystems upon which endangered species and threatened species depend

may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species ….” 16 U.S.C. § 1531(b). Congress defined “conservation” under the ESA as “the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary,” that is, when the species have recovered and no longer need the protection of the ESA. *Id.* § 1532(3).

19.    In broad strokes, the ESA seeks to protect and recover imperiled species and populations by listing them as threatened or endangered based on enumerated statutory factors, 16 U.S.C. § 1533(a)(1)(A)–(E), using the “best scientific and commercial data available,” *id.* § 1533(b)(1).

20.    The term “endangered species” is defined as “any species which is in danger of extinction throughout all or a significant portion of its range.” 16 U.S.C. § 1532(6). A threatened species is “any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.” *Id.* § 1532(20).

21.    At the same time as a species is listed as threatened or endangered, the Services must designate and protect critical habitat for the species, subject to certain limited exceptions. 16 U.S.C. § 1533(a)(3), (b)(2). The listing and designation of critical habitat provisions are contained in Section 4 of the ESA—the section Congress labeled the “cornerstone of effective implementation” of the Act. S. Rep. No. 97-418, at 10 (1982).

22.    Congress expressly recognized the independent value of protecting critical habitat when it enacted the ESA:

> Man can threaten the existence of species of plants and animals in any of a number of ways. … The most significant of those has proven also to be the most difficult to control:  the destruction of critical habitat. …
>
> There are certain areas which are critical which can and should be set aside. It is the intent of this legislation to see that our ability to do so, at least within this country, is maintained.

H.R. Rep. No. 93-412, at 144 (1973).

23.    In 1976, Congress reiterated the distinct importance of designating and

prohibiting the adverse modification of critical habitat:

> It is the Committee's view that classifying a species as endangered or threatened is only the first step in insuring its survival. Of equal or more importance is the determination of the habitat necessary for the species' continued existence. Once a habitat is so designated, the Act requires that proposed federal actions not adversely affect the habitat. If the protection of endangered and threatened species depends in large measure on the preservation of the species' habitat, then the ultimate effectiveness of the Endangered Species Act will depend on the designation of critical habitats.

H.R. Rep. No. 94-887, at 3 (1976).

24.     After a species is listed under Section 4 and critical habitat is designated, Section 7 of the ESA provides fundamental protections to the species and their habitat. Specifically, Congress charged each and every federal agency with the affirmative duty to further conservation of imperiled species; the ESA explicitly elevates species protection over the primary missions of federal agencies. 16 U.S.C. § 1536(a).

25.     In addition to an overarching affirmative duty, the ESA requires every federal agency to obtain review and clearance for activities that may affect listed species or their habitat. If an activity—including "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," such as "the promulgation of regulations," 50 C.F.R. § 402.02—may affect a listed species or its designated critical habitat, that activity cannot go forward until consultation (a biological review of the proposal by FWS or NMFS) ensures that it will not "jeopardize" the species or result in the "destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

26.     The listing of a species as endangered under the ESA also triggers prohibitions under Section 9 of the Act, 16 U.S.C. § 1538, including the prohibition on the "take" of species, which is defined to include "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19); *see also* 50 C.F.R. § 17.3 (Harm "means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.").

27.     The prohibitions in ESA Section 9 also extend beyond intentional take of endangered species to "incidental take," or take that is not a direct goal of the proposed action. During Section 7 consultation, if FWS or NMFS concludes that take will not jeopardize the species, then the agency may issue an Incidental Take Statement that specifies the impacts of the incidental taking on the species, minimization measures, reporting requirements, and any other terms and conditions with which the action agency must comply. 16 U.S.C. § 1536(b)(4)(C).

28.     Today, the ESA protects more than 1,600 plant and animal species and millions of acres have been designated as critical habitat to allow for species' survival and recovery. Since its enactment, the ESA has prevented the extinction of 99 percent of the species under its protections.

## II.     THE 2019 REGULATIONS AND SUBSEQUENT LITIGATION

29.     FWS and NMFS administer the ESA duties of the Departments of the Interior and Commerce, which are charged by Congress with implementing the ESA, and most of their ESA regulations have been in effect since 1986 or earlier. The Services first adopted joint regulations implementing ESA Sections 4 and 7 approximately 40 years ago. *See* 45 Fed. Reg. 13010 (Feb. 27, 1980) (Section 4); 49 Fed. Reg. 38900 (Oct. 1, 1984) (Section 4); 51 Fed. Reg. 19926 (June 3, 1986) (Section 7). Prior to 2019, the ESA Regulations had not been substantially amended since that time, with only minor amendments adopted in 2015 and 2016. *See* 80 Fed. Reg. 26832 (May 11, 2015) (Section 7); 81 Fed. Reg. 7214 (Feb. 11, 2016) (Section 7); 81 Fed. Reg. 7439 (Feb. 11, 2016) (Section 4).

30.     On August 27, 2019, the Services promulgated final regulations that significantly undermined the implementation of ESA Sections 4 and 7. 84 Fed. Reg. 45020; 84 Fed. Reg. 44976. The Services did not suggest the amended regulations were necessary to provide greater species or habitat protection; instead, the regulatory changes relied on Executive Order 13777, which directed federal agencies to eliminate allegedly "unnecessary regulatory burdens." Enforcing the Regulatory Reform Agenda, 82 Fed. Reg. 12285 (Mar. 1, 2017). Immediately after their adoption, Plaintiffs and others challenged the 2019 Regulations. *Ctr. for Biological*

*Diversity v. Bernhardt*, 3:19-cv-05206 (N.D. Cal. Aug. 21, 2019); *California v. Bernhardt*, 4:19-cv-06013 (N.D. Cal. Sept. 25, 2019); *Animal Legal Defense Fund v. Bernhardt*, 3:19-cv-06812 (N.D. Cal. Oct. 21, 2019).

31.    Subsequently, on his first day in office, President Biden signed the Executive Order on "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis," which directed federal agencies to review many rules, including the 2019 Regulations implementing the ESA. 86 Fed. Reg. 7037 (Jan. 25, 2021).

