BENJAMIN M. LEVITAN (*pro hac vice*)
Earthjustice
48 Wall Street, Floor 15
New York, NY 10005
T: (202) 797-4317
blevitan@earthjustice.org

ANDREA A. TREECE (CA Bar #237639)
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
T: (415) 217-2000
atreece@earthjustice.org

KRISTEN L. BOYLES (CA Bar #158450)
CHARISA GOWEN-TAKAHASHI (CA Bar #342937)
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T: (206) 343-7340
kboyles@earthjustice.org
cgowentakahashi@earthjustice.org

*Counsel for Plaintiffs*
*[Additional counsel listed at end]*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB, and WILDEARTH GUARDIANS<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR, U.S. FISH AND WILDLIFE SERVICE, U.S. DEPARTMENT OF COMMERCE, and NATIONAL MARINE FISHIERIES SERVICE,<br><br>*Defendants*. | Case No. 4:24-cv-04651-JST<br><br>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:      September 25, 2025<br>Time:      2:00pm<br>Location: Courtroom 6, 2nd Floor, Oakland<br>Judge:    Hon. Jon S. Tigar |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

NOTICE OF MOTION ....................................................................................................1

INTRODUCTION ...........................................................................................................1

STATUTORY BACKGROUND ...........................................................................................2

    I.      ESA SECTION 4 ..............................................................................................2

    II.     ESA SECTION 7 ..............................................................................................3

FACTUAL BACKGROUND ...............................................................................................4

STANDING ..................................................................................................................7

STANDARD OF REVIEW .................................................................................................8

ARGUMENT .................................................................................................................9

    I.      THE SERVICES WEAKENED THE ESA SECTION 7 RULES IN
          VIOLATION OF THE ESA. .................................................................................9

          A.     The Services invalidly narrowed their evaluation of the "effects of
               the action." .........................................................................................10

               1.     The "effects of the action" definition conflicts with the
                      plain language of Section 7.........................................................10

               2.     The Services failed to provide a rational basis for changing
                      the definition. ...........................................................................14

          B.     The regulations unlawfully require the Services to rely on
               unsupported mitigation promises from action agencies............................14

          C.     The Services unlawfully defined "destruction or adverse
               modification" to allow more harm to critical habitat...............................18

               1.     The "as a whole" approach allows a greater amount of
                      harm to the critical habitat of endangered and threatened
                      species in contravention of the ESA. ............................................19

                2.     The lack of separate definitions improperly conflates
                      "destruction" and "adverse modification." ...................................22

          D.     The Services unlawfully renounced their duty to request
                reinitiation of consultation. .......................................................24

II.     THE SERVICES' CHANGES TO THE ESA SECTION 4 RULES ARE
        ARBITRARY, CAPRICIOUS, AND CONTRARY TO THE ESA. ...................26

        A.     The Service's new definition of "Foreseeable Future" violates the
               plain language of the act and its conservation purpose.............................27

        B.     The Services impermissibly expanded a narrow exception to the
               command to designate critical habitat to the maximum extent
               prudent. ...................................................................................................31

III.    THE SERVICES AGAIN VIOLATED NEPA. ........................................................34

        A.     NEPA requires environmental analysis of major federal actions. .............34

        B.     The Services unlawfully evaded NEPA review for their revisions
               to the Section 4 implementing regulations.................................................36

               1.     The Section 4 regulatory revisions substantively weakened
                      the ESA regulatory framework and could not qualify for a
                      CE. ..................................................................................................37

               2.     Extraordinary circumstances also precluded reliance on a
                      CE. ..................................................................................................38

IV.     PLAINTIFFS PROPERLY CHALLENGE PROVISIONS IN BOTH THE
        2019 AND 2024 REGULATIONS. ........................................................................39

V.      THIS COURT SHOULD VACATE AND REMAND THE
        CHALLENGED PROVISIONS. ............................................................................40

CONCLUSION.......................................................................................................................41

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Alaska Ctr. for Env't v. U.S. Forest Serv.*,
189 F.3d 851 (9th Cir. 1999) ................................................................36, 38

*Alaska Oil & Gas Ass'n*,
815 F.3d 544 (Feb. 29, 2016)................................................................27

*Alaska Oil & Gas Ass'n v. Pritzker*,
840 F.3d 671 (9th Cir. 2016) ................................................12, 28, 29, 30

*All. for the Wild Rockies v. U.S. Forest Serv.*,
907 F.3d 1105 (9th Cir. 2018) ................................................................40

*Alsea Valley All. v. Dep't of Com.*,
358 F.3d 1181 (9th Cir. 2004) ................................................................40

*AquAlliance v. U.S. Bureau of Reclamation*,
287 F. Supp. 3d 969 (E.D. Cal. 2018)................................................18

*Ariz. Cattle Growers' Ass'n v. Salazar*,
606 F.3d 1160 (9th Cir. 2010) ................................................................28

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
462 U.S. 87 (1983)................................................................34

*Bennett v. Spear*,
520 U.S. 154 (1997)................................................................22

*Bldg. Indus. Ass'n of Superior Cal. v. Norton*,
247 F.3d 1241 (D.C. Cir. 2001) ................................................................12

*Butte Environmental Council v. U.S. Army Corps of Engineers*,
620 F.3d 936 (9th Cir. 2010) ................................................................21, 22

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................8

*Citizens for Better Forestry v. U.S. Dep't of Agric.* (Citizens I),
341 F.3d 961 (9th Cir. 2003) ................................................................38

*Citizens for Better Forestry v. U.S. Dept. of Agric.* (Citizens II),
481 F. Supp. 2d 1059 (N.D. Cal. 2007) ................................................................37, 38

*City of Davis v. Coleman*,
521 F.2d 661 (9th Cir. 1975) ................................................................38

*In re Clean Water Act Rulemaking,*
    60 F.4th 583 (9th Cir. 2023) ............................................................................5

*Conner v. Burford,*
    848 F.2d 1441 (9th Cir. 1988) .........................................................................13

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.,*
    789 F.3d 1075 (9th Cir. 2015) ......................................................................7, 15

*Ctr. for Biological Diversity v. Bernhardt,*
    19-05206 (N.D. Cal. Aug. 21, 2019) ...........................................................5, 39

*Ctr. for Biological Diversity v. Haaland,*
    998 F.3d 1061 (9th Cir. 2021) .........................................................................29

*Ctr. for Biological Diversity v. U.S. Forest Serv.,*
    522 F. Supp. 3d 611 (D. Ariz. 2021) ..............................................................25

*Ctr. for Biological Diversity v. U.S. Forest Serv.,*
    No. 20-00020, 2020 WL 6710944 (D. Ariz. Nov. 16, 2020)...........................25

*Ctr. for Env't Health v. Vilsack,*
    No. 15-01690, 2016 WL 3383954 (N.D. Cal. June 20, 2016)..........................40

*Ctr. for Native Ecosystems v. Cables,*
    509 F.3d 1310 (10th Cir. 2007) ......................................................................21

*Cuomo v. Clearing House Ass'n,*
    557 U.S. 519 (2009)........................................................................................21

*Defs. of Wildlife v. Babbitt,*
    958 F. Supp. 670 (D.D.C. 1997) ................................................................27, 30

*Defs. of Wildlife v. Jewell,*
    176 F. Supp. 3d 975 (D. Mont. 2016).....................................................11, 12, 29

*Defs. of Wildlife v. Norton,*
    258 F.3d 1136 (9th Cir. 2001) .........................................................................27

*Defs. of Wildlife v. Zinke,*
    856 F.3d 1248 (9th Cir. 2017) .........................................................................15

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
    36 F.4th 850 (9th Cir. 2022) ...........................................................................35

*Fed. Commc'ns Comm'n v. Fox Television Stations,*
    556 U.S. 502 (2009)........................................................................................14

*Food Mktg. Inst. v. ICC,*
   587 F.2d 1285 (D.C. Cir. 1978) ........................................................................40

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
   528 U.S. 167 (2000) ..........................................................................................7

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.,*
   378 F.3d 1059 (9th Cir. 2004) ............................................................... *passim*

*Greater Yellowstone Coal., Inc. v. Servheen,*
   665 F.3d 1015 (9th Cir. 2011) ........................................................................28

*Greenpeace v. NMFS,*
   106 F. Supp. 2d 1066 (W.D. Wash. 2000) ....................................................40

*Humane Soc'y of U.S. v. Locke,*
   626 F.3d 1040 (9th Cir. 2010) ........................................................................40

*Hunt v. Wash. State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) ..........................................................................................7

*Karuk Tribe of Cal. v. U.S. Forest Serv.,*
   681 F.3d 1006 (9th Cir. 2012) (en banc) .................................................8, 10

*Kern v. Bureau of Land Mgmt.,*
   284 F.3d 1062 (9th Cir. 2002) ........................................................................34

*Klamath-Siskiyou Wildlands Ctr. v. NMFS,*
   109 F. Supp. 3d 1238 (N.D. Cal. 2015) ........................................................40

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.,*
   575 F.3d 999 (9th Cir. 2009) ..........................................................................37

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024) ..............................................................................9, 16, 20

*Louisiana v. Am. Rivers,*
   142 S. Ct. 1347 (2022) ......................................................................................5

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ..........................................................................................7

*Me. Lobstermen's Ass'n v. NMFS,*
   70 F.4th 582 (D.C. Cir. 2023) ........................................................................13

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.,*
   463 U.S. 29 (1983) ............................................................................................9

*N. Spotted Owl v. Lujan,*
  758 F. Supp. 621 (W.D. Wash. 1991)...................................................................31

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
  551 U.S. 644 (2007)...................................................................................................17

*National Wildlife Federation v. National Marine Fisheries Service,*
  524 F.3d 917 (9th Cir. 2008) ............................................................... *passim*

*Nez Perce Tribe v. NOAA Fisheries,*
  No. 07-00247, 2008 WL 938430 (D. Idaho Apr. 7, 2008) ...................................20

*NRDC v. U.S. Dep't of the Interior,*
  113 F.3d 1121 (9th Cir. 1997)...................................................................31, 33, 37

*Occidental Eng'g Co. v. INS,*
  753 F.2d 766 (9th Cir. 1985) ....................................................................................8

*Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.,*
  265 F.3d 1028 (9th Cir. 2001) .................................................................................20

*Paulsen v. Daniels,*
  413 F.3d 999 (9th Cir. 2005) ...................................................................................40

*In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.,*
  794 F. Supp. 2d 65 (D.D.C. 2011) ..........................................................................12

*Pollinator Stewardship Council v. EPA,*
  806 F.3d 520 (9th Cir. 2015) .............................................................................40, 41

*Prutehi Litekyan v. U.S. Dep't of the Air Force,*
  128 F.4th 1089 (9th Cir. 2025) ................................................................................35

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
  747 F.3d 581 (9th Cir. 2014) .............................................................................11, 12

*San Luis & Delta-Mendota Water Auth. v. Locke,*
  776 F.3d 971 (9th Cir. 2014) ...................................................................................28

*Save the Yaak Comm. v. Block,*
  840 F.2d 714 (9th Cir. 1988) ...................................................................................35

*Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n,*
  481 F.2d 1079 (D.C. Cir. 1973) ...............................................................................35

*Sierra Club v. Marsh,*
  816 F.2d 1376 (9th Cir. 1987) .................................................................................15

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
   245 F.3d 434 (5th Cir. 2001) ............................................................31, 34

*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978)...........................................................2, 9, 17, 30

*United States v. Woods*,
   571 U.S. 31 (2013)................................................................................22

*W. Watersheds Project v. Kraayenbrink*,
   632 F.3d 472 (9th Cir. 2011) ............................................................4

*In re Wash. Cattlemen's Ass'n*,
   No. 22-70194, 2022 WL 4393033 (9th Cir. Sept. 21, 2022) ..............5

*West v. Sec'y of Dep't of Transp.*,
   206 F.3d 920 (9th Cir. 2000) ............................................................37

*Wild Fish Conservancy v. Salazar*,
   628 F.3d 513 (9th Cir. 2010) ............................................................18

*WildEarth Guardians v. Haaland*,
   561 F. Supp. 3d 890 (C.D. Cal. 2021) ............................................30

**Statutes**

5 U.S.C. § 706 ..........................................................................................8, 40

16 U.S.C. § 1531 ....................................................................................*passim*

16 U.S.C. § 1532 ....................................................................................*passim*

16 U.S.C. § 1533 ....................................................................................*passim*

16 U.S.C. § 1536 ....................................................................................*passim*

42 U.S.C. § 4332 ....................................................................................34, 35

42 U.S.C. § 4336 ........................................................................................35

Pub. L. No. 118-5, 137 Stat. 10 (2023)....................................................35