32.    On February 9, 2021, Plaintiffs and Federal Defendants jointly stipulated to a stay of the proceedings, explaining that a stay would allow the Services to review the rules pursuant to the Executive Order. *Ctr. for Biological Diversity*, No. 4:19-cv-05206, ECF No. 121. The Court granted the stay on February 16, 2021. *Ctr. for Biological Diversity*, ECF No. 123. The Court lifted the stay on October 7, 2021. *Ctr. for Biological Diversity*, ECF No. 138.

33.    On December 10, 2021, during summary judgment briefing, Federal Defendants moved for remand—but not vacatur—of the 2019 Regulations, citing "substantial concerns" with the rules and an intent to rescind or revise them. *Ctr. for Biological Diversity*, ECF No. 146, at 20–22. In opposition, Plaintiffs countered that the appropriate remedy was remand *with* vacatur. *Ctr. for Biological Diversity*, ECF No. 149. On July 5, 2022, the Court remanded and vacated the rules, without adjudicating the merits. *Ctr. for Biological Diversity*, ECF No. 168.

34.    Four groups of Defendant-Intervenors appealed to the Ninth Circuit seeking to reverse the vacatur of the 2019 Regulations. *E.g.*, *Alabama v. Ctr. for Biological Diversity*, 22-16091 (9th Cir. July 25, 2022). While those cases were pending, the Supreme Court, in unrelated litigation, granted an application to stay a pre-merits vacatur order issued by a district court. *Louisiana v. American Rivers*, 142 S. Ct. 1347 (2022) (mem.). The Ninth Circuit then stayed the Court's vacatur order, and the Court issued a new order to remand without vacatur. *Ctr. for Biological Diversity*, ECF No. 196. As a result, the 2019 Regulations remain in force, except as modified by the 2024 Regulations.

**III.    THE 2024 REGULATIONS**

35.    On June 22, 2023, the Services proposed new regulatory packages to revise or rescind certain provisions of the 2019 Regulations, but the Services' proposed revisions left many provisions unchanged. 88 Fed. Reg. 40764 (proposed revisions to ESA Section 4 implementing regulations); 88 Fed. Reg. 40753 (same for ESA Section 7).

36.    The Services did not release any NEPA analysis of the proposals but invited public comment on their NEPA obligations and the availability of a categorical exclusion. 88 Fed. Reg. at 40762; 88 Fed. Reg. at 40773. In comments, Plaintiffs urged the Services to comply with NEPA and prepare an environmental impact statement ("EIS").

37.    The Services accepted comments through August 21, 2023. As with the prior proposals, the proposed revisions elicited widespread concern and controversy. The Services received more than 150,000 comments urging a complete return to the pre-2019 version of the ESA regulations.

38.    On April 5, 2024, the Services promulgated the final 2024 Regulations, which generally mirrored the proposals, including by retaining elements of the 2019 Regulations that significantly undermine the implementation of ESA Sections 4 and 7. The Services violated NEPA by continuing to claim a categorical exemption for the Section 4 regulations and preparing an inadequate environmental assessment—not an EIS—for the Section 7 regulations.

**IV.    UNDER THE AMENDED SECTION 4 AND SECTION 7 REGULATIONS, FEWER SPECIES WILL BE PROTECTED AND LISTED SPECIES WILL NOT RECEIVE ALL BENEFITS OF THE ESA**

39.    Congress enacted the ESA to halt species' decline towards extinction and shepherd them to recovery. To that end, Congress crafted an interlinked framework for identifying species that are threatened or endangered, then providing a suite of protections for those species and the habitats upon which they depend.

40.    The predicate to achieving the rescue and recovery of a species is listing that species and protecting its essential feeding, breeding, sheltering, and migratory grounds through critical habitat designation. The challenged Section 4 regulations change those basic processes in

ways that likely mean fewer species will be listed and fewer listed species will receive critical habitat protection. Compared to the pre-2019 regulations, a species is now less likely to be listed as threatened until it has reached a dire condition. Threatened and endangered species are more likely to lose ESA protections through delisting and less likely to have designated critical habitat.

41.     Once species are listed, their survival and recovery hinges partly on faithful implementation of Section 7 consultation. The challenged 2019 and 2024 regulatory changes hollow out the conservation value of Section 7. The rules obscure the true impacts of federal actions on species and their critical habitat by supplanting the Act's best available science standard, inventing a different standard for analyzing the likely effects of an action, and using unauthorized means to avoid finding jeopardy or adverse modification or requiring meaningful mitigation of the effects of authorized incidental take. Fewer federal actions will be found to jeopardize listed species or adversely modify critical habitat, and impacts to listed species will be ignored in the face of unsubstantiated promises of mitigation or offsets implemented far from where the impacts occur with no defined means of tracking whether those mitigation efforts are guaranteed, carried out, or successful.

42.     Each of these changes has significant consequences. Cumulatively, these changes erect an array of new barriers to species receiving their statutorily guaranteed protections at multiple fundamental steps of the ESA process. The changes mark a significant departure from the way the Services interpreted the ESA for decades and, indeed, from the ESA itself.

### A.     The Final Section 4 Listing and Critical Habitat Regulatory Changes

43.     Protections under the ESA arise only for species that have been listed as threatened or endangered and (when applicable) for which critical habitat has been designated. The 2019 and 2024 Regulations made significant changes to the pre-2019 regulations that violate the ESA and undermine its core purpose to prevent species from sliding towards extinction and bring them to full recovery. If the Services do not list species and designate critical habitat as the ESA requires, then threatened and endangered species will not benefit from the Act's protections.

1.     *Making It Harder for Threatened Species To Receive ESA Protection By Imposing Artificial Bounds on Science that May Be Used To Determine Endangerment in the "Foreseeable Future"*

44.     The Services finalized a new definition of the term "foreseeable future," which increased the level of certainty required to list species as threatened, contravening the ESA's language and intent. Specifically, the 2024 Regulations improperly limit the "foreseeable future" to "as far into the future as the Services can make reasonably reliable predictions about the threats to the species and the species' responses to those threats." 50 C.F.R. § 424.11(d). This construction would require the Services to find that they can "make reasonably reliable predictions" to support two separate determinations—one about the threats and another about species' responses.