**Regulations**

40 C.F.R. § 1501.4 ............................................................................35, 36, 38

40 C.F.R. § 1501.5 ....................................................................................35

40 C.F.R. § 1508.1 ....................................................................................35

40 C.F.R. § 1508.4 ................................................................................35, 36, 38

40 C.F.R. § 1508.9 ...........................................................................................35

43 C.F.R. § 46.210 ...........................................................................................36

43 C.F.R. § 46.215 .....................................................................................38, 39

50 C.F.R. Part 402 .............................................................................................6

50 C.F.R. Part 424 .............................................................................................6

50 C.F.R. § 402.02 ......................................................................10, 19, 21, 39

50 C.F.R. § 402.14 .....................................................................................16, 39

50 C.F.R. § 402.16 .....................................................................................24, 25

50 C.F.R. § 424.11 .....................................................................................26, 28

50 C.F.R. § 424.12 ...............................................................................27, 32, 33

**Federal Register**

42 Fed. Reg. 4868 (Jan. 26, 1977) .....................................................................4

43 Fed. Reg. 870 (Jan. 4, 1978) .........................................................................4

45 Fed. Reg. 13010 (Feb. 27, 1980) ..................................................................4

49 Fed. Reg. 38900 (Oct. 1, 1984) .....................................................................4

49 Fed. Reg. 38908 (Oct. 1, 1984) ...................................................................27

51 Fed. Reg. 19926 (June 3, 1986) ........................................................4, 24, 25

81 Fed. Reg. 7414 (Feb. 11, 2016) ...................................................................32

82 Fed. Reg. 12285 (Mar. 1, 2017) ....................................................................5

84 Fed. Reg. 44976 (Aug. 27, 2019) ....................................................... *passim*

85 Fed. Reg. 43304 (July 16, 2020) ..................................................................35

87 Fed. Reg. 23453 (Apr. 20, 2022) ..................................................................35

88 Fed. Reg. 40753 (June 22, 2023) .......................................................6, 25, 26

89 Fed. Reg. 24268 (Apr. 5, 2024) .......................................................... *passim*

89 Fed. Reg. 24300 (Apr. 5, 2024) ................................................................1, 6, 33

90 Fed. Reg. 10610 (Feb. 25, 2025) ...............................................................35

**Other Authorities**

H.R. Rep. No. 93-412 (1973).........................................................................31, 33

H.R. Rep. No. 95-1625 (1978).......................................................................31

S. Rep. No. 93-307 (1973).............................................................................30

S. Rep. No. 106-126 (1999)...........................................................................31

**NOTICE OF MOTION**

Pursuant to Fed. R. Civ. P. 56(a) and Civil Local Rule 7, Plaintiffs Center for Biological Diversity, Sierra Club, and WildEarth Guardians respectfully move this Court for summary judgment and declaratory relief. This motion will be argued before the Honorable Jon S. Tigar, United States District Judge, Oakland Courthouse, 1301 Clay Street, Oakland, CA 94612.

Plaintiffs ask the Court to declare that, in promulgating the administrative regulations entitled Listing Endangered and Threatened Species and Designating Critical Habitat, 89 Fed. Reg. 24300 (Apr. 5, 2024); Regulations for Interagency Cooperation, 89 Fed. Reg. 24268 (Apr. 5, 2024); Regulations for Listing Species and Designating Critical Habitat, 84 Fed. Reg. 45020 (Aug. 27, 2019); and Regulations for Interagency Cooperation, 84 Fed. Reg. 44976 (Aug. 27, 2019), the U.S. Fish and Wildlife Service and the National Marine Fisheries Service violated the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. § 1531 *et seq.* and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* Plaintiffs ask the Court to issue an order vacating and setting aside the challenged provisions of the regulations, restoring the versions of the rules in effect prior to the 2019 revisions.

This motion is based on the accompanying memorandum, the pleadings, declarations, exhibits, and other papers previously filed with the Court and such other evidence as the Court deems appropriate.

**INTRODUCTION**

Plaintiffs return to this Court to seek relief from rulemakings that—once again—unlawfully weaken the ESA, our nation's fundamental safety net for biodiversity. In 2019, Plaintiffs filed suit in this Court to challenge ESA implementing regulations that defied the plain language and purpose of the statute and undermined critical protection of imperiled species and their habitats. Ultimately, Federal Defendants obtained a voluntary remand of the challenged rules and promulgated modified versions in 2024. Unfortunately, the modified versions retained many of the same defects that were challenged by Plaintiffs—and introduced some additional flaws—resulting in a renewed failure by Federal Defendants to faithfully implement the requirements of the ESA.

Plaintiffs challenge specific provisions in four separate sets of final rules (collectively "the Final Rules") promulgated in 2019 and 2024 by the U.S. Fish & Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (collectively "the Services"). The Court should now conclude this long-running dispute by granting Plaintiffs' motion for summary judgment, vacating the challenged provisions in the Final Rules, and restoring the versions in effect prior to the 2019 revisions.

**STATUTORY BACKGROUND**

The ESA remains "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Congress passed the ESA in 1973 in response to the ongoing and worsening extinction crisis to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Congress broadly defined "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this [Act] are no longer necessary"—that is, until the point of full recovery. *Id.* § 1532(3). Congress intended "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth.*, 437 U.S. at 184.

Two core components of the ESA must be fully implemented to fulfill Congress's vision of species conservation: Section 4, granting protection to imperiled species and their critical habitat, and Section 7, ensuring that federal actions are not likely to jeopardize protected species or adversely modify or destroy their designated critical habitat.

## I.    ESA SECTION 4

The provisions for listing species and designating critical habitat are contained in Section 4 of the ESA—the section Congress labeled the "cornerstone of effective implementation" of the Act. S. Rep. No. 97-418, at 10 (1982). In broad strokes, the ESA seeks to protect and recover imperiled species and populations by first listing them as threatened or endangered based on

1 enumerated statutory factors, 16 U.S.C. § 1533(a)(1)(A)–(E), using the "best scientific and

2 commercial data available," *id.* § 1533(b)(1).

3     An "endangered species" is defined as "any species which is in danger of extinction

4 throughout all or a significant portion of its range." *Id.* § 1532(6). A threatened species is "any

5 species which is likely to become an endangered species within the foreseeable future throughout

6 all or a significant portion of its range." *Id.* § 1532(20).

7     Once a species has been listed as threatened or endangered, the ESA requires the use of

8 "all methods and procedures which are necessary" to protect both it and the "ecosystem" on

9 which it depends. *See id.* §§ 1531(b), 1532(3). Designation of "critical habitat"—areas of habitat

10 essential to a species' conservation that are subject to special protections from destruction and

11 degradation—is central to this goal, and Congress required the Services to designate and protect

12 critical habitat, subject only to certain limited exceptions, contemporaneously with the species'

13 listing. *Id.* § 1533(a)(3), (b)(2).

14 **II.    ESA SECTION 7**

15     After a species is listed under the ESA, Section 7 assigns every federal agency an

16 affirmative duty to further its conservation. 16 U.S.C. § 1536(a)(1). In addition, Section 7

17 requires each federal agency to obtain review and clearance from FWS or NMFS (depending on

18 the species) for activities authorized, funded, or carried out by that agency (the "action agency")

19 that may affect listed species or their critical habitat. *Id.* § 1536(a)(2).

20     For a federal activity that may affect listed species or critical habitat to proceed, the

21 Services must conduct a biological review and either (1) agree with the action agency that the

22 activity is not likely to adversely affect listed species or their habitat (informal consultation), or

23 (2) for those actions that are likely to adversely affect such species or their habitat, prepare a

24 biological opinion to ensure the action is not likely to "jeopardize" the species or result in the

25 "destruction or adverse modification" of designated critical habitat (formal consultation). *Id.* §

26 1536(a)(2), (b). As with the key listing determinations under Section 4 discussed above, the

27 statute requires that these critical Section 7 determinations about an action's impacts on listed

28

species be based upon "the best scientific and commercial data available." *Id*. § 1536(a)(2).
Section 7(a)(2) embodies the statute's promise to protect species and habitat, and the Ninth
Circuit has called it "[t]he heart of the ESA." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d
472, 495 (9th Cir. 2011).

## FACTUAL BACKGROUND

The ESA's implementing regulations play a key role in protecting threatened and
endangered species. The Services first adopted joint regulations implementing ESA Sections 4
and 7 approximately 40 years ago. *See* 45 Fed. Reg. 13010 (Feb. 27, 1980) (Section 4); 49 Fed.
Reg. 38900 (Oct. 1, 1984) (Section 4); 43 Fed. Reg. 870 (Jan. 4, 1978) (Section 7); 51 Fed.
Reg. 19926 (June 3, 1986) (Section 7). From the beginning, the Services recognized that effective
regulations were necessary to satisfy the purposes of the statute. In their first proposal for joint
regulations implementing Section 7, the Services stated, "The proposal establishes a fixed
procedure of consultation because the FWS and NMFS believe they cannot responsibly fulfill
their obligations under Section 7 unless there is a rational and uniform procedure for the
provision of biological advice to agencies considering actions within the borders of section 7."
42 Fed. Reg. 4868, 4869 (Jan. 26, 1977). Similarly, when promulgating joint regulations for
Section 4 in 1980, "[t]he Services determined that comprehensive implementing regulations
should be promulgated to insure full compliance with the section 4 requirements and to aid the
public in understanding the rulemaking process, pursuant to which Endangered and Threatened
species are protected." 45 Fed. Reg. at 13010.

For several decades, these 1980s-era rules remained in effect with only minor
amendments, providing a stable regulatory framework for ESA implementation. That changed on
August 27, 2019, when the Services promulgated final regulations that significantly undermined
the implementation of ESA Sections 4 and 7. 84 Fed. Reg. 45020; 84 Fed. Reg. 44976. The
Services did not suggest the amended regulations were necessary to achieve the ESA's
imperative to conserve species and the ecosystems they depend on, 16 U.S.C. § 1531(b); to the
contrary, the regulatory changes relied on Executive Order 13777, which directed federal
agencies to eliminate allegedly "unnecessary regulatory burdens." Enforcing the Regulatory

Reform Agenda, 82 Fed. Reg. 12285 (Mar. 1, 2017). As further detailed below, the regulatory changes adopted to fulfill this asserted purpose reflected a substantial weakening of the ESA regulatory framework, including by impermissibly raising the bar for listing species and designating critical habitat under Section 4 and narrowing the range of impacts to listed species that federal agencies must consider under Section 7. Accordingly, Plaintiffs and others challenged the 2019 Regulations immediately after they were adopted. *See, e.g.*, *Ctr. for Biological Diversity v. Bernhardt*, 19-05206 (N.D. Cal. Aug. 21, 2019).

While that litigation was pending—and following a change in Executive Branch administrations—Federal Defendants moved this Court for remand—but not vacatur—of the 2019 Regulations, citing "substantial concerns" with the rules and an intent to rescind or revise them. *Ctr. for Biological Diversity*, ECF No. 146, at 20–22. In opposition, Plaintiffs countered that the appropriate remedy was remand *with* vacatur, noting that "vacatur is the only option that avoids continuing environmental harms to listed species and their habitat due to the loss of, or significant reductions in, ESA protections that the Services themselves appear to admit are a direct and ongoing consequence of the 2019 Rules." *Ctr. for Biological Diversity*, ECF No. 149, at 13. In response, this Court remanded and vacated the rules, without adjudicating the merits. *Ctr. for Biological Diversity*, ECF No. 168. While that ruling was on appeal, however, the U.S. Supreme Court issued a ruling in a separate proceeding regarding a challenge to a different federal agency action that cast doubt on pre-merits vacatur as a remedy. *See Louisiana v. Am. Rivers*, 142 S. Ct. 1347 (2022) (mem.).[1] The Ninth Circuit then stayed this Court's vacatur order pending this Court's consideration of motions to amend the judgment. *In re Wash. Cattlemen's Ass'n*, No. 22-70194, 2022 WL 4393033, at *1 (9th Cir. Sept. 21, 2022). This Court subsequently issued a new order that again remanded the 2019 Regulations, but this time without vacatur. *Ctr. for Biological Diversity*, ECF No. 196. As a result, the harmful 2019 Regulations remained in force even while the Services reexamined them.

---

[1] The Ninth Circuit subsequently held that a district court lacks authority to vacate an administrative rule "without first holding it unlawful." *In re Clean Water Act Rulemaking*, 60 F.4th 583, 596 (9th Cir. 2023).