45.     This new definition violates the statutory command to make listing decisions "solely on the basis of the best scientific and commercial data available." Courts have consistently held that the ESA's best available science standard requires the Services to assess scientific information available at the time of their decision and base their decisions on the "best" of what is available—it does not establish any particular degree of certainty that scientific information must offer in order to be considered. If the best available science indicates a likelihood of endangerment, that cannot be dismissed through an additional reliability test.

46.     The Services must list a species as threatened if it "is likely to become an endangered species within the foreseeable future ...." 16 U.S.C. § 1532(20). The best available science may support such a listing when, for example, the threats are nearly certain to continue, even if a species' response is less predictable. For instance, the best available science could show that a species has always relied on a specific type of habitat for certain life-stages, such as having and rearing young, but could not yet show how exactly the loss of that habitat would impact that species in the future. It may be hard to "make reasonably reliable predictions about" how many individuals will die as a result of that loss. The new definition could preempt a science-based determination whether a species is "likely" to become endangered with an artificial test of whether the Services "can make reasonably reliable predictions about" how the species will slide

1  towards extinction. This sort of "study it to death" approach is not consistent with the ESA's

2  command to take proactive measures to conserve threatened and endangered species and guide

3  them toward recovery.

4                *2.  Impermissible Grounds for Delisting*

5      47.  The Services changed how they can delist species from the ESA, creating

6  unlawful pathways to revoke a species' protected status.

7      48.  Prior to the 2019 revisions, for nearly four decades, the ESA's listing regulations

8  restricted the delisting of a species to situations where the best scientific data available

9  substantiate that the species is no longer threatened or endangered or that it is actually extinct

10  (rather than exceedingly rare). 45 Fed. Reg. at 13023 (promulgating the original version of 50

11  C.F.R. § 424.11(d)). This required the Services to have "conclusive evidence appropriate for the

12  species in question," 49 Fed. Reg. at 38903, and to either know the locations and fate of all

13  individuals of the species or to allow for "a sufficient period of time" before delisting to

14  "indicate clearly" the species is actually extinct. *Id.* at 38909. The Services previously insisted on

15  this high bar to ensure that any decision to delist due to extinction is based on "conclusive

16  evidence appropriate for the species in question." *Id.* at 38903; *see also* Endangered Species

17  Status for Franklin's Bumble Bee, 86 Fed. Reg. 47221, 47223 (Aug. 24, 2021) ("Recent

18  approaches [in scientific literature] to evaluating extinction likelihood place increased emphasis

19  on the extensiveness and adequacy of survey effort, and caution against declaring a species as

20  extinct in the face of uncertainty." (citations omitted)). The revised regulations removed this

21  requirement.

22      49.  The revisions permit the Services, in making delisting decisions, to delist a

23  species prior to substantiating that it has, in fact, recovered, and allow the Services to disregard

24  formal recovery and/or delisting criteria established in species recovery plans for the very

25  purpose of gauging species' progress towards recovery. 84 Fed. Reg. at 45052; 89 Fed. Reg. at

26  24335.

27      50.  The Services also added two new grounds for delisting: (1) when new information

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:24-cv-04651-JST

that has become available since the original listing decision shows the listed entity does not meet the definition of an endangered species or a threatened species and (2) new information that has become available since the original listing decision shows the listed entity does not meet the definition of a species. Both criteria are vague and conflict with the ESA's intent to provide protection for listed species until they no longer need it—that is, until the species has recovered.

### 3. Avoiding the Designation of Critical Habitat

51.    The ESA recognizes that protecting the places species need to feed, breed, shelter, and travel is fundamental to protecting the species themselves. For that reason, the ESA requires the Services to designate critical habitat for listed species except under narrow circumstances if such designation is "not prudent" because it could result in actual harm to the species. This is because "critical habitat is … designed to further the conservation of a listed species," and "serves as a tool for meeting one of the Act's stated purposes: Providing a means for conserving the ecosystems upon which endangered and threatened species depend." 89 Fed. Reg. at 24301. Critical habitat also provides "other conservation benefits" such as "informing management partners of important habitats, stimulating scientific surveys or research, promoting voluntary conservation actions, and raising public awareness of habitats that are essential to the species." *Id.* at 24317.

52.    Prior to the 2019 and 2024 Regulations, the Service previously set forth only two circumstances in which the designation of critical habitat would not be prudent: (1) if identifying critical habitat could harm the species, or (2) where designating critical habitat would not benefit the species. 50 C.F.R. § 424.12(a)(1) (2018).

53.    The 2019 and 2024 Regulations impermissibly expand these circumstances to include situations where: the threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species, or areas within the jurisdiction of the United States provide no more than a "negligible" conservation value for a species occurring primarily outside the jurisdiction of the United States. 89 Fed. Reg. at 24335. The final regulation also states that the Services' power to forego designating critical habitat is "not limited to" the reasons listed in the regulatory text. *Id.*

54.     These changes conflict with the ESA's clear statutory requirements. The ESA defines critical habitat as areas occupied by the species at the time of listing that contain physical or biological features essential to the conservation of the species and which may require special management considerations or protection, as well as unoccupied areas that are essential to the conservation of the species. 16 U.S.C. § 1532(5)(A)(i)–(ii).

55.     The final regulations inappropriately conflate the question of "threats" to a species (appropriate for listing determinations) with the separate question of what is needed for a species' "conservation," which the Act expressly defines as recovery. *Id.* § 1532(3). In doing so, the Services effectively ignore the recognized conservation benefits of critical habitat beyond merely alleviating threats. *See* 89 Fed. Reg. at 24317.