As a result of that reexamination, on June 22, 2023, the Services proposed new regulations to revise or rescind certain provisions of the 2019 Regulations. The proposed revisions, however, left untouched many of the provisions that Plaintiffs had challenged. 88 Fed. Reg. 40753, 40764 (June. 22, 2023) (proposed revisions to ESA Section 4 implementing regulations); *id.* at 40753 (same for ESA Section 7). The Services promulgated the final 2024 Regulations on April 5, 2024. While the 2024 Regulations remedied certain harmful and unlawful provisions of the 2019 Regulations, they retained numerous elements of the 2019 Regulations that significantly undermined the implementation of ESA Sections 4 and 7. Worse, the 2024 Regulations included new measures that further narrowed the scope of the Section 7 consultation requirement and thereby undermined the ESA's species-conservation program in violation of the statute.

This action challenges specific, highly deleterious provisions in the rulemakings discussed above: two rulemakings amending the regulations that implement ESA Section 4, 16 U.S.C. § 1533, that govern listing, delisting, and designation of critical habitat (generally codified under 50 C.F.R. Part 424); and two rulemakings amending the regulations that implement ESA Section 7, 16 U.S.C. § 1536, that govern consultations on federal actions that may affect listed species or critical habitat (generally codified under 50 C.F.R. Part 402).[2]

Together, the challenged provisions conflict with the plain terms of the statute and undermine the ESA's fundamental purpose of preserving imperiled species and their habitat. 16 U.S.C. § 1531(b). Most of the provisions have now been on the books and causing damage to imperiled species and their habitats for nearly six years. Accordingly, Plaintiffs ask this Court to conclude the longstanding controversy over these challenged regulatory changes by invalidating them and restoring essential protections that Federal Defendants unlawfully removed from the ESA regulatory framework.

---

[2] *See* 89 Fed. Reg. at 24300; 84 Fed. Reg. 45020; 89 Fed. Reg. at 24268; 84 Fed. Reg. 44976.

1

**STANDING**

2        Plaintiffs have standing to challenge the Final Rules. To establish Article III standing, "a

3  plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized

4  and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the

5  challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the

6  injury will be redressed by a favorable decision." *Cottonwood Env't Law Ctr. v. U.S. Forest*

7  *Serv.*, 789 F.3d 1075, 1079 (9th Cir. 2015) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't*

8  *Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

9        "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use

10  the affected area and are persons for whom the aesthetic and recreational values of the area will

11  be lessened by the challenged activity." *Friends of the Earth*, 528 U.S. at 183 (citation omitted).

12  Further, "the desire to use or observe an animal species, even for purely [a]esthetic purposes, is

13  undeniably a cognizable interest for purpose[s] of standing." *Lujan v. Defs. of Wildlife*, 504 U.S.

14  555, 562–63 (1992). And "an association has standing to bring suit on behalf of its members

15  when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it

16  seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor

17  the relief requested requires the participation of individual members in the lawsuit." *Hunt v.*

18  *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

19        Plaintiffs satisfy these standing requirements. The Final Rules injure Plaintiffs' members,

20  who have interests in imperiled species—ranging from polar bears in Alaska to humpback

21  whales and Joshua trees in California to Gulf sturgeon in Mississippi—that are and will continue

22  to be harmed by the Final Rules, and vacating the Final Rules would redress that injury. *See* 1st

23  Am. Compl., ECF No. 23 ¶¶ 13–16 and attached declarations, ECF No. 23-2 to 23-12. Plaintiffs

24  have documented specific recreational, aesthetic, and professional interests in the survival and

25  recovery of imperiled species and protections for critical habitat, and the valid implementation of

26  the ESA, and explained how the Final Rules harm those interests. For example, Sierra Club

27  member Daniel Ritzman explains that the weakened ESA regulations enable more seismic

28  exploration and oil and gas development in Alaskan polar bear habitat that he visits both for

personal recreation and as a professional guide: "Development would also harm my interest in seeing polar bears existing in their wild and unaltered habitats. And if exploration in the Coastal Plain proceeds, I fear that I will lose these opportunities for my son." ECF No. 23-9 ¶ 10. Similarly, the wildlife of Port Aransas, Texas, inspired Center for Biological Diversity member William L. Foster II to make his home there. His interests are harmed by the effects of weakened ESA regulations on species including the ESA-listed Kemp's ridley sea turtle and loggerhead sea turtle: "These magnificent animals are synonymous with these barrier islands, and any harm to their habitat or individual sea turtles would be a big blow to our entire community. It would certainly be a major blow to me." ECF No. 23-3 ¶ 2. WildEarth Guardians member Lindsay Larris likewise faces threats from weakened ESA regulations in New Mexico, where she regularly travels and experiences ESA-listed species including Mexican wolves, or "lobos": "Should these new regulations stand, the protections of the ESA will be fundamentally tarnished in a way that will hinder these species from being protected, successfully recovering, and inhabiting the wild corners of the West that I seek out and value." ECF No. 23-11 ¶ 15.

Accordingly, Plaintiffs have Article III standing.

## STANDARD OF REVIEW

Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Plaintiffs' motion raises purely legal issues under the APA and ESA, rendering summary judgment appropriate. *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985) (holding that a district court "is not required to resolve any facts" when deciding whether to grant summary judgment in an APA review of an administrative proceeding).

An agency's compliance with the ESA is reviewed under the APA's arbitrary and capricious standard of review, which instructs courts to "set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc). An action is "arbitrary and capricious if the agency has relied on factors which

1    Congress has not intended it to consider, entirely failed to consider an important aspect of the

2    problem, offered an explanation for its decision that runs counter to the evidence before the

3    agency, or is so implausible that it could not be ascribed to a difference in view or the product of

4    agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29,

5    43 (1983). On matters of statutory construction, "[c]ourts must exercise their independent

6    judgment in deciding whether an agency has acted within its statutory authority, as the APA

7    requires," and determine the "best reading" of the statute. *Loper Bright Enters. v. Raimondo*, 603

8    U.S. 369, 400, 412 (2024).

### ARGUMENT

10        In contravention of the plain terms of the ESA and its overriding purpose, the Service's

11    revisions to key aspects of the ESA regulatory framework allow (or even require) the Services to

12    ignore effects of agency actions that likely jeopardize listed species, reduce the likelihood that

13    consultation will be renewed if an agency action proves unexpectedly harmful, make it harder for

14    species to qualify for the Act's protections, and create new obstacles to both designating critical

15    habitat and protecting such habitat following designation. These changes are arbitrary and

16    unlawful under the ESA.

### I.    THE SERVICES WEAKENED THE ESA SECTION 7 RULES IN VIOLATION OF THE ESA.

18        The Services' revisions to their longstanding regulations governing interagency

19    consultation violate the plain language of Section 7, which directs federal agencies to "insure,"

20    through consultation with the Services, that their actions are "not likely to jeopardize" listed

21    species or destroy or adversely modify their designated critical habitat. 16 U.S.C. § 1536(a)(2).

22    Further, the changes undermine the ESA's conservation purposes and contradict Congress's

23    intent to prioritize species protection over the primary missions of federal agencies. *Id.*; *Tenn.*

24    *Valley Auth.*, 437 U.S. at 184–85, 179–83.

25        "The purpose of consultation is to obtain the expert opinion of [the Services] to determine

26    whether the action is likely to jeopardize a listed species or adversely modify its critical habitat

27    and, if so, to identify reasonable and prudent alternatives that will avoid the action's unfavorable

impacts." *Karuk Tribe*, 681 F.3d at 1020. To this end, if an agency action is likely to adversely affect endangered or threatened species or their critical habitat, ESA Section 7(a)(2) requires that the relevant Service must provide the action agency with a written biological opinion "setting forth the [Service]'s opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). If the Service cannot conclude that the proposed agency action is not likely to place the listed species in jeopardy or adversely modify its critical habitat, "the [Service] shall suggest those reasonable and prudent alternatives which [it] believes would not violate [Section 7(a)(2)] and can be taken by the Federal agency . . . in implementing the agency action." *Id.* In reaching such determinations, both the Services and the action agency must "use the best scientific and commercial data available." *Id.* § 1536(a)(2).

The Services' challenged Section 7 Rule unlawfully undermines this statutory framework in numerous respects.

A.    **The Services invalidly narrowed their evaluation of the "effects of the action."**

1.    The "effects of the action" definition conflicts with the plain language of Section 7.

The 2019 and 2024 Section 7 Rules unlawfully restricted which effects of an agency action must be considered in the jeopardy analysis by overlaying a new standard requiring the Services to exclude important information from biological opinions. Specifically, under the challenged rule, "[e]ffects of the action" are now factored into the analysis only if they "satisfy [a] two-part test: They would not occur but for the proposed action and are *reasonably certain to occur*." 84 Fed. Reg. at 44978; 50 C.F.R. § 402.02 (emphasis added). This is a significant shift from the pre-2019 regulatory scheme, which contained no test for whether a direct effect of an agency action would be considered. The new test's addition of a "reasonably certain to occur" requirement conflicts with Section 7's plain terms.

First, the new test violates the ESA's best available science requirement, 16 U.S.C. § 1536(a)(2), by forcing the Services to ignore effects grounded in rigorous science, but for

1    which the probability of occurrence is less than the Service's vague new threshold for certainty.

2    *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014)

3    ("Where the information is not readily available, we cannot insist on perfection: The best

4    scientific data available, does not mean the best scientific data possible." (cleaned up)). In other

5    words, the new test requires the Services to base jeopardy determinations on incomplete

6    information because all effects deemed not "reasonably certain to occur" are excluded from

7    analysis, even if those effects reflect the best available science. To make a reasoned assessment

8    of whether an action's effects, in the aggregate, are likely to cause jeopardy, the Services must

9    consider a wide array of effects, including those that, individually, are not likely—much less

10   "reasonably certain"—to occur. *See Final ESA Section 7 Consultation Handbook* 4-33, FWS,

11   NOAA (Mar. 1998) (jeopardy determination is based on "aggregate effects").[3]

12          The resulting erosion of species protections is illustrated by case law addressing the

13   listing of species under Section 4—a process that also requires using the best available science,

14   16 U.S.C. § 1533(b)(1)(A)—where courts have rejected arguments by the Services and others for

15   disregarding risks that are scientifically supported but retain some uncertainty. *See infra* at 28–

16   30. In the listing context, this question often arises in the context of climate impacts. For

17   instance, when considering whether to list wolverines under the ESA, FWS disregarded a leading

18   scientific study because it did not analyze precipitation trends at a fine scale, even though no

19   existing study had ever done what FWS was demanding. *See Defs. of Wildlife v. Jewell*, 176 F.

20   Supp. 3d 975, 1003 (D. Mont. 2016). The Montana district court rejected this approach under the

21

22   [3] By way of illustration, consider an action with three possible independent effects, each of

23   which would likely cause jeopardy and has a 40 percent probability of occurring. The Service
     may deem none of those effects "reasonably certain to occur" and exclude them from analysis

24   and conclude that the action is "not likely" to cause jeopardy. But there is a significant
     probability, 78.4 percent, that at least one of those effects will materialize and cause jeopardy,

25   meaning that the Services' conclusion would be inaccurate. (If each effect has a 40 percent
     probability of occurring, then it has a 60 percent probability of *not* occurring. The probability

26   that all three effects will not occur is 0.6 x 0.6 x 0.6, or 0.216. The probability that at least one of
     the effects *will* occur is 1 – 0.216, which is 0.784, or 78.4 percent. *See generally* David Lane,

27   *Online Statistics Education* Sec. V.3 Basic Concepts (2003),

28   https://onlinestatbook.com/2/probability/basic.html.

1   best available science standard, ruling that FWS "cannot demand a greater level of scientific

2   certainty than has been achieved in the field to date." *Id.*

3       Similarly, courts have upheld the Services' decisions to list Pacific bearded seals and

4   polar bears under the ESA even though those listings relied on relatively uncertain climate

5   science. *See Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 680 (9th Cir. 2016) (Pacific

6   bearded seals); *In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 794 F. Supp.

7   2d 65, 106 (D.D.C. 2011), *aff'd sub nom. In re Polar Bear Endangered Species Act Listing &*

8   *Section 4(d) Rule Litig.—MDL No. 1993*, 709 F.3d 1 (D.C. Cir. 2013) (polar bears). When

9   reviewing NMFS's listing of Pacific bearded seals, the Ninth Circuit rejected the plaintiffs'

10  assertion that NMFS's climate projections should not have been considered because they could

11  not "reliably predict" the effects of global warming in the future and explained, "The fact that

12  climate projections for 2050 through 2100 may be volatile does not deprive those projections of

13  value in the rulemaking process." *Alaska Oil & Gas Ass'n*, 840 F.3d at 679–80. Outside of the

14  climate context, the D.C. Circuit upheld the ESA listing of various fairy shrimp species against

15  methodological objections to the study that assessed the species' abundance. *See Bldg. Indus.*

16  *Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001). The court explained that

17  FWS properly relied upon the best available (even if imperfect) science, and "the Service must

18  utilize the 'best scientific . . . data *available*,' not the best scientific data *possible*." *Id.*

19  (alterations in original).