56.     Similarly, neither the statutory definition nor the other provisions of the ESA allow the Services to decline to designate critical habitat for a species generally found outside the United States based on the notion that it would have a small impact on the species' conservation compared to its overall range. These changes exceed the Services' statutory authority.

57.     Finally, the regulations' statement that the Services may decline to designate critical habitat on grounds "not limited to" those specified in the regulations flouts Congress' intent to constrain that discretion and conflicts with numerous court decisions holding Section 4(a)(3)(A) is to be strictly interpreted, limiting the Services' discretion to evade the statute's presumption in favor of designating habitat.

## B.     The Final Section 7 Consultation Regulatory Changes

58.     After the Services list species and designate critical habitat, it is essential that listed species obtain the protections that the ESA requires. Section 7 of the Act requires Federal agencies, in consultation with FWS and NMFS, to "insure" that any action they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification" of any species' critical habitat. 16 U.S.C. § 1536(a)(2). The statute requires FWS and NMFS to: (1) use the best available science; (2) conduct an independent scientific review as a check on agencies that might seek to take

1  actions at the expense of protecting threatened and endangered species; and (3) if jeopardy or

2  destruction/adverse modification of critical habitat is found, develop alternatives and measures to

3  minimize the impacts of the actions (often referred to as "mitigation measures") that agencies

4  must take. *See id.* § 1536(a)(2), (b)(3)–(4).

5       59.    The ESA requires agencies to base determinations of whether an action must

6  undergo consultation or is likely to cause jeopardy or degrade critical habitat on the best science

7  currently available, and the ESA requires that uncertainty be resolved in favor of protection—

8  that is, insuring that a species' ability to survive and ultimately recover is not diminished.

9       60.    ESA regulations distinguish between two types of consultation: formal and

10  informal. During both types of consultation, the action agencies and the Services have a statutory

11  duty to use the best available scientific information. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §

12  402.14(g)(8).

13       61.    Informal consultations are those consultations in which the action agency

14  determines that an action "may affect," but is "not likely to adversely affect" the listed species or

15  its critical habitat. The informal consultation process does not conclude until the pertinent

16  Service issues its written concurrence, and only then may the consultation be resolved without

17  preparation of a biological opinion. If the action "may affect" a listed species and the conditions

18  for informal consultation are not met, the agencies must conduct a formal consultation. 50 C.F.R.

19  §§ 402.02, 402.14(a).

20       62.    Formal consultations culminate with the Services' issuance of a biological

21  opinion, in which the Services determine whether an action is likely either to jeopardize the

22  survival and recovery of a listed species *or* to destroy or adversely modify a species' designated

23  critical habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.02 (definition of "formal consultation"). In

24  order to make this determination, the Service must review all relevant information and provide a

25  detailed evaluation of the action's effects, including the cumulative effects of other activities in

26  the area, on the listed species and critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §

27  402.14(g)–(h).

28       63.    As part of the formal consultation process, the Services must also formulate

1    discretionary conservation recommendations to reduce or minimize the action's impacts on listed

2    species or critical habitat. 50 C.F.R. § 402.14(g)(6).

3        64.    If the Services determine that the action is likely to jeopardize the species or

4    adversely modify its critical habitat, the biological opinion must specify reasonable and prudent

5    alternatives that will avoid such jeopardy or adverse modification. 16 U.S.C. § 1536(b); 50

6    C.F.R. § 402.14(h)(3). If the jeopardy or adverse modification cannot be avoided, the agency

7    action may not proceed.

8        65.    The provisions described below resulted from the 2019 and 2024 regulatory

9    packages and represent significant, unlawful changes from the pre-2019 regulations.

10           1.    *Unchecked Reliance on Mitigation Promises To Reach "No Jeopardy" or
11                "No Adverse Modification" Determinations*

12        66.    Section 7(a)(2) of the ESA expressly requires the Services to "insure" that agency

13    actions are not likely to cause jeopardy or result in the destruction or adverse modification of

14    critical habitat. 16 U.S.C. § 1536(a)(2). During formal consultation, the Services have an

15    obligation under their own regulations to "use the best scientific and commercial data available

16    and will give appropriate consideration to beneficial actions as proposed or taken by the Federal

17    agency" in formulating their biological opinion of the impacts of an agency action, any

18    reasonable and prudent alternatives, and reasonable and prudent measures to minimize the

19    impacts of incidental take. 50 C.F.R. §§ 402.14(g)(8), 402.02.

20        67.    Under the newly amended version of 50 C.F.R. § 402.14(g)(8), when assessing

21    whether an action jeopardizes a species or destroys or adversely modifies critical habitat, the

22    Services must rely on the action agency's mere assertion that it will follow through on

23    minimizing any incidental take without requiring any additional demonstration of binding plans.

24    84 Fed. Reg. at 45017. This change conflicts with the Service's obligations under Section 7(a)(2)

25    to "insure" that agency actions are not likely to jeopardize species or adversely modify critical

26    habitats. The change also conflicts with judicial precedents uniformly holding, consistent with

27    Congress's intent, that measures to minimize incidental take cannot be relied on to avoid a

28    jeopardy or adverse modification determination unless those measures are sufficiently concrete,

specific, and certain to occur.

2. *Narrowed Definition of the "Effects of the Action" the Services Must Consider*

68. The 2019 and 2024 Regulations significantly and unlawfully narrow the effects the Services must analyze when determining whether a federal agency action is likely to cause jeopardy to a species or adverse modification of critical habitat. The Services' definition of effects caused by the proposed action includes a newly minted "but for" causation test—requiring that an effect will not be considered unless it would not occur but for the proposed activity. 89 Fed. Reg. at 24297. This new definition allows the Services to speculate that certain impacts—for example, the growth-inducing effects of a new highway—would occur regardless of the proposed activity and on that basis avoid consideration of those impacts in the Section 7(a)(2) consultation process.

69. In addition to the "but for" causation test, the new definition requires that an effect be "reasonably certain to occur" in order to be considered. *Id.* Including a requirement that the effect be "reasonably certain to occur" creates an artificially high new standard for showing an effect would result from the proposed action (as opposed to, for example, impacts to the species from the proposed action as well as other stressors).