20      Now, however, the Services are attempting to import the reasoning rejected by courts in

21  such Section 4 cases into the regulation governing the evaluation of the effects of an agency

22  action under Section 7. The Ninth Circuit has made clear that the best available science standards

23  in Sections 4 and 7 are equivalent. *See San Luis & Delta-Mendota Water Authority*, 747 F.3d at

24  602 (citing case law about using the best available science in listing decisions, including

25  *Building Industry Association*, when articulating the standard of review under Section 7(a)(2)).

26  Under Section 7, as under Section 4, the Services violate the ESA's "best available science"

27  requirement when they demand greater certainty than the best available science offers. *See* 16

28  U.S.C. § 1536(a)(2).

1    The facts in *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988), demonstrate how

2    the revisions to "effects of the action" conflict with the ESA's requirements. In *Conner*, FWS

3    had prepared a biological opinion assessing the effects of leasing federal land for oil and gas

4    development without assessing the effects of the development itself, citing "insufficient

5    information available to render a comprehensive biological opinion beyond the initial lease

6    phase." *Id.* at 1452 (quoting the biological opinion). The Ninth Circuit held that "incomplete

7    information about post-leasing activities does not excuse the failure to comply with the statutory

8    requirement of a comprehensive biological opinion using the best information available." *Id.* at

9    1454. The court concluded, "In light of the ESA requirement that the agencies use the best

10   scientific and commercial data available to insure that protected species are not jeopardized, 16

11   U.S.C. § 1536(a)(2), the FWS cannot ignore available biological information or fail to develop

12   projections of oil and gas activities which *may* indicate *potential* conflicts between development

13   and the preservation of protected species." *Id.* (emphasis added) The same reasoning applies

14   here.

15   The second way that the new test violates the plain language of Section 7 is by changing

16   the standard for issuing a finding of jeopardy or habitat impairment. The ESA requires the

17   Services to assess whether jeopardy or habitat impairment is "likely." 16 U.S.C. § 1532(a)(2). In

18   this context, the Services and the courts have interpreted "likely" to mean "more likely than not."

19   *Me. Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 595 (D.C. Cir. 2023) (quoting *Alaska Oil & Gas*

20   *Ass'n*, 840 F.3d at 684).

21   The Services cannot assess whether an action is "more likely than not" to cause jeopardy

22   if it ignores effects that are likely (but not "reasonably certain").[4] The new test is analogous to

23

24   ───────────────

[4] Building on the illustration in footnote 3, consider an action with three possible independent

25   effects, each of which would likely cause jeopardy and has a 51 percent probability of

26   occurring—"likely" but not "reasonably certain." Under the new test, the Services would not

     consider any of those effects in its jeopardy determination, even though the probability of at least

27   one of the effects occurring and causing jeopardy is 88.2 percent. (The probability that all three

     effects will not occur is 0.49 x 0.49 x 0.49, or 0.118. The probability that at least one of the

28   effects *will* occur is 1 – 0.118, which is 0.882, or 88.2 percent.)

believing that the ground is not likely to get wet even though a thunderstorm is likely (but not "reasonably certain"). To make a rational determination of likelihood, the Services must consider not only "reasonably certain" effects—they must consider effects across a wide range of probabilities to determine whether, in the aggregate, jeopardy or habitat impairment is "likely."

### 2. The Services failed to provide a rational basis for changing the definition.

The Services' new "effects" test is also unlawful because the Services have no rational justification for it. "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio*." *Fed. Commc'ns Comm'n v. Fox Television Stations*, 556 U.S. 502, 515 (2009). Here, the Services not only failed to display awareness of their change in position but expressly denied it. *See* 89 Fed. Reg. at 24273 (asserting that the new definition of "effects of the action" in 2019 and 2024 did not change the "scope of the effects analysis"). Yet before 2019, the Services' regulations had never applied a "reasonably certain" test (or specified any other test) to direct effects of an agency action when assessing jeopardy.

The Services' failure to acknowledge the existence of their changed position is arbitrary and capricious. As a result of this failure, the Services have also arbitrarily and capriciously failed to analyze the significance of the new test, including its unlawfully heightened standard for jeopardy and its dismissal of the best available science.

### B. The regulations unlawfully require the Services to rely on unsupported mitigation promises from action agencies.

In addition to unlawfully raising the bar for considering the effects of agency actions, the Services unlawfully lowered the bar for accepting an action agency's promises of forthcoming mitigation measures to avoid or reduce such effects. When evaluating the likelihood that an agency action will jeopardize a species or adversely modify or destroy critical habitat, it is essential that the Services conduct a comprehensive and realistic evaluation of the action's effects. Agencies often propose measures to minimize an action's impacts on a species or habitat,

1   but these measures are effective only if they are sufficiently concrete and ultimately

2   implemented. When the Services base biological opinions on speculative minimization measures,

3   they make erroneous no-jeopardy determinations and approve actions likely to unlawfully harm

4   listed species.

5       To avoid that outcome, the Ninth Circuit has consistently construed the plain terms of

6   Section 7(a)(2) as prohibiting the Services from relying on minimization measures unsupported

7   by specific, binding plans. In *National Wildlife Federation v. National Marine Fisheries Service*,

8   conservation organizations challenged NMFS's determination that the operation of dams would

9   not jeopardize ESA-listed salmon and steelhead or adversely modify their habitat. 524 F.3d 917

10  (9th Cir. 2008). The biological opinion relied on the action agency's stated intention to make

11  structural improvements facilitating safe passage for the fish. *See id.* at 935–36. The appellate

12  court rejected NMFS's determination, stating, "[W]e are not persuaded that even a sincere

13  general commitment to future improvements may be included in the proposed action in order to

14  offset its certain immediate negative effects, absent *specific and binding plans*. Although the

15  record does reflect a general desire to install structural improvements where feasible, it does not

16  show a clear, definite commitment of resources for future improvements." *Id.* (emphasis added).

17  *See also Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1258 (9th Cir. 2017) ("[O]ur precedents

18  require an agency to identify and guarantee mitigation measures that target certain or existing

19  negative effects."); *Sierra Club v. Marsh*, 816 F.2d 1376, 1385–86 (9th Cir. 1987) (holding that

20  the risk that planned mitigation measure might not be implemented "must be borne by the

21  project, not by the endangered species"), *abrogation on other grounds recognized in Cottonwood

22  Env't Law Ctr.*, 789 F.3d at 1088 & n.13.[5]

---

[5] The sole case that the Services cite to support their position does not address the question at
hand—whether the Services must require a binding commitment for minimization measures
assessed in a biological opinion—but rather addresses whether such measures are enforceable if
not implemented. *See* 84 Fed. Reg. at 45003 (citing *Ctr. for Biological Diversity v. U.S. Bureau
of Land Mgmt.*, 698 F.3d 1101, 1114–15 (9th Cir. 2012)). Enforceability is a separate question,
and not one that negates the need for a specific and binding plan.

1    The 2019 Regulations fly in the face of the plain terms of the ESA and Ninth Circuit

2    precedent construing it. The Regulations not only allow approval of agency actions with

3    amorphous, non-binding plans for offsetting impacts—making it impossible for the Services to

4    "insure" against jeopardy—they go so far as to explicitly *prohibit* the Services from "requir[ing]

5    any additional demonstration of binding plans" for measures intended to minimize an agency

6    action's impacts on a species or habitat. 50 C.F.R. § 402.14(g)(8). The Services' defiance of

7    governing precedent could hardly be more stark: while Ninth Circuit case law prohibits the

8    Services from considering the offsetting effects of mitigation measures "absent specific and

9    binding plans," *Nat'l Wildlife Fed'n*, 524 F.3d at 935–36, the challenged regulation prohibits the

10   Services from requiring "binding plans" to consider such measures, 50 C.F.R. § 402.14(g)(8).

11   This regulation constrains the Services' analysis during formal consultation, allowing—and even

12   compelling—the Services to ignore an action's likely adverse effects by assuming without

13   evidence that they will be minimized by uncertain offsets. In short, the Services must now

14   assume the implementation of minimization measures, however *unlikely* they are to occur. This

15   change is particularly corrosive of the ESA regulatory scheme when combined with the Services'

16   revision of the "effects" definition, discussed above, because the Services now require the effects

17   of agency action to be disregarded unless "reasonably certain to occur," while the offsetting

18   effects of proposed mitigation measures are assumed to be reasonably certain to occur without

19   any demonstration of the truth of that assumption. This is the antithesis of "*insur[ing]*" that an

20   agency action "is not likely to jeopardize the continued existence of any endangered species or

21   threatened species or result in the destruction or adverse modification of [critical] habitat," as the

22   ESA requires. 16 U.S.C. § 1536(a)(2) (emphasis added); *see also id.* § 1536(b)(3).

23   In attempting to defend this misguided revision, the Services inaccurately claimed that

24   the new regulatory language clarified case law "confusion." 84 Fed. Reg. at 45003. But what

25   they labeled as "confusion" is nothing more than their disagreement with contrary precedent

26   interpreting the ESA. The Services cannot substitute their preferred interpretation for the "best

27   reading" of the statute. *Loper Bright*, 603 U.S. at 400.

28

1    The Services also asserted that they had "eliminate[d] a double standard such that all

2  aspects of the proposed action are treated the same by assuming the action will be implemented

3  as proposed in its entirety" and that minimization measures should "not be forced to meet a

4  heightened threshold" compared to harmful effects. 84 Fed. Reg. at 45007. First, that statement

5  is simply incorrect because, as discussed, the new regulation requires a higher demonstration of

6  certainty for the effects of an agency action than it does for unrealized mitigation offsets.

7    Second, even if this rationale could justify ignoring the plain terms of the ESA and

8  binding precedent—which it cannot—it makes no sense. Action agencies can be presumed to

9  pursue their "primary missions" as set forth in their proposed actions. *Tenn. Valley Auth.*, 437

10  U.S. at 154. They cannot be presumed to have the same level of interest in safeguarding the

11  interests of imperiled species. That is the entire premise behind the "institutionalized caution"

12  embodied in interagency consultation required by Section 7 of the ESA. *Id.* at 194.

13    And third, the ESA expressly requires agencies to "insure" that their actions are not likely

14  to cause jeopardy, 16 U.S.C. § 1536(a)(2). As the Supreme Court has recognized in construing

15  Section 7(a)(2), "To insure something . . . means to make certain, to secure, to guarantee (some

16  thing, event, etc.)." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 667 (2007)

17  (cleaned up). What the Services called a "double standard" merely reflects that, under the ESA,

18  Congress sought to insure implementation of measures that protect listed species and to prevent

19  measures that jeopardize them.

20    Next, the Services claim that action agencies "are in the best position to determine

21  whether measures they propose to undertake . . . are sufficiently certain to occur." 84 Fed. Reg.

22  at 45002. But, as the Ninth Circuit has made clear, the question is not who gets to make a

23  judgment call as to the likelihood that minimization measures will be implemented; rather, the

24  ESA requires "specific and binding plans" to avoid leaving that question to such subjective

25  judgments. *Nat'l Wildlife Fed'n*, 524 F.3d at 935–36. Indeed, the Ninth Circuit has explicitly

26  rejected the Services' reliance on an action agency's "sincere general commitment to future

27  improvements." *Id.* Yet the Service's regulation explicitly invites such reliance.

28

1    Finally, the Services suggest that binding commitments to implement minimization

2  measures are gratuitous because an action agency's failure to implement such measures could

3  trigger other statutory guardrails such as mandatory reinitiation of consultation (if allowable

4  incidental take is exceeded) or enforcement actions and citizen suits (if the acts prohibited by

5  ESA § 9 are committed). *See* 84 Fed. Reg. at 45003–04. However, this ignores the critical point

6  that the purpose of ESA Section 7 is to "insure" against the likelihood of jeopardy or adverse

7  modification at the outset, 16 U.S.C. § 1536(a)(2), not merely to respond when jeopardizing

8  action or adverse modification is in progress—an approach the Ninth Circuit has rejected. In

9  *Wild Fish Conservancy v. Salazar*, FWS arbitrarily limited its analysis to a five-year period and

10  failed to analyze the possibility of longer-term jeopardy. 628 F.3d 513, 521 (9th Cir. 2010).

11  Rejecting the limited scope of FWS's analysis, the court explained that "[t]he duty to reinitiate

12  consultation in the future . . . does not diminish the Service's obligation to prepare a

13  comprehensive biological opinion now." *Id.* at 525. *See also AquAlliance v. U.S. Bureau of*

14  *Reclamation*, 287 F. Supp. 3d 969, 1074 n.59 (E.D. Cal. 2018) (rejecting reliance on a

15  conservation measure of "adaptive management" that was "so non-specific as to be essentially

16  meaningless, save that it promises what is already required by law: reinitiation of consultation

17  should the project have unanticipated effects"). By failing to consider the *prospective* role of

18  consultation in *preventing* unacceptable consequences, the Services again violated the ESA.