70. Creating a higher bar for scientific certainty that predicts harm to a species or its habitat will result from the proposed action violates the Section 7(a)(2) requirement to "*insure*" that *any action* authorized, funded, or carried out by such agency is not likely to jeopardize species or adversely modify critical habitat. Artificially limiting and attempting to draw bright lines around some elements of a proposed action to cabin—or exclude effects entirely from—the consultation process would result in far greater risk to species listed as endangered and threatened and violates the best available science requirement of the ESA.

3. *Failing To Analyze the Effects of Agency Action by Impermissibly Incorporating Certain Effects Into Environmental Baseline*

71. The Services finalized a new definition of the "environmental baseline" that encompasses any impacts that an agency lacks discretion to modify. 89 Fed. Reg. at 24297 ("The

1  impacts to listed species or designated critical habitat from Federal agency activities or existing

2  Federal agency facilities that are not within the agency's discretion to modify are part of the

3  environmental baseline."). This definition flatly contradicts Section 7(a)(2)'s requirement to

4  ensure that the effects of "any action"—not the effects of any discretionary action—are not likely

5  to jeopardize a species' continued existence or destroy or adversely modify its critical habitat.

6      72.   Segregating from a proposed action those elements that the agency lacks

7  discretion to modify is inconsistent with the definition of "action" as anything a federal agency

8  authorizes, funds, or carries out. 50 C.F.R. § 402.02. For example, where the impacts of

9  nondiscretionary elements of a federal action hasten or continue a species' decline to extinction,

10  shunting those impacts into the environmental baseline inappropriately results in a no-jeopardy

11  determination for the entire action.

12      73.   Consultation on a proposed federal action with both discretionary and

13  nondiscretionary elements must ensure that the entire action does not appreciably reduce the

14  likelihood of survival and recovery or destroy or adversely modify critical habitat. Once

15  consultation is underway, agency discretion to modify a federal action is relevant to the

16  availability and design of reasonable and prudent alternatives when an action will cause

17  jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.02. If no such alternatives exist—whether

18  because there is no effective way to avoid or adequately minimize the harms or because the

19  agency lacks discretion to implement any effective alternatives—then the Services must say so in

20  a biological opinion and the action generally cannot proceed. 16 U.S.C. § 1536(g)(3), (5)(A).

21          4.      *Narrowed Definition of "Destruction or Adverse Modification" of Critical
                    Habitat*

22

23      74.   The Services' revised definition of "destruction or adverse modification" of

24  critical habitat also impermissibly limits the Services' analysis to whether an action is likely to

25  "appreciably diminish[] the value of critical habitat *as a whole*," disregarding impacts that

26  appreciably diminish significant portions of critical habitat. 84 Fed. Reg. at 45016 (emphasis

27  added); 89 Fed. Reg. at 24290–91. Yet the purpose of establishing critical habitat is to delineate

28  areas that are essential for the species' survival and recovery. Adding "as a whole" conflicts with

the ESA's plain language and focus on recovery.

75.    The "as a whole" language means that the prohibition on "destruction or adverse modification" of critical habitat will not be triggered unless the critical habitat would be reduced below the minimum deemed necessary for survival or recovery of the species, which amounts to jeopardizing the species. This impermissibly prevents the prohibition on "destruction or adverse modification" from having independent effect from the prohibition on jeopardizing the species.

76.    The "as a whole" standard poses particular threats to highly migratory or wide-ranging species that, by definition, require large amounts of designated critical habitat. The "as a whole" language also disregards circumstances where the Service has designated critical habitat necessary for certain functions, such as dispersal habitat or nesting/roosting/foraging habitat for threatened northern spotted owls in the Pacific Northwest.

77.    The new definition also fails to acknowledge that species often require multiple populations dispersed across different locations in order to achieve stability and resilience. Even actions that a Service deems do not "diminish[] the value of critical habitat as a whole" could significantly impair a species' ability to survive or recover.

78.    In addition to inserting "as a whole," the Services repromulgated a defect in the definition: the unlawful conflation of "destruction" and "adverse modification" of critical habitat. The Services' failure to define these terms separately violates the plain language of the statute, which uses the disjunctive to prohibit "destruction *or* adverse modification"—separate concepts requiring separate definitions and analyses. 16 U.S.C. § 1536(a)(2) (emphasis added). Conflating these terms is especially problematic with the addition of "as a whole" because the revised definition wrongly allows the *destruction* of anything less than a species' "whole" critical habitat.

### 5.    *Reinitiation of Consultation Exemptions (50 C.F.R. § 402.16)*

79.    The Services' final regulations exempt programmatic land management plans from the requirement to reinitiate consultation upon listing of the new species or designation of new or additional critical habitat (subject to certain exceptions). 84 Fed. Reg. at 45017–18.

80.    Later consultations on site-specific actions cannot fill the void. Consultation on

programmatic actions provides a full picture of all relevant impacts in order to determine whether the combination of activities in the plan will avoid jeopardy and adverse modification of critical habitat. These determinations are appropriately made at the programmatic level, where the agency is best able to consider the aggregate impacts of all the proposed activities, together with other activities taking place in the same area. Deferring this analysis to project-specific consultations risks masking or missing these collective impacts.

        6.    *Reinterpreting "Reasonable and Prudent Measures" Meant To Minimize an Action's Incidental Take To Include Indirect or Geographically Distant Mitigation "Offsets"*

81.    The 2024 Rule significantly modified provisions in Sections 402.02 and 402.14(i) governing what kinds of measures can be included in an incidental take statement as reasonable and prudent measures or terms and conditions intended to minimize incidental take for projects that will take—but will not jeopardize—listed species.

82.    In the context of a "no jeopardy" biological opinion, the ESA requires the Services to specify the impact of the incidental take the biological opinion authorizes *and* reasonable and prudent measures necessary or appropriate to minimize the impact of the authorized incidental take. 16 U.S.C. § 1536(b)(4). Prior to the 2024 rule, the Services interpreted "reasonable and prudent measures" to include only measures within the action area that minimized effects on individuals and habitats affected by the action considered in the biological opinion.