19
20  ###    C.    The Services unlawfully defined "destruction or adverse modification" to allow more harm to critical habitat.

21    The Services further erred in narrowing the definition of a critical prohibited outcome

22  under the ESA—the "destruction or adverse modification" of a listed species' designated critical

23  habitat. The ESA requires the Services to designate critical habitat because the statute recognizes

24  that habitat is essential for species survival and recovery, and the Section 7 consultation process

25  works to insure that federal agency action is not likely to result in the "destruction or adverse

26  modification" of such critical habitat. 16 U.S.C. § 1536(a)(2). However, in 2019, the Services

27  amended Section 7's implementing regulations to require that a federal action must appreciably

28  diminish "the value of critical habitat *as a whole*" to meet the definition of "destruction or

adverse modification" of critical habitat. 50 C.F.R. § 402.02 (emphasis added). The Services also failed to separately define "destruction" and "adverse modification," instead conflating the two terms, ignoring their separate plain meaning and Congress's use of the disjunctive "or" to make clear that these two terms refer to two different things. For both of these reasons, the definition unlawfully undermined the protections of critical habitat afforded by Section 7.

        1.    <u>The "as a whole" approach allows a greater amount of harm to the critical habitat of endangered and threatened species in contravention of the ESA.</u>

First, adding "as a whole" to the regulatory definition of "destruction or adverse modification" of critical habitat flouts the plain terms of the statute. The ESA provides that action agencies and the Services must "insure" that their actions are not likely to "result in the destruction or adverse modification" of designated critical habitat. This unequivocal mandate reflects Congress's determination that critical habitat—which is designated *after* economic impacts are taken into account, 16 U.S.C. § 1533(b)(2)—is *essential* for the "conservation," i.e., "recovery" of listed species. *See id.* § 1532(5)(A)(i), (ii) (defining "critical habitat" as the areas "essential to the conservation of the species"); *id.* § 1532(3) (defining "conservation" as "use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this [Act] are no longer necessary"); *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004) (holding that destruction or adverse modification can "occur when sufficient critical habitat is lost so as to threaten a species' *recovery* even if there remains sufficient critical habitat for the species' survival" (emphasis added)).

Yet allowing such "essential" critical habitat to be eroded until its value is diminished "as a whole" eviscerates Section 7's protections. It replaces a categorical statutory prohibition with a regulatory provision that vastly increases the allowable impact to critical habitat. Under the 2019 and 2024 Regulations, a proposed action's adverse effects will be found to result in "destruction or adverse modification" *only* if they "will diminish the conservation value of the critical habitat in such a considerable way that the *overall value of the entire critical habitat designation* to the conservation of the species is appreciably diminished." 84 Fed. Reg. at 44986 (emphasis added).

1    "It is only when adverse effects from a proposed action rise to this *considerable level* that the

2    ultimate conclusion of 'destruction or adverse modification' of critical habitat can be reached."

3    *Id.* (emphasis added). This regulatory addition makes clear that only extensive impacts to the

4    conservation value of an entire critical habitat designation will meet this standard. This is hardly

5    the "best reading" of the ESA. *Loper Bright*, 603 U.S. at 400, 412.

6    The Ninth Circuit recognized the flaw in this approach when assessing the Services'

7    analysis of impacts to critical habitat under the prior regulatory definition, finding that

8    "[f]ocusing solely on a vast scale can mask multiple site-specific impacts that, when aggregated,

9    do pose a significant risk to a species." *Gifford Pinchot Task Force*, 378 F.3d at 1075; *see also*

10   *Nez Perce Tribe v. NOAA Fisheries*, No. 07-00247, 2008 WL 938430, at *10 (D. Idaho Apr. 7,

11   2008) (rejecting argument that impact of agency action "is too small to matter" in critical habitat

12   analysis, where action would degrade habitat for ESA-listed fish species and "good habitat is not

13   abundant elsewhere"). Yet the challenged regulatory change embodies this flawed approach. For

14   example, the "as a whole" regulatory definition fails to acknowledge that species often require

15   multiple populations dispersed across different locations to achieve stability and resilience. And

16   it disregards circumstances where relatively small areas within a larger critical habitat

17   designation are necessary for specific life functions such as breeding, nesting, or foraging.

18   The threat of piecemeal destruction of habitat especially affects highly migratory or wide-

19   ranging species, which require large amounts of designated critical habitat, sometimes in

20   contiguous units. In the context of the jeopardy analysis, the Ninth Circuit warned against an

21   approach in which "a listed species could be gradually destroyed, so long as each step on the

22   path to destruction is sufficiently modest." *Nat'l Wildlife Fed'n*, 524 F.3d at 930; *see also Pac.*

23   *Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1036–37 (9th

24   Cir. 2001) (noting in the jeopardy context that, "[w]ithout aggregation, the large spatial scale

25   appears to be calculated to ignore the effects of individual sites and projects"). Similarly, here,

26   the Services' "as a whole" regulatory definition threatens a "slow slide into oblivion," by

27   allowing piecemeal destruction or adverse modification which is "one of the very ills the ESA

28   seeks to prevent." *Nat'l Wildlife Fed'n*, 524 F.3d at 930.

Further, the Services' new definition fails to account for the importance of critical habitat for species recovery, as distinct from species survival. According to the Ninth Circuit, destruction or adverse modification can "occur when sufficient critical habitat is lost so as to threaten a species' recovery even if there remains sufficient critical habitat for the species' survival." *Gifford Pinchot*, 378 F.3d at 1070, *superseded on other grounds by regulation as stated in Zinke*, 856 F.3d at 1260; *see also Ctr. for Native Ecosystems v. Cables*, 509 F.3d 1310, 1321–22 (10th Cir. 2007) ("critical habitat is adversely modified by actions that adversely affect a species' recovery" (cleaned up)). But under the challenged regulatory definition, as long as a proposed action does not appreciably diminish the value of the entire critical habitat, the destruction of significant portions or features of habitat "essential" for listed species' recovery is permitted. *See* 16 U.S.C. § 1532(5)(A) (defining critical habitat as essential for species conservation); *Gifford Pinchot*, 378 F.3d at 1070 (emphasizing that critical habitat is "necessary" for survival and recovery).

In attempting to defend the new "as a whole" language in the 2024 regulatory preamble, the Services sought to diminish its significance, claiming it "will not reduce or alter how the Services consider the effects of small changes to critical habitat," and that "impacts to a smaller area may in some cases result in a determination of destruction or adverse modification." 89 Fed. Reg. at 24290. Yet this rationale begs the question of why the Services added the new language if it accomplished no change in the regulatory process. And the Services' lip service about consideration of smaller-scale impacts rings hollow given that these preamble assurances did not make it into the actual regulatory language, which provides for a finding of "destruction or adverse modification" only where critical habitat is impacted "as a whole." 50 C.F.R. § 402.02. *See Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531–33 (2009) (rejecting agency's reliance on regulatory preamble language that "cannot be reconciled with the regulation's" actual language).

The Services equally err in claiming that the Ninth Circuit "endorsed" their approach in *Butte Environmental Council v. U.S. Army Corps of Engineers*, 620 F.3d 936 (9th Cir. 2010). To begin with, that case does not address the specific statutory construction issue raised here, let

1    alone explain how the "as a whole" formulation can be reconciled with the plain language of

2    Section 7. This case, unlike *Butte Environmental Council*, squarely raises the issue of whether

3    the "best reading" of the ESA allows the Service to carve out a massive loophole that Congress

4    did not see fit to adopt.

5        To be sure, *Butte Environmental Council* recognized that in some circumstances "[a]n

6    area of a species' critical habitat can be destroyed without appreciably diminishing the value of

7    critical habitat for the species' survival or recovery." 620 F.3d at 948. However, recognizing that

8    *every* encroachment on critical habitat does not rise to the level of "destruction or adverse

9    modification" does not amount to an endorsement of the view that only impacts to the value of

10   critical habitat "*as a whole*" rise to that level. To the contrary, the *Butte Environmental Council*

11   court cited and quoted the *Gifford Pinchot* holding that focusing on a vast scale can improperly

12   mask important localized impacts—but found no evidence of such masking in that case. *Id.*

13   Moreover, *Butte Environmental Council* "express[ed] no opinion on whether the 'adverse

14   modification' inquiry under section 7 of the ESA properly focuses on the effects of an action on

15   a particular unit of critical habitat or on total critical habitat nationwide." *Id.* at 948 n.1. Yet the

16   Services' new definition focuses the inquiry on total critical habitat to the exclusion of more

17   unit-specific considerations. *Butte Environmental Council* cannot salvage the Services' unlawful

18   grafting of the "as a whole" language to the statutory prohibition.

19           2.    <u>The lack of separate definitions improperly conflates "destruction" and</u>
20                 <u>"adverse modification."</u>

21       In addition, in the challenged rules, the Services have perpetuated their failure to

22   separately define the two terms "destruction *or* adverse modification"—a longstanding error that

23   is even more consequential under the new definition. The "ordinary use" of the term "or" is

24   "almost always disjunctive" and the words it connects are to "be given separate meanings."

25   *United States v. Woods*, 571 U.S. 31, 45–46 (2013) (quoting *Reiter v. Sonotone Corp.*, 442 U.S.

26   330, 339 (1979)). And generally, textual interpretations that "give no significance" to portions of

27   the statute are "disfavored." *Nat'l Wildlife Fed'n*, 524 F.3d at 932; *see also Bennett v. Spear*, 520

28   U.S. 154, 173 (1997) ("It is the cardinal principle of statutory construction that it is [the courts']

1  duty to give effect, if possible, to every clause and word of a statute." (cleaned up)). By defining

2  these two terms together, the Services failed to give them separate meanings, rendering language

3  in the ESA meaningless and disregarding the underlying Congressional intent. *See* 16 U.S.C.

4  § 1536(a)(2); *Gifford Pinchot*, 378 F.3d at 1070 ("Where Congress in its statutory language

5  required 'or,' the agency in its regulatory definition substituted 'and.' This is not merely a

6  technical glitch, but rather a failure of the regulation to implement Congressional will.").

7       Moreover, conflating the two terms is especially improper since they plainly have distinct

8  meanings and import. "Destruction" is defined as "the action or process of destroying

9  something,"[6] and "destroy" is defined as "to ruin the structure, organic existence, or condition

10  of."[7] In comparison, "adverse" is defined as "causing harm,"[8] while modification is defined as

11  "the making of a limited change in something."[9] The difference is plain. "Destruction" refers to

12  an action that completely and permanently eliminates critical habitat for a species—such as the

13  paving over of habitat to build a parking lot. "Adverse modification," on the other hand, refers to

14  an action that impairs the value of critical habitat for the species' survival or recovery but not in

15  a manner that necessarily precludes that habitat from ever having conservation value—such as

16  logging that removes important habitat components until trees grow back. The first is permanent

17  and irreversible as a practical matter; the second entails a less extreme impact that may

18  nevertheless significantly devalue the habitat for the species' recovery.

19       The addition of "as a whole" exacerbates the Services' failure to separately define

20  destruction and adverse modification. In conflating the two terms, the Services arbitrarily

21  assumed that the same geographic scope—i.e., all of it—should apply to both destruction and

22  adverse modification, but that underscores the practical as well as legal infirmity in conflating

23

24  [6] *Destruction*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/destruction (last visited Apr. 26, 2025).

25  [7] *Destroy*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/destroy (last visited Apr. 26, 2025).

26  [8] *Adverse*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/adverse (last visited Apr. 26, 2025).

27  [9] *Modification*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/modification (last visited Apr. 26, 2025).

28

these distinct concepts. The Services did not recognize that *destroying*—i.e., rendering entirely useless—a smaller tract of critical habitat could imperil a species as much (if not more) than *adversely modifying* a larger tract. As the Ninth Circuit noted in the context of overturning a regulation defining "destruction or adverse modification" as occurring only when there was appreciable diminishment of the value of the critical habitat for both survival *and* conservation, "[t]he agency's interpretation would drastically narrow the scope of protection commanded by Congress under the ESA." *Gifford Pinchot*, 378 F.3d at 1070. For this reason too, the Services' amended definition of "destruction or adverse modification" is contrary to the plain terms of the ESA.