83.    The 2024 Rule significantly altered existing regulations by adding language to the end of § 402.14(i)(2) that states RPMs "may include measures implemented inside *or outside* of the action area that avoid, reduce, *or offset* the impact of incidental take." 89 Fed. Reg. at 24298 (emphasis added).

84.    The concept of offsetting the impacts of incidental take through off-site mitigation in lieu of onsite avoidance and impact reduction measures is not consistent with the ESA's command to "minimize" the impact of the incidental take caused by a specific action.

85.    Moreover, regardless of whether the ESA could be read to allow the Services to

use measures outside the action area to minimize impacts of incidental take, the actual language of the 2024 Rule fails to accomplish this. The ESA emphasizes minimizing the impacts of the particular action at hand—impacts that affect particular individuals or habitat. The 2024 Rule's generalized, discretionary language states only that priority "should" be given to minimizing such impacts in the action area and the Service "may" choose other measures outside the action area that have nothing to do with the individuals or actual habitat experiencing harm from the action.

86.     The rule's lack of clarity and criteria allows the Services to rely on geographically distant offsets with diminished conservation benefit rather than addressing the project impacts before them. For example, if new transmission wires are placed in areas that will harm endangered birds, an offset that would expand nearby nesting habitat for the species does not provide a 1-for-1 benefit. Similarly, where a species is doing relatively better in some parts of its range and faring poorly in others, offsetting the impacts of take in the areas where the species is struggling with measures that benefit the distant and/or more robust populations would only exacerbate the imbalance and thereby slow the recovery of the entire listed species.

### 7.   *Renouncing the Obligation To Request the Reinitiation of Consultation When Statutory Criteria Are Met*

87.     In the revised regulations, the Services attempted to absolve themselves of their obligation to request that action agencies reinitiate consultation when the previous consultation no longer covers the effects of the action. 89 Fed. Reg. at 24279–80, 24298. The revised regulations permit the Services to remain silent even when they are aware that an action agency is required to reinitiate consultation and fails to do so.

88.     The Services did not explain how this change comports with their role in administering the ESA or furthers the Act's purposes. Nor did they acknowledge that their expertise and access to pertinent information give them unique insight into the need to reinitiate consultation that is integral to the function of the ESA. Instead, the Services argue that they are not authorized to *compel* action agencies to reinitiate consultation, which is irrelevant to their role in *requesting* reinitiation.

## V.     THE SERVICES FAILED TO COMPLY WITH NEPA

89.     The Services did not analyze the impacts of the revised regulations under NEPA. For the revisions to the ESA Section 4 regulations, the Services concluded that the regulations were categorically excluded from NEPA review, and that no extraordinary circumstances were present. 84 Fed. Reg. at 45051–52; 89 Fed. Reg. at 24334.

90.     For the revision to the ESA Section 7 regulations governing consultation, the Services also concluded that the regulations were categorically excluded from NEPA review and that no extraordinary circumstances were present. 84 Fed. Reg. at 45015; 89 Fed. Reg. at 24297. In 2024, acting out of what they described as an abundance of caution, the Services also prepared an environmental assessment and findings of no significant impact for the Section 7 regulations. But the assessment and findings erred in concluding that neither the 2019 nor the 2024 Regulations would have significant environmental effects.

### FIRST CLAIM FOR RELIEF

**Violation of the Endangered Species Act and the Administrative Procedure Act: Contrary To Law and Failure of Rational Decisionmaking With Respect To ESA Section 4 Regulatory Revisions**

91.     The allegations made in paragraphs 1–90 are realleged and incorporated by this reference.

92.     The Services cannot adopt regulations that contradict the text and purpose of the ESA. Under the APA, a "reviewing court shall … hold unlawful and set aside" federal agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or "without observance of procedure required by law," 5 U.S.C. § 706(2)(D). An agency does not have authority to adopt a regulation that violates the statute.

93.     When promulgating regulations, the Services must articulate a satisfactory explanation for their action, including a rational connection between the facts found and the choice made. A regulation is arbitrary and capricious under the APA where "the agency has

relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

94.     Numerous sections of the 2019 and 2024 Regulations with respect to ESA Section 4 are contrary to the text and purpose of the ESA, including:

- redefining "foreseeable future" to impose elevated certainty requirements;
- enabling the premature delisting of protected species; and
- expanding circumstances under which the Services will decline to designate critical habitat.

95.     Promulgation of these sections by the Services also lacks detailed justification and rational basis and fails to use the best available science, as required by the ESA.

96.     The Services' promulgation of the 2019 and 2024 Regulations with respect to ESA Section 4 is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2).

**SECOND CLAIM FOR RELIEF**

**Violation of the Endangered Species Act and the Administrative Procedure Act: Contrary to Law and Failure of Rational Decisionmaking With Respect to ESA Section 7 Regulatory Revisions**

97.     The allegations made in paragraphs 1–96 are realleged and incorporated by this reference.

98.     The Services cannot adopt regulations that contradict the text and purpose of the ESA. Under the APA, a "reviewing court shall … hold unlawful and set aside" federal agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or "without observance of procedure required by law," 5 U.S.C. § 706(2)(D). An agency does not have authority to adopt a regulation that violates

the statute.

99.     When promulgating regulations, the Services must articulate a satisfactory explanation for their action, including a rational connection between the facts found and the choice made. A regulation is arbitrary and capricious under the APA where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

100.     When an agency issues a regulation changing or amending a prior regulation, it faces a high burden. The agency must demonstrate that (1) a new rule is permissible under the statute; (2) there are good reasons for it; (3) the agency believes it to be better; and (4) the agency displays awareness that it is changing its position. When a new regulation rests upon a factual finding contrary to prior policy, an agency must provide a more detailed justification than what would suffice if the new policy were created on a blank slate. Any unexplained inconsistency between the prior rule and its replacement is a basis for finding the agency's interpretation arbitrary and capricious.