### D.    The Services unlawfully renounced their duty to request reinitiation of consultation.

The Services' new Section 7 Regulations also unlawfully and arbitrarily abandoned the Services' legal obligation to request reinitiation of interagency consultation where changed circumstances warrant such proceedings. Agency actions can have unanticipated adverse consequences. For example, the action may exceed the authorized level of incidental take or affect species listed after consultation in a manner not originally contemplated or foreseen. To address these situations, the implementing regulations have long required action agencies to reinitiate consultation under certain conditions to comply with their ongoing duty to insure against jeopardy and the destruction and adverse modification of critical habitat. The regulations have also required the Services to request reinitiation when they became aware that a triggering event, such as exceeding the level of take specified in an Incidental Take Statement, had occurred. In this context, the Services' role as the expert agencies on endangered or threatened species is an important check on action agencies that may be unaware of the need to reinitiate consultation or fail to act on it. However, in the 2024 Regulations, the Services eliminated their obligation to request reinitiation of consultation when listed species face threats beyond those contemplated in the initial consultation. *Compare* 50 C.F.R. § 402.16(a) *with* 51 Fed. Reg. at 19963.

1    The Services' sole justification for this change was that they lack authority to *compel*

2    action agencies to reinitiate consultation. *See, e.g.*, 89 Fed. Reg. at 24280. But that rationale

3    arbitrarily sidesteps whether the Services should at least be required to *request* that action

4    agencies reinitiate consultation, which is all that was required under the prior regulations. *See* 50

5    C.F.R. § 402.16 (2018). The Services acknowledged that they have authority to make such

6    requests and provided no rational explanation for renouncing their obligation to do so. *See* 89

7    Fed. Reg. at 24280.

8    Although the Services claimed that the revision reflects their longstanding interpretation

9    of the regulation, their cited sources—the Preamble to the 1986 Regulations and the 1998 ESA

10    Consultation Handbook, s*ee* 88 Fed. Reg. at 40757—offer no support for this assertion. The

11    1986 Preamble explicitly stated that, despite its lack of authority to require reinitiation, "the

12    Service *shall request* reinitiation when it believes that" such reinitiation is warranted under

13    governing standards. 51 Fed. Reg. at 19956 (emphasis added). The ESA Consultation Handbook

14    likewise stated that the Services cannot compel reinitiation but outlined a series of escalating

15    steps for the Services to take in the face of agency recalcitrance on this issue, including involving

16    high-level Service officials and referring any unauthorized take to law enforcement. *See ESA*

17    *Consultation Handbook* 2-10 to 2-11. Nothing in the Handbook suggests that the Services'

18    request to reinitiate consultation is futile or optional. *See also id.* 4-64 ("[I]f the Services

19    recognize that any of these conditions [requiring reinitiation] have occurred, written advice is

20    provided to the action agency of the need to reinitiate consultation.").

21    The Services also claimed that the revision was necessary to counteract recent case law

22    interpreting the prior language as requiring the Services to compel reinitiation, even after the

23    Services attempted to clarify their position in the 2019 Regulations. *See* 88 Fed. Reg. at 40756–

24    57 (citing *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 20-00020, 2020 WL 6710944

25    (D. Ariz. Nov. 16, 2020)). However, the cited ruling indicated that the Services could discharge

26    their legal duty simply by making a request to action agencies. *See Ctr. for Biological Diversity*,

27    2020 WL 6710944, at *4; *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 522 F. Supp. 3d 611,

28    616 (D. Ariz. 2021). But even assuming, for the sake of argument, that the regulation needed

1  clarification in view of these rulings, the Services could have made clear that they were retaining

2  their duty to *request* reinitiation.

3        In their 2023 proposal, the Services also claimed that "attempt[ing] to reinitiate

4  consultation unilaterally without a request for reinitiation and cooperation from the action agency

5  is contrary to the fundamental nature of the consultation process under section 7—a provision

6  that Congress entitled 'interagency cooperation.'" 88 Fed. Reg. at 40757. This assertion ignores

7  the unique statutory role of the Services, as consulting agencies with greater expertise than action

8  agencies in determining whether an action threatens unexamined impacts to wildlife, in assisting

9  action agencies in meeting their Section 7 obligations. *See* 16 U.S.C. § 1536(b) (providing for

10 expert biological opinions in ESA consultation); *see also id.* § 1533(c)(2) (requiring Services to

11 review the status of ESA-listed species at least once every five years).

12       In sum, by repeatedly seeking to justify their abandonment of the duty to request

13 reinitiation of Section 7 consultation based on rationales that failed to consider relevant factors or

14 were impermissibly implausible, the Services acted arbitrarily and capriciously.

15 **II.    THE SERVICES' CHANGES TO THE ESA SECTION 4 RULES ARE**
16 **ARBITRARY, CAPRICIOUS, AND CONTRARY TO THE ESA.**

17       The Services' revisions to the Section 4 implementing regulations equally violate

18 statutory provisions for protecting imperiled species. First, in the challenged regulations, the

19 Services limited their forecasting responsibilities in evaluating foreseeable threats to species that

20 may warrant listing as "threatened" species by limiting their evaluation of threats to only those

21 which the Services "can make reasonably reliable predictions" both "about the threats to the

22 species *and* the species' responses to those threats," 50 C.F.R. § 424.11(d) (emphasis added), in

23 defiance of the Act's best available science requirement and its conservation purpose. Second,

24 the Service contravened Congress's clear intent that critical habitat be designated for a species

25 concurrent with listing unless such a designation would not benefit the species by establishing

26 broad new exceptions for when the designation of critical habitat would be "not prudent." In line

27 with Congress's intent, prior to the 2019 and 2024 Regulations, and for approximately 35 years

28 since 1984, the Service previously set forth only two circumstances in which the designation of

critical habitat would not be prudent, both focused on the impact of identifying habitat on the species: (1) if identifying critical habitat could harm the species, or (2) where designating critical habitat would not benefit the species. 49 Fed. Reg. 38908, 38909 (Oct. 1, 1984). The expansion of this exception to the designation of critical habitat now threatens to swallow the rule, with an explicit statement that the Services could find that designation was not prudent in other, unenumerated circumstances. *See* 50 C.F.R. § 424.12(a)(1). Both actions violated the ESA.

### A. The Service's new definition of "Foreseeable Future" violates the plain language of the act and its conservation purpose.

The 2019 and 2024 Section 4 Regulations unlawfully restrict the Services' statutory responsibility to examine whether a species is likely to become imperiled in the "foreseeable future." The ESA defines "threatened species" as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). The Act does not provide a statutory definition of "foreseeable future," but when granting the Services the authority to list threatened species, Congress recognized the need to act quickly to protect species before they plunge into extinction. Accordingly, the very concept of a threatened species is necessarily forward-looking and predictive—"[t]he purpose of creating a separate designation for species which are 'threatened,' in addition to species which are 'endangered,' was to try to 'regulate these animals before the danger becomes imminent while long-range action is begun.'" *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 680 (D.D.C. 1997) (quoting S. Rep. No. 307, 93d Cong. 1st Sess. 3 (1973)). Indeed, the purpose of the ESA is "not only to protect the last remaining members of the species but to take steps to insure that species which are likely to be threatened with extinction never reach the state of being presently endangered." *Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1142 (9th Cir. 2001) (quoting legislative history); *see also Alaska Oil & Gas Ass'n*, 815 F.3d 544, 555 (Feb. 29, 2016) (noting that the ESA is "concerned with protecting the future of the species, not merely the preservation of existing [animals]").

However, the 2024 Regulations improperly limited the Services' consideration of the "foreseeable future" to extend only "as far into the future as the Services can make reasonably

1    reliable predictions about the threats to the species and the species' responses to those threats."

2    50 C.F.R. § 424.11(d). At first glance, such reasonably reliable predictions may seem to be a

3    logical requirement—one that is, in fact, reasonable. But the 2024 standard adds non-statutory

4    requirements and undermines the best available science standard.

5         The new regulatory definition of "foreseeable future" raised the bar by isolating two

6    separate aspects of the listing determination, requiring *both* the threats to the species *and* the

7    species' responses to those threats to be reasonably reliable. 50 C.F.R. § 424.11(d). Like the

8    Service's changes to the ESA Section 7 "effects" analysis discussed above, the Services'

9    regulatory addition of a new extra-statutory standard for these important Section 4 listing

10   determinations violated the ESA's best available science requirement. 16 U.S.C.

11   § 1533(b)(1)(A).

12        The Service's new "reasonably reliable predictions" requirement contradicts the ESA's

13   command for the Services to list a species as threatened "solely on the basis of the best scientific

14   and commercial data available." *Id*. This statutory mandate prohibits the Services from

15   "invok[ing] 'scientific uncertainty' to justify its action." *Greater Yellowstone Coal., Inc. v.*

16   *Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011). Instead, the Services must extrapolate from the

17   available data even when they do not have perfect clarity. *See Ariz. Cattle Growers' Ass'n v.*

18   *Salazar*, 606 F.3d 1160, 1164 (9th Cir. 2010) ("Although the [Service] cannot act on pure

19   speculation or contrary to the evidence, the ESA accepts agency decisions in the face of

20   uncertainty."). When doing so, the Services need only "identify the limits of that data when

21   making a listing determination." *Alaska Oil & Gas Ass'n*, 840 F.3d at 681. Not only does

22   "[u]ncertainty regarding the speed and magnitude of [an] adverse impact . . . not invalidate [that]

23   data[,]" *id.* at 683, but the Services are not free to "ignore available studies, even if it disagrees

24   with or discredits them[,]" *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995

25   (9th Cir. 2014).

26        Applying these ESA-derived standards, courts have consistently rejected arguments that

27   scientific information must meet a specified threshold of reliability to be considered in the

28   Section 4 listing analysis. Regarding the evaluation of threats to a species, the Ninth Circuit in

1    *Alaska Oil & Gas Association* reviewed whether NMFS's reliance on projections regarding

2    climate change and its resulting impact on sea ice would affect the future viability of bearded

3    seals. 840 F.3d at 674. The industry plaintiff contended that NMFS could not make reliable

4    predictions because of the variability in the climate models used by the agency. *Id.* at 679.

5    Indeed, when the models looked to the foreseeable future, the Ninth Circuit noted that their

6    prediction of "potential climate trends" "showed greater volatility, and thus less reliable

7    predictive value, in the Arctic." *Id.* at 678. The appellate court continued, however, to find that

8    "[t]he ESA does not require NMFS to base its decision on ironclad evidence when it determines

9    that a species is likely to become endangered in the foreseeable future; it simply requires the

10   agency to consider the best and most reliable scientific and commercial data and to identify the

11   limits of that data when making a listing determination." *Id.* at 681. The court upheld NMFS's

12   ultimate reliance on those models, despite their volatility, as consistent with the ESA's best

13   available science requirement. NMFS had also "provided a rational and reasonable basis" for

14   using the models, and the agency had "candidly disclosed the limitations of the available data

15   and its analysis." *Id.*

16        In the context of addressing a species' response to identified threats, the District Court in

17   Montana faced a similar issue when it reviewed FWS's determination that the wolverine did not

18   warrant listing as an endangered or threatened species. *Jewell*, 176 F. Supp. 3d at 975. One basis

19   for FWS's determination was that even if the wolverine lost the deep snow habitat used for

20   denning purposes, its listing was not warranted because "[t]he biological response of wolverine

21   populations to such changes" allegedly could not "reasonably be deduced with an acceptable

22   degree of certainty." *Id.* at 996. The court rejected this "demand for conclusiveness [as] contrary

23   to the law," *id.* at 1005, because "if evidence shows that wolverines need snow for denning

24   purposes, and the best available science projects a loss of snow as a result of climate where and

25   when wolverines den, then what sense does it make to deny that climate change is a threat to the

26   wolverine simply because research has yet to prove exactly *why* wolverines need snow for

27   denning?" *Id.* at 1004; *see also Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1064–

28   65, 1069 (9th Cir. 2021) (holding that FWS's decision not to list the Pacific walrus based on the

1    agency's assertion for "the potential for walruses to change behavior to adapt to the loss of sea

2    ice" was arbitrary and capricious because of FWS's prior statement that the best available

3    science showed that sea ice was necessary to the walrus's survival); *WildEarth Guardians v.*

4    *Haaland*, 561 F. Supp. 3d 890, 901–02 (C.D. Cal. 2021) (holding FWS decision not to list

5    Joshua trees in part due to contention that trees will be able to migrate arbitrary and capricious

6    because agency ignored evidence that species had an extremely limited capacity to migrate).

7         Yet, in the challenged rule, the Services have attempted to reintroduce the same kind of

8    misguided reliability requirement rejected in these cases and allow themselves to invoke

9    scientific uncertainty to deny protections to a species if either the threats themselves *or* the

10   species' reaction to those threats are less than "reasonably reliable." In so doing, they violated

11   the ESA's best available science requirement, which demands that the Services consider the best

12   available data and identify its limits in making listing determinations—it does not allow arbitrary

13   limits on such consideration. *See Alaska Oil & Gas Ass'n*, 840 F.3d at 681.