101.     The previously described sections of the 2019 and 2024 Regulations regarding ESA Section 7 are contrary to the text and purpose of the ESA. Both individually and cumulatively, these regulatory changes pose grave threats to endangered and threatened species, including species of interest to Plaintiffs and their members, by erecting extensive, unlawful barriers to the Services' ability to find that any specific agency actions are jeopardizing species with extinction and/or destroying or adversely modifying their critical habitats. The challenged regulatory changes involve:

- Unchecked reliance on mitigation promises so that the Services are in no position to "insure" that agency actions are unlikely to jeopardize species or impair critical habitats;

- Severely limiting the effects and activities considered during consultation so that only "but for" and "reasonably certain" effects may be considered, in conflict with the Services' obligations to consider the best available science when "insur[ing]" that agency actions are not likely to jeopardize species or impair critical habitats.

- Redefining ongoing harms as part of the environmental baseline in a manner that allows action agencies and the Services to minimize the true impact of agency actions and violates the obligation to consider whether "any" agency action jeopardizes a species or impairs critical habitat

- Defining destruction or adverse modification of critical habitat in a way that replaces the categorical statutory prohibition on destruction or modification of any critical habitat with a new, non-textual "as a whole" standard, and conflating "destruction" with "adverse modification";

- Limiting the reinitiation of consultation on land management plans in a manner that forecloses reinitiation even when significant new information and other developments bearing on the plan's adverse impacts on species is brought to the attention of the Services and action agencies;

- Reinterpreting "reasonable and prudent measures" in a manner that conflicts with the statutory obligation to "minimize" the taking of species and that includes indirect and geographically distant "offsets"; and

- Renouncing the Services' longstanding obligation to request that action agencies reinitiate consultation when the previous consultation no longer fulfills statutory and regulatory requirements.

102.    Promulgation of these sections by the Services also lacks detailed justification or adequate explanation; ignores relevant factors; fails adequately to respond to public comments on the proposed rule changes; and sets forth no reasonable basis for a change in longstanding agency practice, as required by the APA, and is not based on the best available science, as required by the ESA. Of particular concern, the regulatory changes exacerbate the problem

1   whereby multiple agency actions over time incrementally harm species and their critical habitats

2   without the Services ever determining that any one particular action will be responsible for

3   causing jeopardy or adverse modification of critical habitat. While purporting to acknowledge

4   the severity of this problem, the regulatory changes adopted by the Services do nothing to

5   address it and, to the contrary, render it even more likely that already-imperiled species will

6   continue to spiral downwards towards extinction.

7       103.   The Services' promulgation of the 2019 and 2024 Revised Regulations with

8   respect to ESA Section 7 is arbitrary, capricious, an abuse of discretion, and otherwise not in

9   accordance with law, in violation of the APA, 5 U.S.C. § 706(2).

10                      **THIRD CLAIM FOR RELIEF**

11   **Violation of the National Environmental Policy Act and the Administrative Procedure Act:**
     **Failure To Prepare an Adequate Environmental Impact Statement**
12

13      104.   The allegations made in paragraphs 1–103 are realleged and incorporated by this

14   reference.

15      105.   NEPA is our "basic national charter for protection of the environment." 40 C.F.R.

16   § 1500.1. Among other things, NEPA requires all agencies of the federal government to prepare

17   a "detailed statement" that discusses the environmental effects of, and reasonable alternatives to,

18   all "major Federal actions significantly affecting the quality of the human environment." 42

19   U.S.C. § 4332(2)(C). This statement is commonly known as an Environmental Impact Statement

20   ("EIS"). A "major Federal action" upon which an EIS may be required includes "new or revised

21   agency rules [and] regulations." 40 C.F.R. § 1508.1(q)(2). The environmental effects that must

22   be considered in an EIS include "indirect effects, which are caused by the action and are later in

23   time or farther removed in distance, but are still reasonably foreseeable," as well as direct effects.

24   40 C.F.R. § 1508.1(g)(1)–(2). An EIS must also consider the cumulative impacts of the proposed

25   action, that is, the environmental impacts that result "from the incremental effects of the action

26   when added to the effects of other past, present, and reasonably foreseeable future actions." 40

27   C.F.R. § 1508.1(g)(3). The purpose of an EIS is to inform the decision-makers and the public of

28

1  the significant environmental impacts of the proposed action, means to mitigate those impacts,

2  and reasonable alternatives that will have lesser environmental effects.

3      106.   In preparing an EIS, NEPA requires federal agencies, including FWS and NMFS,

4  to "study, develop, and describe appropriate alternatives to recommended courses of action in

5  any proposal which involves unresolved conflicts concerning alternative uses of available

6  resources." 40 U.S.C. § 4332(H). This requires an agency to "[d]iscuss each alternative

7  considered in detail, including the proposed action, so that reviewers may evaluate their

8  comparative merits" as well as describe the "underlying purpose and need for the proposed

9  agency action." 40 C.F.R. §§ 1502.14(b), 1502.13.

10      107.   The regulations promulgated by the federal agency responsible for overseeing

11  implementation of NEPA, the Council on Environmental Quality ("CEQ"), authorize agencies to

12  specify categories of actions that do "not have a significant effect, individually or in the

13  aggregate, on the human environment." 40 C.F.R. § 1507.3(c)(8). The CEQ regulations require

14  that all federal agencies establish those categories by rule. 40 C.F.R. § 1501.4(a). When a

15  categorical exclusion covers a proposed action, the CEQ regulations require that agencies

16  "evaluate the action for extraordinary circumstances in which a normally excluded action may

17  have a significant effect." *Id.* § 1501.4(b).

18      108.   An agency must prepare an environmental assessment for actions that it finds are

19  not likely to have significant effects and to which no categorical exclusion applies. 42 U.S.C. §

20  4336(b)(2); 40 C.F.R. § 1501.5(a). Environmental assessments must "provide sufficient evidence

21  and analysis for determining whether to prepare an environmental impact statement or a finding

22  of no significant impact" and discuss alternatives and the purpose and need for the proposed

23  action. 40 C.F.R. § 1501.5(c).