14        The Services' definition of foreseeable future also runs counter to the ESA's conservation

15   purpose. Congress required the Services to act on the basis of the best available science, so that

16   the Services would "take preventive measures before a species is 'conclusively' headed for

17   extinction." *Babbitt*, 958 F. Supp. at 679–80 (quoting S. Rep. No. 307, 93d Cong. 1st Sess. 3

18   (1973)). Indeed, Congress was clear that the term foreseeable future was meant to allow the

19   Services to "forecast population trends" in order to list species "before the danger [of extinction]

20   becomes imminent." S. Rep. No. 93-307, at 3 (1973), *as reprinted in* 1973 U.S.C.C.A.N. 2989,

21   2992. As the Supreme Court has found, Congress spoke "in the plainest of words, making it

22   abundantly clear that the balance has been struck in favor of affording endangered species the

23   highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'"

24   *Tenn. Valley Auth.*, 437 U.S. at 194. The Services' definition of foreseeable future does the exact

25   opposite, striking the balance in favor of denying threatened species necessary protections. For

26   this reason too, the Services violated the ESA.

27

28

**B.    The Services impermissibly expanded a narrow exception to the command to designate critical habitat to the maximum extent prudent.**

The Services further violated ESA Section 4 by unlawfully expanding regulatory exceptions to their duty to designate critical habitat "to the maximum extent prudent and determinable." 16 U.S.C. § 1533(a)(3). Habitat destruction and degradation are leading causes of species imperilment and extinction in the United States and worldwide. Recognizing this, and that the "destruction of critical habitat . . . has proven also to be the most difficult [threat] to control," H.R. Rep. No. 93-412, at 5 (1973), Congress established that one of the ESA's primary purposes is to conserve habitat and ecosystems. 16 U.S.C. § 1531(b).

To give life to this purpose, the Act requires the Services to designate critical habitat for species concurrent with listing "to the *maximum extent prudent* and determinable." *Id.* § 1533(a)(3) (emphasis added), (b)(2), (b)(6)(A)(II), (b)(6)(C). In issuing this command, Congress required a precautionary approach in which critical habitat must be designated for listed species except in rare circumstances where it would not benefit them.

The ESA's legislative history confirms this view, explaining that the "not prudent" exception is strictly limited to "rare circumstances where the specification of critical habitat . . . would not be beneficial to the species." H.R. Rep. No. 95-1625, at 17 (1978), 1978 WL 8486; *see also* S. Rep. No. 106-126, at 10 (1999), 1999 WL 33592886 (underscoring that the Service's authority to "determine that designation is not prudent . . . is to be exercised only in rare situations"). In other words, it is to be applied where designation "would not be in the best interests of the species." H.R. Rep. No. 95-1625, at 16.

Congress meant the "imprudence exception" to the ESA's mandate for designation of critical habitat "to be a narrow one," *NRDC v. U.S. Dep't of the Interior*, 113 F.3d 1121, 1126 (9th Cir. 1997), and intended "that a 'not prudent' finding regarding critical habitat would only occur under 'rare' or 'limited' circumstances." *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 443 (5th Cir. 2001); *see also N. Spotted Owl v. Lujan*, 758 F. Supp. 621, 626 (W.D. Wash. 1991) ("This legislative history leaves little room for doubt regarding the intent of

1  Congress: The designation of critical habitat is to coincide with the final listing decision absent

2  extraordinary circumstances.").

3       The Services' challenged regulations defy this statutory commandment for critical habitat

4  designation in all but exceptional circumstances. They substantially expand the circumstances

5  under which the Services may find designation of critical habitat "not prudent" to include

6  instances in which "[t]he present or threatened destruction, modification, or curtailment of a

7  species' habitat or range is not a threat to the species" or "[a]reas within the jurisdiction of the

8  United States provide no more than negligible conservation value, if any, for a species occurring

9  primarily outside the jurisdiction of the United States," and they throw the door open even wider

10  by stating that the Services' power to forego designating critical habitat is "not limited to" the

11  reasons listed in the regulatory text. 50 C.F.R. § 424.12(a)(1)(i)–(iii). These regulatory changes

12  marked a sharp departure from the Services' prior regulation on this issue, enacted in 2016,

13  which simply equated "not prudent" with "no benefit." *See* Implementing Changes to the

14  Regulations for Designating Critical Habitat, 81 Fed. Reg. 7414, 7425 (Feb. 11, 2016) ("[I]t is

15  permissible . . . to determine that designating critical habitat for a species is not beneficial and,

16  therefore, not prudent.").

17       By broadly expanding the regulatory off-ramps to critical habitat designation, the

18  challenged rule enables the Services to forego designation of critical habitat even where it *would*

19  benefit listed species. For instance, the new regulations provide that designation is not prudent

20  where habitat loss is allegedly not a threat to the species, even though governing case law

21  underscores that critical habitat serves not only to stave off threats to a species' survival, but also

22  to "carve out territory that is . . . essential for the species' recovery," *Gifford Pinchot*, 378 F.3d at

23  1070. The new regulation inappropriately conflates the question of "threats," relevant to

24  determining whether a species is in danger of extinction now or in the foreseeable future within

25  the context of listing decisions, with the separate question of what is needed for a species'

26  "conservation," which the Act expressly defines as recovery. 16 U.S.C. § 1532(3). Not only does

27  this approach unlawfully enable the Services to leave vital recovery habitat unprotected, but it

28  also disregards other recognized conservation benefits of critical habitat designation beyond

1    merely alleviating threats, such as "through informing management partners of important

2    habitats, stimulating scientific surveys or research, promoting voluntary conservation actions,

3    and raising public awareness of habitats that are essential." 89 Fed. Reg. at 24317.

4    　　　Similarly, the new regulation allows the Services to decline to designate critical habitat

5    for a species generally found outside the United States based on the notion that such designation

6    would have a small impact on the species' conservation compared to its overall range. But the

7    ESA states that critical habitat will be designated to the "*maximum extent* prudent," 16 U.S.C. §

8    1533(a)(3) (emphasis added), and the legislative history is clear that the Services are to do what

9    they can for species *within* the United States: "There are certain areas which are critical which

10   can and should be set aside. It is the intent of this legislation to see that our ability to do so, *at*

11   *least within this country*, is maintained." H.R. Rep. No. 93-412, at 144 (1973) (emphasis added).

12   　　　Moreover, the Services' approach on this issue essentially replicates on an international

13   scale the approach rejected by the Ninth Circuit in *Natural Resources Defense Council v. U.S.*

14   *Department of the Interior*, where FWS sought to limit critical habitat designation to those

15   circumstances where "it would result in the application of section 7 to 'the *majority* of land-use

16   activities occurring within critical habitat.'" 113 F.3d 1121, 1125–26 (9th Cir. 1997) (quoting 58

17   Fed. Reg. 16742, 16756 (1993)). The Ninth Circuit reasoned in that case that:

18   　　　　By rewriting its "beneficial to the species" test for prudence into a "beneficial to
19   　　　　*most of* the species" requirement, the Service expands the narrow statutory
     　　　　exception for imprudent designations into a broad exemption for imperfect
20   　　　　designations. This expansive construction of the "no benefit" prong to the
     　　　　imprudence exception is inconsistent with clear congressional intent.

21   *Id.* at 1126. By the same reasoning, the Services cannot lawfully apply an equivalent "beneficial

22   to *most of* the species" rationale, *id.*, to deny the benefit of critical habitat protections to species

23   
24   found "*primarily* outside the jurisdiction of the United States." 50 C.F.R. § 424.12(a)(1)(iii)

25   (emphasis added).

26   　　　Based on these same principles, the Services' expansive new regulatory provision stating

27   that the permissible grounds for avoiding critical habitat designations are "not limited to" even

28   the unlawful new categories discussed above, *id.* § 424.12(a)(1), contravenes the ESA. This

1  provision flouts Congress's intent to constrain the Services' discretion and conflicts with the

2  precedent discussed above holding that ESA Section 4(a)(3)(A) is to be strictly interpreted in

3  favor of designating critical habitat. Put simply, Congress's intent "that a 'not prudent' finding

4  regarding critical habitat would only occur under 'rare' or 'limited' circumstances," *Sierra Club*,

5  245 F.3d at 443, cannot be honored by giving the Services a blank check to forego such

6  designations. For all these reasons, the Services' broad new exceptions from their ESA Section 4

7  duty to designate critical habitat are arbitrary and unlawful.

8  **III.    THE SERVICES AGAIN VIOLATED NEPA.**

9      In addition to violating the ESA, the Services violated NEPA by failing to consider and

10  disclose the environmental impacts of rolling back key regulatory protections for endangered and

11  threatened species and their habitats in the Section 4 implementing regulations. Instead of

12  following NEPA's mandate to examine such impacts and study alternatives to avoid them, the

13  Services in 2019 and 2024 contended that their weakening of the prior regulatory framework was

14  so inconsequential as to be "categorically excluded" from NEPA compliance altogether.

15  Accordingly, the Services violated NEPA.

16  **A.    NEPA requires environmental analysis of major federal actions.**

17      NEPA has "twin aims." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S.

18  87, 97 (1983). First, it requires each federal agency "to consider every significant aspect of the

19  environmental impact of a proposed action. Second, it ensures that the agency will inform the

20  public that it has indeed considered environmental concerns in its decisionmaking process." *Kern*

21  *v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (quoting *Balt. Gas & Elec.*, 462

22  U.S. at 97).

23      To that end, NEPA's "look before you leap" mandate requires federal agencies to prepare

24  a detailed environmental impact statement ("EIS") before undertaking "major Federal actions

25  significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C) (2019 &

26

27

28

2024),[10] with the aim of identifying resulting impacts and exploring alternative approaches and mitigations to lessen such impacts, *see* 42 U.S.C. § 4332(C)(iii), (F) (2024); 42 U.S.C. § 4332(C)(iii), (E) (2019). In this regard, "the term 'actions' refers not only to construction of particular facilities, but includes project proposals, proposals for new legislation, *regulations*, policy statements, or expansion or *revision of ongoing programs*." *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1088 (D.C. Cir. 1973) (cleaned up, emphases added). Pursuant to implementing regulations promulgated by the Council on Environmental Quality ("CEQ") that were effective when the Services promulgated the rules, if an agency believes a proposed action is unlikely to have significant environmental effects, or is unsure whether it will do so, it may prepare a less exhaustive environmental assessment ("EA") of the action. 40 C.F.R. § 1501.5 (2024); 40 C.F.R. § 1508.9 (2019); *see also* 42 U.S.C. § 4336(b)(2) (2024). "If substantial questions are raised regarding whether the proposed action *may* have a significant effect upon the human environment, a decision not to prepare an EIS is unreasonable." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).

In narrow situations, neither an EIS nor an EA is required and federal agencies may invoke a categorical exclusion ("CE") from further NEPA analysis. *See* 40 C.F.R. § 1501.4 (2024); 40 C.F.R. § 1508.4 (2019); *see also* 42 U.S.C. §§ 4336(a)(2), 4336c (2024). CEs are appropriate only for categories of actions that the agency has previously determined "normally do not have a significant effect on the human environment." 40 C.F.R. § 1508.1(e) (2024); *see also id.* § 1501.4(a) (2024); 40 C.F.R. § 1508.4 (2019). Even if an agency determines that a CE covers a proposed action, the agency must still "evaluate the action for extraordinary

---

[10] NEPA's language and implementing regulations have recently been amended, but these changes do not affect Plaintiffs' claim. First, Congress amended NEPA in the Fiscal Responsibility Act of 2023. *See* Pub. L. No. 118-5, § 321, 137 Stat. 10, 38–46 (2023). However, these amendments do not "purport to apply retroactively." *Prutehi Litekyan v. U.S. Dep't of the Air Force*, 128 F.4th 1089, 1100 n.3 (9th Cir. 2025). Second, CEQ revised its NEPA regulations in 2020 and 2022 and withdrew them entirely in 2025. *See* 90 Fed. Reg. 10610 (Feb. 25, 2025); 87 Fed. Reg. 23453 (Apr. 20, 2022); 85 Fed. Reg. 43304 (July 16, 2020). However, in adjudicating NEPA claims, courts "look to the regulations in place at the time of the challenged decision." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 879 n.5 (9th Cir. 2022).

1    circumstances in which a normally excluded action may have a significant effect." 40 C.F.R. §

2    1501.4(b) (2024); *see also* 40 C.F.R. § 1508.4 (2019). Otherwise, the agency "shall prepare an

3    environmental assessment or environmental impact statement, as appropriate." 40 C.F.R. §

4    1501.4(b)(2) (2024); *see also* 40 C.F.R. § 1501.4 (2019). When relying on a CE, an agency

5    "must supply a convincing statement of reasons why potential effects are insignificant." *Alaska*

6    *Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999) (citation omitted).