24      109.   FWS has defined a categorical exclusion as "[p]olicies, directives, regulations,

25  and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or

26  whose environmental effects are too broad, speculative, or conjectural to lend themselves to

27  meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-

28  case." 43 C.F.R. § 46.210(i).

110.    NMFS similarly defined categorical exclusions in NOAA Administrative Order 216-6A and Companion Manual, Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities (Jan. 13, 2017), Appendix E.

111.    The Services stated that both packages of 2019 Regulations and the 2024 Regulations for Section 4 were categorically excluded from NEPA because they are of an administrative, financial, legal, technical, or procedural nature. 84 Fed. Reg. at 45051, 45015; 89 Fed. Reg. at 24334. To the contrary, the revisions remove substantive protections from threatened and endangered species, revise the conditions for listing, delisting, and designating critical habitat, and change substantive measures in ESA biological consultations. The revisions will have significant adverse environmental effects and are likely to harm threatened and endangered species and their designated critical habitat.

112.    Even if the revisions could be covered by a categorical exclusion, which they cannot be, extraordinary circumstances require the preparation of an EIS. The revisions have highly controversial environmental effects; involve unresolved conflicts concerning alternative uses of available resources; have highly uncertain and potentially significant environmental effects; involve unique or unknown environmental risks; establish a precedent for future action and represent a decision in principle about future actions with potentially significant environmental effects; and have significant impacts on listed species, species proposed to be listed, and designated critical habitat under the ESA. 43 C.F.R. § 46.215.

113.    With respect to the 2024 Regulations for Section 7, while the Services prepared an environmental assessment, that cannot substitute for the required EIS. The environmental assessment does not adequately discuss the effects of various alternatives. For example, it irrationally asserts that the effects of retaining the 2019 Regulations and of reverting to the pre-2019 regulations would be indistinguishable. The environmental assessment also fails to cover the Section 4 implementing regulations and thereby unlawfully ignores the cumulative effects of these simultaneous, closely related regulatory packages.

114.    The Services are subject to NEPA, and the final decisions revising the ESA regulations are major federal actions significantly affecting the human environment within the

1  meaning of 42 U.S.C. § 4332(2)(C).

2      115.    The Services' promulgation of the 2019 and 2024 Revised ESA Regulations

3  under a categorical exclusion to NEPA; their promulgation of the ESA regulations without

4  preparing an EIS that (a) examines an adequate range of alternatives, (b) has a statement of

5  purpose and need that corresponds to the agencies' proposed action, (c) identifies the correct no-

6  action alternative baseline for comparing and assessing direct, indirect, and cumulative

7  environmental effects, and (d) uses high quality scientific information; and their promulgation of

8  ESA revised regulations without preparing an EIS that examines the overarching direct, indirect,

9  and cumulative environmental effects is arbitrary, capricious, an abuse of discretion, and

10  otherwise not in accordance with law, in violation of NEPA, the CEQ regulations, the FWS and

11  NMFS guidelines implementing NEPA, and the APA, 5 U.S.C. § 706(2).

12  **PRAYER FOR RELIEF**

13      Plaintiffs respectfully request that the Court:

14      (1)    Declare that the Services acted arbitrarily, capriciously, and contrary to law,

15  including the ESA, in violation of the APA, in promulgating the 2019 and 2024 Revised ESA

16  Regulations;

17      (2)    Declare that the Services acted arbitrarily, capriciously, contrary to law, abused

18  their discretion, and failed to follow the procedures required by law in their promulgation of the

19  2019 and 2024 Regulations, in violation of the APA;

20      (3)    Declare that the Services acted arbitrarily, capriciously, and contrary to law,

21  including NEPA and the CEQ regulations, in violation of the APA, by invoking categorical

22  exclusions and failing to prepare an Environmental Impact Statement on the 2019 and 2024

23  Regulations, and by failing to evaluate alternatives to, and the full impacts of, the revised

24  regulations in an Environmental Impact Statement;

25      (4)    Hold unlawful and vacate the 2019 and 2024 Revised ESA Regulations,

26  reinstating the prior in-force regulations;

27      (5)    Enjoin FWS and NMFS from applying or otherwise relying upon the 2019 or

28  2024 Revised ESA Regulations;

1       (6)     Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys'

2  fees; and

3       (7)     Grant Plaintiffs such further and additional relief as the Court may deem just and

4  proper.

5

6        Respectfully submitted this 30th day of September, 2024.

7                                 */s/Benjamin M. Levitan*

                                  Benjamin M. Levitan (NY Bar #5215058)

8                                  (*pro hac vice*)

                                  Earthjustice

9                                  48 Wall Street, Floor 15

                                  New York, NY 10005

10                                T: (202) 797-4317

11                                blevitan@earthjustice.org

12                              Andrea A. Treece (CA Bar #237639)

13                              Earthjustice

                              50 California Street, Suite 500

14                              San Francisco, CA 94111

15                              T: (415) 217-2000

                              atreece@earthjustice.org

16                              Kristen L. Boyles (CA Bar #158450)

17                              Charisa Gowen-Takahashi (CA Bar #342937)

                              Earthjustice

18                              810 Third Ave., Suite 610

                              Seattle, WA 98104

19                              T: (206) 343-7340

20                              kboyles@earthjustice.org

                              cgowentakahashi@earthjustice.org

21

22                              *Counsel for Plaintiffs Center for Biological*

                              *Diversity, Sierra Club, and WildEarth Guardians*

23

24                              */s/ Ryan Adair Shannon*

                              Ryan Adair Shannon (OSB #155537)

25                              (*pro hac vice*)

                              Center for Biological Diversity

26                              P.O. Box 11374

                              Portland, OR 97211

27                              T: (971) 717-6407

28                              rshannon@biologicaldiversity.org

1

2          *Attorney for Plaintiff Center for Biological Diversity*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28