7          **B.**    **The Services unlawfully evaded NEPA review for their revisions to the**
      **Section 4 implementing regulations.**

8

9          Notwithstanding NEPA's mandate, the Services did not analyze the impacts of their 2019

10   ESA rulemakings. Instead, the Services concluded that their 2019 Section 4 and 7 Rules were

11   categorically excluded from NEPA review and that no extraordinary circumstances were present.

12   *See* 84 Fed. Reg. at 45015 (Section 7 Rule); 84 Fed. Reg. at 45051–52 (Section 4 Rule);

13   AR_ESA00005–7, 8–10 (NMFS CE memos); AR_ESA00134–54, 156–66 (FWS CE memos).

14   Specifically, the Services sought to invoke their established CEs for regulations "of an

15   administrative, financial, legal, technical, or procedural nature." AR_ESA00005, 8 (referencing

16   NOAA CE G7); AR_ESA00136, 158 (referencing 43 C.F.R. § 46.210(i)); *see also*

17   AR_ESA00138–54; AR_ESA00160–66 (FWS repeatedly offering rote assertion that all 2019

18   regulatory changes "are of an administrative, legal or technical nature"). The Services claimed

19   that the Section 4 Rule "go[es] no further than to clarify the existing regulations and make them

20   more consistent with the statutory language, case law, and plain-language standards," and does

21   not "substantively chang[e] the status quo." 84 Fed. Reg. at 45051. In 2024, the Services

22   prepared an environmental assessment covering some of the revisions to portions of the Section

23   7 regulatory revisions but again relied on a CE for Section 4, failing to cure—and instead

24   perpetuating—the NEPA violations from 2019 as to the Section 4 changes. *See*

25   ESA_S4_AR00698 (FWS Section 4 Rule CE); ESA_S4_AR00012 (NMFS Section 4 Rule CE).

26   The use of CEs for the Section 4 regulatory revisions in 2019 and 2024 was arbitrary and the

27

28

Services' CE invocations were unlawful.

        1.    <u>The Section 4 regulatory revisions substantively weakened the ESA
regulatory framework and could not qualify for a CE.</u>

First, rather than being merely administrative, technical, or procedural, the Services'
2019 and 2024 ESA Rules substantively weakened protections for endangered and threatened
species. For example, the revised regulations added an allowance for the Services to deem
designation of critical habitat for listed species imprudent where existing or threatened habitat
destruction is "not a threat to the species," 84 Fed. Reg. at 45053 (50 C.F.R.
§ 424.12(a)(1)(ii))—even though prior case law underscored that critical habitat serves not only
to stave off threats to a species' survival, but also to "carve out territory that is . . . essential for
the species' recovery," *Gifford Pinchot*, 378 F.3d at 1070, and that "Congress intended the
imprudence exception to be a narrow one," *NRDC*, 113 F.3d at 1126. Because the changes
substantively weakened the ESA regulatory framework, the Services erred in relying upon a CE
that applies solely to actions "of an administrative, financial, legal, technical, or procedural
nature" to approve them. AR_ESA00008; AR_ESA00158. *See West v. Sec'y of Dep't of Transp.*,
206 F.3d 920, 929 (9th Cir. 2000) (holding that agency violated NEPA in relying on CE where
agency project was "inconsistent with the terms used in the [CE] regulation"). Put simply, the
CE that the Services invoked did not apply.

In addition to the facial inapplicability of the CE invoked by the Services, the potential
for significant environmental effects from the 2019 and 2024 Section 4 Rules precluded the
Services' use of a CE. Where, as here, agencies substantively weaken the programmatic
regulations that govern their future, site-specific actions and determinations, the resulting threat
of environmental harm prohibits reliance on a CE. *See Cal. ex rel. Lockyer v. U.S. Dep't of
Agric.*, 575 F.3d 999, 1012–18 (9th Cir. 2009) (rejecting agency invocation of CE in replacing
protections for national forest roadless lands with procedural petitioning process); *Citizens for
Better Forestry v. U.S. Dept. of Agric.* (*Citizens II*), 481 F. Supp. 2d 1059, 1087–90 (N.D. Cal.
2007) (invalidating agency reliance on CE in weakening national forest planning regulations).
This is because, as the Ninth Circuit has recognized, it is reasonable to conclude "that lower

1    environmental safeguards at the national programmatic level will result in lower environmental

2    standards at the site-specific level." *Citizens for Better Forestry v. U.S. Dep't of Agric.*

3    (*Citizens I*), 341 F.3d 961, 975 (9th Cir. 2003) (discussing standing); *see Citizens II*, 481 F.

4    Supp. 2d at 1089–90 (applying *Citizens I* in CE analysis).[11]

5        In sum, although NEPA demands "a convincing statement of reasons" for any CE, *Alaska*

6    *Ctr. for Env't*, 189 F.3d at 859, here the Services offered only a superficial justification that

7    ignored, and failed to grapple with, critical questions about the impact of the 2019 and 2024

8    Section 4 Rules' weakening of the ESA regulatory framework. For this reason, they violated

9    NEPA.

10            2.    <u>Extraordinary circumstances also precluded reliance on a CE.</u>

11        The Services also disregarded extraordinary circumstances that prohibited their

12    invocation of a CE for the 2019 and 2024 Section 4 Rules. *See* 40 C.F.R. § 1501.4(b) (2024); 40

13    C.F.R. § 1508.4 (2019). First and foremost, they arbitrarily dismissed the readily apparent

14    significant impacts on threatened and endangered species and their critical habitats, which are

15    deemed an "extraordinary circumstance" in the Department of the Interior's regulations. *See* 43

16    C.F.R. § 46.215; *see also* AR_ESA00009; AR_ESA00159. The only reasoning the Services

17    offered in support of their determination that this "extraordinary circumstance" does not apply

18    was FWS's cursory assertion that the Rules would not require reexamination of any completed

19    action and were "of an "administrative, technical, and/or procedural nature." AR_ESA00159.

20    But, as discussed above, this rationale erroneously disregarded the Rules' substantive weakening

21    of species protections. It also disregarded the obvious point that, although *completed* actions

22    might not be reexamined, *future* actions would be subjected to the Services' weakened regulatory

23    scheme. For this latter reason, the 2019 and 2024 Section 4 Rules also triggered an independent

24

25    ───────────────

26    [11] The requisite NEPA analysis for a programmatic action must necessarily rely to some extent
      on reasonable forecasting about the impact of weakening key regulatory standards, but
27    "[r]easonable forecasting and speculation is [] implicit in NEPA, and [courts] must reject any
      attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion
28    of future environmental effects as crystal ball inquiry." *City of Davis v. Coleman*, 521 F.2d 661,
      676 (9th Cir. 1975) (cleaned up).

"extraordinary circumstance" encompassing actions that "[e]stablish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects." 43 C.F.R. § 46.215(e). The Services' contrary conclusions were unreasoned and unlawful.

## IV.    PLAINTIFFS PROPERLY CHALLENGE PROVISIONS IN BOTH THE 2019 AND 2024 REGULATIONS.

In their Complaint, Plaintiffs explained that "[t]his action challenges the four regulatory revision packages issued in 2019 and 2024." ECF No. 23 ¶ 7; *see also id.* ¶ 115. Federal Defendants have stated their belief that only the 2024 Regulations are currently at issue. *See Ctr. for Biological Diversity*, 19-05206, ECF No. 202, at 4–5. The Parties agreed to resolve this issue through merits briefing. ECF No. 31 ¶ 14.

This action encompasses provisions in both the 2019 and 2024 Regulations for the straightforward reason that some of the challenged provisions were promulgated in 2019 and not amended in 2024. For example, the 2019 Regulations contained the challenged definition of "destruction or adverse modification" in 50 C.F.R. § 402.02, as well as the requirement to rely on agencies' mitigation promises in § 402.14(g)(8). *See* 84 Fed. Reg at 45016–17. Neither of those provisions was revised in 2024. *See* 89 Fed. Reg. at 24297–98 (neither revising nor repromulgating those provisions).

Federal Defendants have repeatedly acknowledged that not every subject in the 2019 Regulations was amended in 2024. In the 2024 Regulations, they stated, "The basis and purpose for this final rule are reflected in our explanation in the June 2023 proposed rule, the responses to comments below, *as well as the 2019 final rule for those aspects of the 2019 final rule we are not changing here*." 89 Fed. Reg. at 24268 (emphasis added). And in their Answer, they admitted that the notice for the 2024 Regulations "proposed rules to revise or rescind *certain provisions* of the 2019 Regulations." ECF No. 29 ¶ 35 (emphasis added). Therefore, for some of the challenged provisions, there is simply nothing in the 2024 Regulations to challenge, and the 2019 Regulations must be challenged directly.

1

2

### V.     __THIS COURT SHOULD VACATE AND REMAND THE CHALLENGED PROVISIONS.__

3

To remedy the Services' violation of the ESA and NEPA, the Court should vacate and

4 remand the Final Rule provisions challenged here. *See Alsea Valley All. v. Dep't of Com.*, 358

5 F.3d 1181, 1185 (9th Cir. 2004) ("[V]acatur of an unlawful agency rule normally accompanies a

6 remand."); *see also* 5 U.S.C. § 706(2) (providing for a "reviewing court" to "hold unlawful and

7 set aside" illegal agency action). Such vacatur will result in the reinstatement of the prior,

8 longstanding regulatory provisions. *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005)

9 ("The effect of invalidating an agency rule is to reinstate the rule previously in force.").

10 The default remedy for illegal agency action is vacatur. 5 U.S.C. § 706(2); *Klamath-*

11 *Siskiyou Wildlands Ctr. v. NMFS*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015) (noting "courts

12 in the Ninth Circuit decline vacatur only in rare circumstances"). Vacatur serves an essential

13 function in countering an agency's desire to stay with its chosen course. As the D.C. Circuit

14 recognized, vacatur of an illegal agency action helps to avoid the "danger that an agency, having

15 reached a particular result, may become so committed to that result as to resist engaging in any

16 genuine reconsideration of the issues." *Food Mktg. Inst. v. ICC*, 587 F.2d 1285, 1290 (D.C. Cir.

17 1978). The court emphasized that "[t]he agency's action on remand must be more than a barren

18 exercise of supplying reasons to support a pre-ordained result." *Id.*; *see also Greenpeace v.*

19 *NMFS*, 106 F. Supp. 2d 1066, 1078 (W.D. Wash. 2000) ("Environmental reviews of the kind at

20 issue here 'must be taken objectively and in good faith . . . and not as a subterfuge designed to

21 rationalize a decision already made.'" (citation omitted)).

22 Unlawful agency action creates a "presumption of vacatur," unless Defendants meet their

23 burden to show otherwise. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121–22

24 (9th Cir. 2018); *Ctr. for Env't Health v. Vilsack*, No. 15-01690, 2016 WL 3383954, at *13 (N.D.

25 Cal. June 20, 2016) (defendants failed to meet burden). The Ninth Circuit has authorized remand

26 without vacatur only in "rare" or "limited" circumstances, *Humane Soc'y of U.S. v. Locke*, 626

27 F.3d 1040, 1053 n.7 (9th Cir. 2010) ("rare circumstances"); *Pollinator Stewardship Council v.*

28 *EPA*, 806 F.3d 520, 532 (9th Cir. 2015) ("limited circumstances"), and only when the agency can

show that "*equity demands*" a departure from the presumptive remedy, *id.* (emphasis added) (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)). The Services can make no such showing here, and the Court should vacate and remand the challenged Final Rule provisions.

## CONCLUSION

For the reasons discussed above, Plaintiffs ask the Court to grant their motion for summary judgment, vacate the challenged provisions of the Section 4 and 7 Rules promulgated in 2019 and 2024, reinstate the prior ESA regulations, and remand to the Services to comply with the ESA, NEPA, and the APA.

Respectfully submitted this 28th day of April, 2025.

*/s/ Benjamin M. Levitan*
Benjamin M. Levitan (*pro hac vice*)
Earthjustice
48 Wall Street, Floor 15
New York, NY 10005
T: (202) 797-4317
blevitan@earthjustice.org

Andrea A. Treece (CA Bar #237639)
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
T: (415) 217-2000
atreece@earthjustice.org

Kristen L. Boyles (CA Bar #158450)
Charisa Gowen-Takahashi (CA Bar #342937)
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T: (206) 343-7340
kboyles@earthjustice.org
cgowentakahashi@earthjustice.org

*Counsel for Plaintiffs Center for Biological Diversity, Sierra Club, and WildEarth Guardians*

1                           */s/ Ryan Adair Shannon*

2                           Ryan Adair Shannon (OSB #155537)
(*pro hac vice* forthcoming)

3                           Center for Biological Diversity
P.O. Box 11374

4                           Portland, OR 97211
T: (971) 717-6407

5                           rshannon@biologicaldiversity.org

6

7                           *Attorney for Plaintiff Center for Biological Diversity*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28