1  ADAM R.F. GUSTAFSON
   Acting Assistant Attorney General
2  Environment & Natural Resources Division
   U.S. Department of Justice
3
   MICHAEL R. EITEL, Acting Assistant Chief
4  JOHN H. MARTIN, Senior Trial Attorney
   Wildlife & Marine Resources Section
5  999 18th Street, North Terrace 600
   Denver, Colorado 80202
6  Tel: 303-844-1479 (Eitel); 303-844-1383 (Martin)
   Email: Michael.Eitel@usdoj.gov;
7  Email: John.H.Martin@usdoj.gov
8
9  ANGELA N. ELLIS, Trial Attorney
   Natural Resources Section
10 150 M Street NE
   Washington, D.C. 20002
11 Tel:  (202) 305-0479
   Email: Angela.Ellis@usdoj.gov
12
13 *Attorneys for Federal Defendants*

14                 UNITED STATES DISTRICT COURT

15          NORTHERN DISTRICT OF CALIFORNIA (Oakland)

16

17 | CENTER FOR BIOLOGICAL DIVERSITY, et al., | Case No. 4:24-cv-04651-JST |
18 | | Related Case: 4:19-cv-5206-JST |
19 | Plaintiffs, | **DEFENDANTS' MOTION TO REMAND** |
20 | v. | **OR STAY, CROSS-MOTION FOR** |
21 | U.S. DEPARTMENT OF THE INTERIOR, et al., | **SUMMARY JUDGMENT, AND OPPOSITION TO PLAINTIFFS'** |
22 | | **MOTION FOR SUMMARY** |
   | Federal Defendants. | **JUDGMENT.** |
23 | | Date: October 16, 2025 |
24 | | Time: 2:00 P.M (PST) |
   | | Location: videoconference only |
25 | | Judge:  Hon. Jon S. Tigar |

26

27

28

## NOTICE OF MOTION

Please take notice that on October 16, 2025, at 2:00 P.M. PST, or as soon thereafter as counsel can be heard, the United States Departments of the Interior and Commerce, acting through the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (collectively "the Services") (altogether the "Federal Defendants"), will move this Court to remand or stay this case and to cross-move this Court for summary judgment on all claims.[1] The motion is based on the declarations and memorandum in support filed concurrently herewith, as well as the administrative records.

## RELIEF REQUESTED

Based on the motion and supporting materials, the Court should remand the 2024 Endangered Species Act ("ESA" or "the Act") regulations challenged here to the Services or, at a minimum, stay this case pending the completion of the rulemaking. Alternatively, the Court should dismiss this case for lack of jurisdiction, as Plaintiffs have failed to demonstrate Article III standing over each claim and each form of relief sought. Finally, if the Court reaches the merits, pursuant to Civil L. R. 7-2, Federal Defendants move for summary judgment on all claims in the First Amended Complaint (ECF 23) because Plaintiffs fail to demonstrate that the specific regulations at 50 C.F.R. Parts 402 and 424 challenged herein are contrary to law.

---

[1] As Federal Defendants stated in their motion for extension of time, which the Court granted, they intended to include all motions and requests for relief in one combined filing, which does not prejudice the parties given Federal Defendants did not seek an extension of the page limits. *See* ECF 42 at 3-4, ¶ 6.

**TABLE OF CONTENTS**

**PAGE**

STATEMENT OF THE CASE AND ISSUES.................................................................. 1

STATUTORY BACKGROUND........................................................................................ 1

  I. SECTION 4 OF THE ENDANGERED SPECIES ACT .......................................... 2

  II. SECTION 7 OF THE ENDANGERED SPECIES ACT ........................................ 2

STATEMENT OF FACTS ................................................................................................ 3

STANDARD OF REVIEW ............................................................................................... 5

ARGUMENT ...................................................................................................................... 6

  I.  THE COURT SHOULD REMAND THE 2024 ESA REGULATIONS OR, AT
     A MINIMUM, STAY THIS CASE. ..................................................................... 6

  II. THE COURT LACKS JURISDICTION AND SHOULD DISMISS THE CASE
     BECAUSE PLAINTIFFS FAILED TO DEMONSTRATE STANDING............................. 9

 III. THE CHALLENGED 2024 ESA RULES EMBODY THE BEST READING
     OF SECTIONS 4 AND SECTIONS 7 OF THE ESA. ....................................... 14

    A. The four challenged amendments to the ESA Section 7 regulations are each
       consistent with the ESA............................................................................................ 15

      1.The Services may limit Section 7 analyses to those consequences that are
        reasonably certain to occur and thus foreseeable.......................................... 15

      2. In Section 7 consultations, the Services may consider all mitigation measures
        described as part of an agency action. ............................................................ 22

      3. The Services may consider consequences to critical habitat as a whole
        when determining whether agency action would result in its destruction or
        adverse modification............................................................................................. 29

      4. The Services have no mandatory duty to request reinitiation of Section 7
        consultation. ........................................................................................................... 35

    B. The Services' regulations for listing species and designating critical habitat
       are reasonable and consistent with ESA Section 4........................................... 36

      1. The Services may define the "foreseeable future" based on their ability to
        make reasonably reliable predictions................................................................ 36

   2.The Services may define general circumstances when a determination of critical habitat may not be prudent. ............................................................................................... 40

IV. THE SERVICES COMPLIED WITH THE NATIONAL ENVIRONMENTAL POLICY ACT (NEPA). ............................................................................ 44

V. THE COURT SHOULD NOT VACATE THE 2024 ESA REGULATIONS. ....................... 48

CONCLUSION .............................................................................................................................. 50

# TABLE OF AUTHORITIES

**CASE**                                                                          **PAGE(S)**

*Alaska Oil & Gas Ass'n v. Pritzker,*
   840 F.3d 671 (9th Cir. 2016) ..................................................................... 18, 38, 39

*Ali v. Fed. Bureau of Prisons,*
   552 U.S. 214 (2008) ................................................................................................ 26

*Azar v. Allina Health Servs.,*
   587 U.S. 566 (2019) ................................................................................................ 42

*Babbitt v. Sweet Home Ch. of Cmtys. for a Great Or.,*
   515 U.S. 687 (1995) .......................................................................................... 15, 16

*Balt. Gas & Elec. Co. v. Nat. Res. Def.Council,*
   462 U.S. 87 (1983) .................................................................................................. 46

*Bear Valley Mut. Water Co. v. Jewell,*
   790 F.3d 977 (9th Cir. 2015) ............................................................................ 15, 40

*Bennett v. Spear,*
   520 U.S. 154 (1997) ................................................................................................ 19

*Bondi v. VanDerStok,*
   604 U.S. ---, 145 S. Ct. 857 (2025) ...................................................................... 15

*Butte Env't Council v. U.S. Army Corps of Eng'rs,*
   620 F.3d 936 (9th Cir. 2010) ............................................................................ 32, 50

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke,*
   889 F.3d 584 (9th Cir. 2018) .................................................................................. 6

*Cal. by & through Becerra v. Azar,*
   950 F.3d 1067 (9th Cir. 2020) ............................................................................... 12

*California Communities Against Toxics v. U.S. EPA,*
   688 F.3d 989 (9th Cir. 2012) ................................................................................. 49

*California v. Texas,*
   593 U.S. 659 (2021) ................................................................................................ 13

*Children's Health Def. v. Fed. Commc'ns Comm'n,*
   25 F.4th 1045 (D.C. Cir. 2022) ............................................................................... 6

*City of Tacoma, Wash. v. FERC*,
  460 F.3d 53 (D.C. Cir. 2006)...................................................................................16

*Clapper v. Amnesty International USA*,
  568 U.S. 398 (2013)...................................................................................................12

*Ctr. for Biological Diversity v. Bernhardt*,
  982 F.3d 723 (9th Cir. 2020).....................................................................................28

*Ctr. for Biological Diversity v. Haaland*,
  609 F. Supp. 3d 1058 (N.D. Cal. 2022).......................................................................4

*Ctr. for Biological Diversity v. Haaland*,
  641 F. Supp. 3d 835 (N.D. Cal. 2022).....................................................................4, 7

*Ctr. for Biological Diversity v. Haaland*,
  998 F.3d 1061 (9th Cir. 2021)...................................................................................39

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
  698 F.3d 1101 (9th Cir. 2012)...................................................................................24

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
  No. 23-3624, 2025 WL 1669344 (9th Cir. June 13, 2025)........................................20

*Def. of Wildlife v. Flowers*,
  414 F.3d 1066 (9th Cir. 2005)...................................................................................36

*Defs. of Wildlife v. Jewell*,
  176 F. Supp. 3d 975 (D. Mont. 2016).......................................................................39

*Defenders of Wildlife v. Zinke*,
  856 F.3d 1248, 1258 (9th Cir. 2017).........................................................................28

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004)...................................................................................................37

*Duwamish Tribe v. Haaland*,
  764 F. Supp. 3d 1068 (W.D. Wash. 2025)..................................................................8

*Ethyl Corp. v. Browner*,
  989 F.2d 522 (D.C. Cir. 1993).....................................................................................7

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009).....................................................................................................7

*Firearms Reguls. Accountability Coal., Inc. v. Garland*,
  No. 1:23-CV-00003, 2025 WL 1780562 (D.N.D. Apr. 14, 2025)..............................49

*Garcia v. Google Inc.*,
    786 F.3d 733 (9th Cir. 2015) ...................................................................................... 11

*Greater Yellowstone Coal., Inc. v. Servheen*,
    665 F.3d 1015 (9th Cir. 2011) .................................................................................... 39

*Gros Ventre Tribe v. United States*,
    469 F.3d 801 (9th Cir. 2006) ................................................................................ 11, 12

*Harrison v. Kernan*,
    No. 16-cv-07103-RMI, 2024 WL 812013 (N.D. Cal. Feb. 23, 2024) ...................... 12

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................................................... 36

*In re Am. Rivers & Idaho Rivers United*,
    372 F.3d 413 (D.C. Cir. 2004) ..................................................................................... 1

*In re Clean Water Act Rulemaking*,
    60 F.4th 583 (9th Cir. 2023) .................................................................................. 11, 49

*In re Polar Bear Endangered Species Act Listing*,
    709 F.3d 1 (D.C. Cir. 2013) ....................................................................................... 38

*In re Wash. Cattlemen's Ass'n*,
    No. 22-70194, 2022 WL 4393033 (9th Cir. Sept. 21, 2022) ........................................ 4

*INS v. Nat'l Ctr. for Immigrants' Rts., Inc.*,
    502 U.S. 183 (1991) ................................................................................................... 15

*Jackson v. Cal. Dep't of Mental Health*,
    399 F.3d 1069 (9th Cir. 2005) .................................................................................... 11

*K Mart Corp. v. Cartier, Inc.*,
    486 U.S. 281 (1988) ................................................................................................... 48

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
    681 F.3d 1006 (9th Cir. 2012) ...................................................................... 5, 6, 13, 16

*King v. Burwell*,
    576 U.S. 473 (2015) ................................................................................................... 24

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936) ..................................................................................................... 9

*Lands Council v. Powell,*
    395 F.3d 1019 (9th Cir. 2005) ................................................................. 5, 6

*Li v. Keisler,*
    505 F.3d 913 (9th Cir. 2007) ........................................................................ 7

*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369 (2024)...................................................................... 8, 14, 36, 44

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)....................................................................... 10, 11, 13

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990)........................................................................................ 9

*M. F. v. Kijakazi,*
    No. 20-08742 WHA, 2022 WL 2047555 (N.D. Cal. June 7, 2022) ...................... 15

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.,*
    602 F.3d 687 (5th Cir. 2010) ....................................................................... 20

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010)..................................................................................... 49

*Nat. Res. Def. Council v. EPA,*
    38 F.4th 34 (9th Cir. 2022) ........................................................................... 7

*Nat'l Wildlife Fed'n v. NMFS,*
    2005 WL 1278878 (D. Or. May 26, 2005) ................................................... 27

*National Wildlife Federation v. NMFS,*
    524 F.3d 917 (9th Cir. 2008) ................................................................. 27, 28

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
    551 U.S. 644 (2007)..................................................................................... 16

*Nat'l Family Farm Coal. v. EPA,*
    966 F.3d 893 (9th Cir. 2020) ....................................................................... 19

*Nat'l Hydropower Ass'n v. U.S. Fish & Wildlife Serv.,*
    No. CV 24-2285, 2025 WL 1555156 (D.D.C. June 2, 2025) ........................... 5, 9

*Natural Resources Defense Council v. U.S. Department of the Interior,*
    113 F.3d 1121 (9th Cir. 1997) ..................................................................... 44

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004)......................................................................................... 9

*Occidental Eng'g Co. v. INS*,
    753 F.2d 766 (9th Cir. 1985) ................................................................... 6

*Pacific Radiation Oncology, LLC v. Queen's Medical Center*,
    810 F.3d 631 (9th Cir. 2015) ................................................................. 10

*Padgett v. Wright*,
    587 F.3d 983 (9th Cir. 2009) ................................................................. 15

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ................................................................................ 50

*Reno v. Flores*,
    507 U.S. 292 (1993) ......................................................................... 6, 38

*Rock Creek All. v. U.S. Fish & Wildlife Serv.*,
    663 F.3d 439 (9th Cir. 2011) ................................................................. 32

*Roulette v. City of Seattle*,
    97 F.3d 300 (9th Cir. 1996) ..................................................................... 6

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ................................................... 19, 25, 36

*Sector Colls. & Univs. v. Duncan*,
    681 F.3d 427 (D.C. Cir. 2012) ................................................................. 6

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*,
    605 U.S. ---, 145 S. Ct. 1497 (2025) ............................................... passim

*Shands Jacksonville Med. Ctr. v. Burwell*,
    139 F. Supp. 3d 240 (D.D.C. 2015) ......................................................... 9

*Sierra Club v. Marsh*,
    816 F.2d 1376 (9th Cir. 1987) ................................................. 28, 29, 36

*SKF USA Inc. v. United States*,
    254 F.3d 1022 (Fed. Cir. 2001) ............................................................... 8

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) .............................................................................. 12

*Sprint Telephony PCS, L.P. v. Cnty. of San Diego*,
    543 F.3d 571 (9th Cir. 2008) ................................................................. 20

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ............................................................ 10, 12, 14

*Tibble v. Edison Int'l*,
    843 F.3d 1187 (9th Cir. 2016) ........................................................ 42

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ........................................................................ 10

*Trump v. CASA, Inc.*,
    No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025) ................ 14

*United States v. Salerno*,
    481 U.S. 739 (1987) ................................................................... 6, 38

*United States v. Tan*,
    16 F.4th 1346 (9th Cir. 2021) ........................................................ 42

*United States v. Texas*,
    599 U.S. 670 (2023) ........................................................................ 49

*Utah v. EPA*,
    No. 23-1157, 2025 WL 1354371 (D.C. Cir. May 2, 2025) .......... 7, 8, 9

*Util. Comm'rs v. FERC*,
    964 F.3d 1177 (D.C. Cir. 2020) ...................................................... 6

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ........................................................................ 45

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) .......................................................................... 6

*WildEarth Guardians v. Haaland*,
    561 F. Supp. 3d 890 (C.D. Cal. 2021) .......................................... 39

*Winter v. Natural Resources Defense Council*,
    555 U.S. 7 (2008) ............................................................................ 50

*Zepeda v. U.S. INS*,
    753 F.2d 719 (9th Cir. 1983) ........................................................ 48

**STATUTES**

5 U.S.C. § 701 ...................................................................................... 5

5 U.S.C. § 706(2) ................................................................................ 49

16 U.S.C. § 1531–1544 ................................................................................ 1

16 U.S.C. § 1532(3) ................................................................................... 33

16 U.S.C. § 1532(5)(A) ................................................................................ 2

16 U.S.C. § 1532(5)(A)(i) ........................................................................... 31

16 U.S.C. § 1532(5)(A)(ii) .......................................................................... 31

16 U.S.C. § 1532(6) ............................................................................... 2, 30

16 U.S.C. § 1532(15) ................................................................................... 2

16 U.S.C. § 1532(20) ............................................................................. 2, 37

16 U.S.C. § 1533(a)(3)(A) .......................................................................... 44

16 U.S.C. § 1536(a)(2) .......................................................................... passim

16 U.S.C. § 1536(a)(3) ............................................................................... 26

16 U.S.C. § 1536(b)(1) ............................................................................... 25

16 U.S.C. § 1536(b)(3)(A) ..................................................................... passim

16 U.S.C. § 1536(b)(4) ............................................................................... 35

16 U.S.C. § 1536(d) ................................................................................... 26

42 U.S.C. § 4332(2)(C) ............................................................................... 45

Pub. L. No. 95-632, 92 Stat. 3752 (1978) .................................................. 35

**REGULATIONS**

50 C.F.R. Part 402 ................................................................................. 3, 13

50 C.F.R. Part 424 ....................................................................................... 3

50 C.F.R. § 402.01(b) .................................................................................. 2

50 C.F.R. § 402.02 .............................................................................. passim

50 C.F.R. § 402.14(c)(1) ............................................................................ 27

50 C.F.R. § 402.14(c)(1)(i) ........................................................................ 28

50 C.F.R. § 402.14(g)(8) ............................................................................ 23

50 C.F.R. § 402.15 ..................................................................................... 25

50 C.F.R. § 402.16 ..................................................................................... 35

50 C.F.R. § 424.11(d) ........................................................................... 13, 37

50 C.F.R. § 424.12(a)(1) ....................................................................... 41, 44

**FEDERAL REGISTER**

40 Fed. Reg. 44412 (Sept. 26, 1975) ................................................................... 3

43 Fed. Reg. 870 (Jan. 4, 1978) ................................................................... 3, 34

45 Fed. Reg. 13010 (Feb. 27, 1980) ................................................................... 3

45 Fed. Reg. 64195 (Sept. 29, 1980) ................................................................... 3

49 Fed. Reg. 38900 (Oct. 1, 1984) ................................................................... 3

51 Fed. Reg. 19926 (June 3, 1986) ........................................................... passim

59 Fed. Reg. 65781 (Dec. 21, 1994) ................................................................. 21

80 Fed. Reg. 26832 (May 11, 2015) ................................................................. 19

81 Fed. Reg. 7214 (Feb. 11, 2016) ........................................................... passim

83 Fed. Reg. 35178 (July 25, 2018) ......................................................... passim

84 Fed. Reg. 44976 (Aug. 27, 2019) ........................................................ passim

84 Fed. Reg. 45020 (Aug. 27, 2019) ................................................... 4, 37, 42

86 Fed. Reg. 7037 (Jan. 20, 2021). ................................................................... 4

88 Fed. Reg. 40753 (June 22, 2023) ............................................................... 36,

88 Fed. Reg. 40764 (June 22, 2023) ............................................................... 40

88 Fed. Reg. 83726 (Nov. 30, 2023) ......................................................... 11, 13

88 Fed. Reg. 40753 (June 22, 2023) ............................................................... 36

88 Fed. Reg. 40764 (June 22, 2023) ......................................................... 40, 43

88 Fed. Reg. 83726 (Nov. 30, 2023) ............................................................... 11

89 Fed. Reg. 23919 (Apr. 5, 2024) ................................................................... 4

89 Fed. Reg. 24268 (Apr. 5, 2024) ......................................................... passim

89 Fed. Reg. 24300 (Apr. 5, 2024) ......................................................... passim


Exec. Order 13990, 86 Fed. Reg. 7037 (Jan. 20, 2021) ..................................... 4

Exec. Order 14154, 90 Fed. Reg. 8353 (Jan. 20, 2025) ..................................... 5

Exec. Order 14181, 90 Fed. Reg. 8747 (Jan. 24, 2025) ..................................... 5

Exec. Order 14219, 90 Fed. Reg. 10583 (Feb. 19, 2025) ................................... 5

Exec. Order 14156 § 6(c), 90 Fed. Reg.8433 (Jan. 20, 2025) ............................ 5

**OTHER AUTHORITIES**

H. Conf. Rep. No. 95-1804 (1978) ............................................................................... 35

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |

Fed. Defs.' Motion to Remand or Stay and Cross Mot. for Sum. Judg.,
Case No 3:24-cv-04651-JST

xii

## STATEMENT OF THE CASE AND ISSUES

With this case, Plaintiffs rushed into court to present abstract, facial challenges to the Services' 2024 regulations addressing specific provisions of the ESA, 16 U.S.C. §§ 1531–1544. They press these claims without challenging any specific application of the regulations that injures them or their members. And Plaintiffs continue to press their claims even when faced with unequivocal action by this Administration to reconsider the regulations through rulemaking. These are not the circumstances that warrant or justify this Court's intervention. Under Ninth Circuit precedent, the Court should remand or stay this litigation during the agencies' rulemaking process, given the Services' good faith, well-grounded decision to reconsider the challenged 2024 ESA regulations. Alternatively, the Court should dismiss the claims because Plaintiffs lack Article III standing to raise a facial challenge to rules that neither directly harm Plaintiffs nor threaten them with some imminent, concrete, and particularized injury that the Court can remedy by resolving this case.

If the Court reaches the merits, it should dismiss Plaintiffs' claims as legally and factually unsupported. Despite contending that the regulations conflict with the ESA, Plaintiffs hardly reference the statute itself. Plaintiffs' opposition is based on *their* institutional and policy views. Plaintiffs' views do not undermine the Services' regulations, which are consistent with the ESA's actual text and provide reasoned implementation guidance that adheres to the ESA's policies and purposes of protecting and conserving ESA-listed species and designated critical habitat. This is why Plaintiffs' ESA claims, and the tack-on National Environmental Policy Act ("NEPA") claim, must fail. This simply is not a case of agency intransigence, but one challenging the reasoned, well-considered actions of agencies entrusted to administer the ESA. For all these reasons, the Court should remand or dismiss this case.

## STATUTORY BACKGROUND

Congress granted to the Department of the Interior and the Department of Commerce shared responsibility to implement the ESA and "protect[] threatened or endangered species of fish, wildlife and plants." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 415 (D.C. Cir. 2004). The U.S. Fish and Wildlife Service implements the ESA for the Department of the

Interior and has responsibility over terrestrial and freshwater species. 16 U.S.C. § 1532(15); 50 C.F.R. § 402.01(b). The National Marine Fisheries Service implements the ESA for the Department of Commerce and has responsibility for marine and anadromous species. *Id.*

## I.   SECTION 4 OF THE ENDANGERED SPECIES ACT

Under the ESA, an "endangered species means any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20). The ESA requires the Services to "determine whether any species is an endangered species or a threatened species because of any" of the five statutory factors listed in Section 4(a). *Id.* § 1533(a)(1). The Services must make these determinations "solely on the basis of the best scientific and commercial data available ... after conducting a review of the status of the species." *Id*. § 1533(b)(1)(A).

Upon listing a species under the ESA, the appropriate Service must, "to the maximum extent prudent and determinable," designate critical habitat for such species. *Id.* § 1533(a)(3)(A). Under the ESA, "critical habitat" means "the specific areas within the geographical area occupied by the species, at the time it is listed ..., on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and ... specific areas outside the geographical area occupied by the species at the time it is listed ..., upon a determination by the [applicable Service] that such areas are essential for the conservation of the species." *Id*. § 1532(5)(A).

## II.   SECTION 7 OF THE ENDANGERED SPECIES ACT

Once a species is listed as "endangered" or "threatened" under the ESA, it is protected under the ESA's substantive and procedural provisions. Section 7 of the ESA mandates that federal agencies must ensure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. *Id*. § 1536(a)(2). To satisfy this substantive mandate, federal agencies must consult with the Services, which results in one or both of the Services

issuing a "biological opinion" for the respective species or critical habitat at issue. *Id*. § 1536(b). Among other things, the Services must provide a written statement "detailing how the agency action affects the species or its critical habitat," "a summary of the information on which the opinion is based," and the consulting agency's opinion on whether the proposed action is likely to jeopardize the continued existence of the species or result in the destruction or adverse modification of critical habitat of such species. *Id*. § 1536(b)(3)(A). If "jeopardy or adverse modification is found," the Services must specify reasonable and prudent alternatives that the Services believe would not violate the ESA and "can be taken by the Federal agency or applicant in implementing the agency action." *Id*. If the consulting agency determines that the action will not violate Section 7(a)(2) but will cause incidental take of a listed species, it also provides an incidental take statement. *Id*. § 1536(b)(4). If the action agency complies with the terms and conditions of the incidental take statement, ESA Section 7(o)(2) exempts the specified level of take from the ESA Section 9 take prohibition. *Id*. § 1536(o)(2).

## STATEMENT OF FACTS

The Services have promulgated joint regulations implementing the ESA. *See* 50 C.F.R. Parts 17, 402, and 424. Following early rules defining select statutory terms, the Services published comprehensive regulations addressing ESA Section 4 and Section 7. For Section 4's listing provisions, codified at 50 C.F.R. Part 424, the Services published regulations in 1975, 40 Fed. Reg. 44412 (Sept. 26, 1975), followed by comprehensive regulations in the 1980s, *see* 45 Fed. Reg. 13010 (Feb. 27, 1980); 45 Fed. Reg. 64195 (Sept. 29, 1980); 49 Fed. Reg. 38900 (Oct. 1, 1984). For Section 7's consultation provisions, codified at 50 C.F.R. Part 402, the Services published regulations in 1978, 43 Fed. Reg. 870 (Jan. 4, 1978), followed by revisions in 1986, 51 Fed. Reg. 19926 (June 3, 1986).

This regulatory landscape remained relatively static until 2016, when the Services revised certain regulatory provisions implementing Sections 4 and 7. *See* 81 Fed. Reg. 7214 (Feb. 11, 2016); 81 Fed. Reg. 7414 (Feb. 11, 2016). Twenty states challenged the 2016 regulations, which resulted in a settlement requiring the Services to reconsider the 2016 regulations. *See Ala. ex rel. Steven T. Marshall v. Nat'l Marine Fisheries Serv.*, No. 1:16-cv-00593-CG-MU (S.D. Ala. Feb.

2, 2017) (ECF 55-56). Following reconsideration, the Services updated and revised the Section 4 and Section 7 regulations. *See* 84 Fed. Reg. 45020 (Aug. 27, 2019) (Section 4); 84 Fed. Reg. 44976 (Aug. 27, 2019) (Section 7).

Some states and environmental organizations challenged the 2019 regulations in the Northern District of California, with other States and industry participants intervening to support the regulations. *Ctr. for Biological Diversity v. Haaland*, No. 19-cv-5206 (N.D. Cal. Aug. 21, 2019) (related to *California, et al. v. Haaland et al.*, No. 3:19-cv-6013 (N.D. Cal. Sept 25, 2019), and *Animal Legal Def. Fund v. Haaland*, No. 3:19-cv-6812 (N.D. Cal. Oct. 21, 2019)). President Biden then issued Executive Order 13990, which directed the Services to evaluate and, where appropriate, revise or rescind environmental regulations issued during the prior four years. *See* 86 Fed. Reg. 7037 (Jan. 20, 2021). Following the mandated reviews, the Services announced that they would begin rulemaking to reconsider the regulations and sought a voluntary remand. Without reaching the merits, this Court remanded but also vacated the 2019 regulations. *Ctr. for Biological Diversity v. Haaland*, 609 F. Supp. 3d 1058 (N.D. Cal. 2022). Due to concerns with pre-merits vacatur, the Ninth Circuit stayed the district court's vacatur order. *In re Wash. Cattlemen's Ass'n*, No. 22-70194, 2022 WL 4393033, at *1 (9th Cir. Sept. 21, 2022). This Court then reconsidered and remanded the 2019 regulations without vacatur. *Ctr. for Biological Diversity v. Haaland*, 641 F. Supp. 3d 835 (N.D. Cal. 2022).

In 2024, the Services completed the voluntary remand by retaining parts of the 2019 regulations, while revising or rescinding other provisions. *See* 89 Fed. Reg. 24300 (Apr. 5, 2024) (Section 4); 89 Fed. Reg. 24268 (Apr. 5, 2024) (Section 7); 89 Fed. Reg. 23919 (Apr. 5, 2024) (Section 4(d)). Hydropower industry groups challenged a single regulation promulgated as part of the Section 7 regulatory revisions in August 2024. *Nat'l Hydropower Ass'n, et al. v. U.S. Dep't of the Interior, et al.*, No. 1:24-cv-2285-SLS (D.D.C. Aug. 24, 2024). Several groups led by the American Farm Bureau Federation filed suit in late March 2025 challenging the 2024 Section 4, 4(d), and 7 regulations. *See Am. Farm Bureau Fed'n, et al., v. U.S. FWS*, No. 1:25-cv-947-SLS (D.D.C. Mar. 31, 2025). And Plaintiffs here challenged specific 2024 ESA Section 4 and 7 regulations.

Before Plaintiffs filed for summary judgment, President Trump issued Executive Orders addressing, in part, the 2024 regulations. *See* Exec. Order 14181, 90 Fed. Reg. 8747 (Jan. 24, 2025); Exec. Order 14154, 90 Fed. Reg. 8353 (Jan. 20, 2025); Exec. Order 14219, 90 Fed. Reg. 10583 (Feb. 19, 2025). Executive Order 14219 directs agencies to review regulations, like the 2024 regulations, for consistency with lawful "delegations of legislative power" and to ensure such regulations "are based on … the best reading of the underlying statutory authority or prohibition." *Id*. Executive Orders 14181, 14154, and 14156, in turn, direct the agencies to review regulations, including the ESA regulations, and revise or rescind any regulations that impose undue burdens or are contrary to law. *See* Exec. Order No. 14181 § 2(e), 90 Fed. Reg. 8747; Exec. Order No. 14154 § 3(c), 90 Fed. Reg. 8353; Exec. Order No. 14156 § 6(c), 90 Fed. Reg. 8433. And the Secretary of the Interior directed the Department to develop a plan to "suspend, revise, or rescind" the 2024 Section 4, 4(d), and 7 regulations. *See* Secretary's Order No. 3418 (Feb. 3, 2025) (www.doi.gov/sites/default/files/document_secretarys_orders/so-3418-signed.pdf).

The Services have started rulemaking to reconsider the 2024 ESA Section 4 and 7 regulations. They have prepared proposed rules and, following required intergovernmental reviews, intend to submit them to the Office of the Federal Register by October 31, 2025. *See* Decl. of Kimberly Damon-Randall ("Damon-Randall Decl.") ¶10 and Decl. of Gina Shultz ("Schultz Decl.") ¶10. Following public comments, any public meetings, and intergovernmental reviews, the Services anticipate submitting final rules to the Office of the Federal Register by October 31, 2026. *Id*. at ¶11. Recognizing the effects of the rulemaking on legal challenges to the 2024 regulations, the District of Columbia stayed another challenge to part of the 2024 regulations implementing ESA Section 7. *Nat'l Hydropower Ass'n v. U.S. Fish & Wildlife Serv*., No. CV 24-2285, 2025 WL 1555156 (D.D.C. June 2, 2025).

## STANDARD OF REVIEW

Plaintiffs' ESA and NEPA claims are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc). Under the APA, the Court may direct that summary judgment be

granted to either party based on its review of the administrative record. *Id.* at 1017; *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005); *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985) (because there are no disputed facts in APA cases, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did").

Plaintiffs also present a facial challenge to regulations. "To prevail in such a facial challenge, [plaintiffs] 'must establish that no set of circumstances exists under which the [regulation] would be valid.'" *Reno v. Flores*, 507 U.S. 292, 301 (1993) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 599 (9th Cir. 2018) (applying "no set of circumstances" test to facial challenge to agency regulation); *Children's Health Def. v. Fed. Commc'ns Comm'n*, 25 F.4th 1045, 1052 (D.C. Cir. 2022) (applying "no set of circumstances" test). When a court "conclude[s] that a challenged regulatory provision does not exceed the statute's limits and otherwise satisfies the requirements of the [APA], [it] will uphold the provision and preserve the right of complainants to bring as-applied challenges against any alleged unlawful applications." *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 964 F.3d 1177, 1185 (D.C. Cir. 2020) (quoting *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012)); *Roulette v. City of Seattle*, 97 F.3d 300, 304 n.10 (9th Cir. 1996), as amended on denial of reh'g and reh'g en banc (Sept. 17, 1996) (noting preservation of future as-applied challenge); *cf. Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (explaining facial challenges are disfavored because of risk of premature interpretation based on speculation rather than in the context of actual disputes).

## ARGUMENT

### I. THE COURT SHOULD REMAND THE 2024 ESA REGULATIONS OR, AT A MINIMUM, STAY THIS CASE.

The Services are reconsidering the ESA regulations that Plaintiffs challenge in this case. They have started the rulemaking process and are on track to publish proposed rules by no later than October 31, 2025, and final rules by October 2026. *See* Damon-Randall Decl. ¶¶ 10-11;

Shultz Decl. ¶¶ 10-11. The rulemaking will moot or, at a minimum, substantially alter the disputes in this case. Federal Defendants therefore request that the Court remand the challenged regulations to the Services without vacatur or stay this case.

Agencies have inherent authority to reconsider past decisions and to revise, replace, or repeal a decision to the extent permitted by law and supported by reasoned explanation. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). When an agency proposes to reconsider its decision, an agency's voluntary remand request should be granted "unless the request is frivolous or made in bad faith." *Nat. Res. Def. Council v. EPA*, 38 F.4th 34, 60 (9th Cir. 2022) (citation omitted); *Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993) ("We commonly grant [agency remand] motions, preferring to allow agencies to cure their own mistakes rather than wasting the courts' and the parties' resources reviewing a record that both sides acknowledge to be incorrect or incomplete."). This is so even if the agencies do not "concede any error in the underlying proceedings." *Li v. Keisler*, 505 F.3d 913, 916 (9th Cir. 2007).

Here, the Services are reconsidering the challenged 2024 ESA regulations through rulemaking. In doing so, they will adhere to all applicable requirements. Damon-Randall Decl. ¶ 10; Shultz Decl. ¶ 10. Because the rulemaking has begun, the relevant question is whether "the request is frivolous or made in bad faith[]." *Nat. Res. Def. Council*, 38 F.4th at 60 (citation omitted). It is not.

First, agencies have discretion to reconsider their decisions based on new policies. *Utah v. EPA,* No. 23-1157, 2025 WL 1354371, *1 (D.C. Cir. May 2, 2025) (per curiam); *Ctr. for Biological Diversity v. Haaland*, 641 F. Supp. 3d 835, 842 (N.D. Cal. 2022). The Services are doing precisely that by reconsidering the rules based on Executive and Secretarial orders that have set new policies and priorities for the Services. Damon-Randall Decl. ¶¶ 6-7; Shultz Decl. ¶¶ 6-7.

Second, the Services are considering significant intervening Supreme Court precedent. "Intervening events outside of the agency's control, for example, a new legal decision or the passage of new legislation, counsel in favor of granting such a remand request." *Nat. Res. Def. Council*, 38 F.4th at 60. After the Services adopted the 2024 regulations, the Supreme Court

decided *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), which overruled longstanding precedent requiring courts to defer to an agency's interpretation of ambiguous statutory text and set a new framework that considers a single "best reading" of a statute. *See id.* at 400, 412-13 (replacing framework that allowed for multiple "permissible" interpretations to one). The Services will consider these new standards during the rulemaking, which "could obviate" the need for review. *EPA*, 2025 WL 1354371, at *2 (abeyance proper when agency reconsideration could obviate the need for review). Or, if a dispute remains, the Services' consideration can provide agency expertise that facilitates the Court's statutory interpretation task. *Loper Bright*, 603 U.S. at 387-88 (considering agency expertise as guidance, "even on legal questions"); *see also SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001) (remands are proper even when an "agency's views on the statutory question, though not dispositive, may be useful to the reviewing court").

Third, a remand will allow the Services to determine NEPA compliance anew for both the Section 4 and 7 rulemakings. When completing analyses of any final revisions to the regulations, the Services will consider recent guidance from the Council on Environmental Quality as well as any updates to their own NEPA implementing procedures. *See, e.g.,* National Oceanic & Atmospheric Administration ("NOAA"), Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities: Companion Manual for NOAA Administrative Order 216-6A (June 30, 2025), https://www.noaa.gov/sites/default/files/2025-06/2025NOAANEPAProcedures.pdf. These reviews also have the potential to alter or moot Plaintiffs' existing NEPA claims through administrative avenues. *See Duwamish Tribe v. Haaland*, 764 F. Supp. 3d 1068, 1070 (W.D. Wash. 2025) (rejecting arguments that a remand would be futile because the "remand presents a real possibility of a different outcome").

Finally, the remand will not cause undue harm to Plaintiffs. The agencies are proceeding expeditiously and without delay; they have established a reasonable rulemaking schedule, where they have completed the initial steps to develop proposed rules. Damon-Randall Decl. ¶¶ 5, 10-11; Shultz Decl. ¶¶ 5, 10-11. Following mandatory intragovernmental reviews, the Services intend to submit a proposed rule to the Office of the Federal Register by October 31, 2025, and a

final rule by October 31, 2026. Damon-Randall Decl. ¶¶ 5, 10-11; Shultz Decl. ¶¶ 5, 10-11.

Plaintiffs may argue they are prejudiced because this Court could provide interpretative guidance now, before the Services complete another round of rulemaking. But this approach circumvents the APA's rulemaking process by asking the Court to shape future regulatory proposals with advisory opinions, rather than the agencies as informed by public comments. *Cf. Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 265, 270-71 (D.D.C. 2015) (remands proper in part because the agency has the opportunity "on remand to give meaningful consideration to significant comments"). As the D.C. Circuit recently summarized: "It is a cardinal virtue of Article III courts to avoid unnecessary decisions." *EPA*, 2025 WL 1354371, *2. For these reasons, another court facing a challenge to the same 2024 ESA regulations has stayed the action pending the rulemaking. *Nat'l Hydropower Ass'n,* 2025 WL 1555156, at *1 (staying separate challenge to the Section 7 regulation).

Plaintiffs also are not harmed from the 2024 regulations being operative during the rulemaking. Plaintiffs are mounting a facial challenge to the regulations. Normally, these facial challenges are not justiciable. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (regulations typically unreviewable until their "factual components [are] fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him"); *Norton v. S. Utah Wilderness All*., 542 U.S. 55, 66–67 (2004) (relying on the APA's limitations on judicial review, which recognize that it is the agency's task to, in the first instance, "work out compliance with the broad statutory mandate"). *See also* Section II infra (Plaintiffs lack Article III standing). During a remand or stay, Plaintiffs can seek judicial review of any concrete application of the regulations that allegedly harms them.

Plaintiffs' inability to obtain programmatic relief during the rulemaking is not the type of harm that counsels against a remand. And, without any undue harm, the Court should grant the remand without vacatur or—at a minimum—stay this case during the rulemaking process. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (the power to stay is "incidental to the power inherent in every court to control the disposition of the causes on its docket").

## II.   THE COURT LACKS JURISDICTION AND SHOULD DISMISS THE CASE

**BECAUSE PLAINTIFFS FAILED TO DEMONSTRATE STANDING.**

If the Court does not remand or stay this case, it should dismiss it for lack of jurisdiction. Article III empowers federal courts to decide only "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. A case or controversy exists only if the plaintiff has suffered an injury in fact that is traceable to the challenged action and would likely be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Plaintiffs must make this showing "for each claim that they press" and "for each form of relief that they seek." *Id.* at 431. And at summary judgment, they must make the requisite showings with "specific facts," not conclusory allegations. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs raise a facial challenge to six regulations, none of which regulate Plaintiffs or their members. Plaintiffs' standing thus turns on guesswork about how third parties will respond to the ESA regulations. While the Supreme Court has not foreclosed the ability of plaintiffs to show standing in this context, it has stated these facial challenges are "rarely if ever appropriate for federal-court adjudication." *Id.* at 568.

This case is not that rare exception. The Supreme Court has long held that Article III's case or controversy requirement must turn on "a live dispute over a concrete application of [agency] regulations." *Summers v. Earth Island Inst.*, 555 U.S. 488, 490 (2009). The Court has squarely rejected the idea that standing can arise on a facial challenge to procedural rules unconnected "from any concrete application that threatens imminent harm to his interests." *Id.* at 494 (emphasis added). "Such a holding would fly in the face of Article III's injury-in-fact requirement." *Id*. Yet Plaintiffs bring the very same type of challenge here, one unconnected to any concrete application of the regulation that injures Plaintiffs or their members.

Plaintiffs initially rely on *past* final agency actions as the source of their alleged injuries. *See*, *e.g.*, ECF 23-2 ¶¶ 12-13, ECF 23-5 ¶¶ 11-12, ECF 23-3 ¶ 17, ECF 23-4 ¶ 11, ECF 23-8 ¶ 17, ECF 23-9 ¶ 30. Even assuming these past actions injured Plaintiffs, any harm flowing from them is not redressable. The "court's equitable power lies only over the merits of the case or controversy before it," *Pacific Radiation Oncology, LLC v. Queen's Medical Center*, 810 F.3d 631, 633 (9th Cir. 2015), and Plaintiffs do not challenge the prior petition findings, listing rules,

or interagency consultations, *see* ECF 1. The Court thus lacks jurisdiction over the past actions and cannot grant relief as to them. It could not, for example, order the agencies to reconsider the 2020 wolverine listing decision (ECF 23-2 ¶ 12) or the 2020 Gulf of America biological opinion (ECF 23-3 ¶ 17) that Plaintiffs' members allege have injured them, even if those decisions were still operative, which they are not.[2] *See Garcia v. Google Inc.,* 786 F.3d 733, 744-47 (9th Cir. 2015) (en banc) (injunctions may not issue based on complaints of harm caused by unchallenged actions); *In re Clean Water Act Rulemaking,* 60 F.4th 583, 594 (9th Cir. 2023) (reading the "APA as foreclosing any authority of courts to vacate agency actions not first held unlawful").

Plaintiffs also rely on conclusory allegations—not facts—to show that any injury arising from these past agency actions was traceable to one of the six challenged regulations. *See* ECF 23-2 ¶ 12 (no specific facts tying any finding or harm specifically to one of the challenged regulations); *id.* ¶ 13 (no explanation on how the finding is connected to the regulation or caused personalized harms); ECF 23-4 ¶ 11 (no explanation of injuries); ECF 23-4 ¶ 17 (claiming a 2020 biological opinion was flawed based on a regulation not challenged by Plaintiffs); ECF 23-9 ¶ 30 (same). These conclusory allegations do not suffice at summary judgment. *Lujan*, 504 U.S. at 561.

Moreover, these prior agency actions were informed solely by the 2019 ESA regulations that were superseded *before* Plaintiffs filed suit. *Compare* ECF 1 (first complaint, filed in August 2024), with 89 Fed. Reg. at 24268 (Section 7 regulations); 89 Fed. Reg. at 24300 (Section 4 regulations). This too precludes standing. Because the 2019 ESA regulations had no legal force or effect when Plaintiffs sued, the Court cannot redress harms traceable to the 2019 ESA regulations. *See Jackson v. Cal. Dep't of Mental Health*, 399 F.3d 1069, 1072-73 (9th Cir. 2005) (no standing where challenged incarceration ended before complaint was filed); *Gros Ventre*

---

[2] *See* Final Rule 88 Fed. Reg. 83726 (Nov. 30, 2023) (superseding the 2020 decision by listing the wolverine); NOAA Fisheries, Biological and Conference Opinion on Bureau of Ocean Energy Management and Bureau of Safety and Environmental Enforcement's Oil and Gas Program Activities in the Gulf of America (May 15, 2025), https://www.fisheries.noaa.gov/resource/document/biological-and-conference-opinion-bureau-ocean-energy-management-and-bureau (superseding the 2020 opinion).

*Tribe v. United States*, 469 F.3d 801, 814 (9th Cir. 2006) (no standing to challenge agency action that had been vacated before the lawsuit commenced).

Even so, Plaintiffs argue that the 2019 ESA regulations are operative because some parts of them were retained. *See* ECF 37 at 39 ("Pls.' Br."). While a new agency action may mirror aspects of an old one, or even "expressly adopt[]" a prior rule's rationale, that does not make the *old* agency action live and capable of harming a plaintiff. *Cal. by & through Becerra v. Azar*, 950 F.3d 1067, 1097 (9th Cir. 2020) (reviewing new regulations that mirrored and adopted rationales from prior rules). Here, the Services took comments on all the 2019 ESA regulations, and they made new decisions in 2024 with new justifications for the actions to retain, revise, or rescind the 2019 regulations. *See* 89 Fed. Reg. at 24268; 89 Fed. Reg. at 24329-30; *see also Harrison v. Kernan*, No. 16-cv-07103-RMI, 2024 WL 812013, at *2 (N.D. Cal. Feb. 23, 2024) (changed "justifications" in a superseding rule can render a challenge to a prior rule moot). Plaintiffs' focus on past agency actions and the 2019 ESA regulations fail to establish a live case or controversy over the 2024 ESA regulations.

Plaintiffs also assert the 2024 ESA regulations may injure their members if applied in a future petition finding, regulation, or Section 7 consultation. To show standing, Plaintiffs must identify a "concrete" injury that "must be 'de facto'; that is, it must actually exist." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). Standing cannot turn on "possible" future injuries, *Clapper v. Amnesty International USA*, 568 U.S. 398, 409-10 (2013), or even a "statistical probability" of harm, *Summers,* 555 U.S. at 497-500. But that is exactly what Plaintiffs do when alleging that theoretical future actions will injure them. They base their standing on the assumption that the 2024 ESA regulations will authorize or prescribe theoretical future actions that *invariably* will harm their members. *See, e.g.*, ECF 23-2 ¶ 12 (expressing concern that "additional species" may be denied protections); ECF 23-4 ¶ 11 (expressing concerns about potential interagency consultations); ECF 23-5 ¶¶ 12-13 (same); ECF 23-2 ¶ 19 (assuming species will decline); ECF 23-4 ¶ 14 (same); ECF 23-7 ¶ 27 (claiming that return to pre-2019 regulations would redress unidentified harms that otherwise will arise); *but see* ECF 23-7 ¶ 23 (arguing that agency conduct under the pre-2019 regulations also harmed the members). The facts do not support

these assumptions.

The Section 4 and Section 7 regulations do not direct fixed outcomes in future ESA listing, critical habitat, or consultation actions. Instead, each of the several challenged regulations provides general standards for the Services to apply on a case-by-case basis. The Section 4 "foreseeable future" regulation, for example, expressly calls for a "case-by-case" inquiry. 50 C.F.R. § 424.11(d). The Section 4 "not prudent" regulation identifies a non-exclusive list of factors for the Services to consider. *Id.* § 424.12(a). And the Section 7 consultation regulations likewise must be applied to affirmative agency actions involving unique facts and the Services' exercise of their professional judgment as to those facts in ways that defeat Plaintiffs' standing theories now. *See* 50 C.F.R. Part 402; *see also Karuk Tribe of Cal.*, 681 F.3d at 1021 (noting consultation obligations arise only with discrete, affirmative agency actions).

Because the 2024 regulations do not prescribe specific results, Plaintiffs cannot show that *every* future application of the regulations will injure them. Plaintiffs' declarant, for example, objects to the 2020 listing decision for the American wolverine, ECF 23-2 ¶ 12, but disregards the Services' subsequent action to list the species in 2023, *see* 88 Fed. Reg. at 83726. Nor can Plaintiffs pinpoint specific future actions that will injure them in a concrete and particularized way, as they only guess how, when, and where the 2024 regulations will be applied in ways that might injure their members, which defeats standing. *See, e.g.*, ECF 23-2 ¶ 19 (alleging that species may decline without adequate ESA protections, not that one of the six regulations has caused a particularized injury to them).[3]

Plaintiffs' remedy arguments confirm they are guessing about future harms. *California v. Texas*, 593 U.S. 659, 671 (2021) (evaluating "the relationship between 'the judicial relief requested' and the 'injury' suffered" (citation omitted)). Plaintiffs seek only generalized relief—

---

[3] Likewise, Plaintiffs can only speculate that judicial relief would redress some vaguely described injury. They argue, for example, that vacatur of the ESA regulations would change the conduct of "action agencies," like the U.S. Army Corps of Engineers and the Bureau of Land Management. ECF 23-6 ¶ 19. But the Supreme Court rejected this programmatic argument decades ago on multiple grounds. *See Lujan*, 504 U.S. at 5679-70 (noting that action agencies have control, in first instance, whether to engage in Section 7 consultation with Services).

vacatur of the regulations. Pls.' Br. 50-51. But remedy questions do not focus on the underlying action; they focus on redressing particularized injuries to Plaintiffs. *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631, at *11 (U.S. June 27, 2025). And Plaintiffs cannot propose relief tailored to these specific Plaintiffs—like enjoining regulations as applied to Plaintiffs or for specific ESA listing, critical habitat, or consultation actions— precisely because they have identified no particularized injury to their members in the first place. That is, Plaintiffs' generic remedy of vacatur mirrors the injuries they allege for standing—generalized, nonspecific interests in species, habitat, and the ESA. *See, e.g.,* ECF 23-9 ¶ 44 (remedy would ensure future decisions are "not undermined by application of these flawed new regulations").

For similar reasons, Plaintiffs fail to establish standing for their NEPA claim. They allege merely that a violation of NEPA injures them. *See* ECF 23-2 ¶ 18. "But deprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing." *Summers*, 555 U.S. at 496. Plaintiffs have failed to identify any "concrete interest" and thus standing for this claim.

For all the foregoing reasons, the Court should dismiss this case for lack of jurisdiction.

### III. THE CHALLENGED 2024 ESA RULES EMBODY THE BEST READING OF SECTIONS 4 AND SECTIONS 7 OF THE ESA.

If the Court reaches the merits, Plaintiffs disagree with four discrete amendments to the Section 7 interagency consultation regulations, as well as two discrete amendments to the Section 4 listing and critical habitat provisions. But their arguments scarcely focus on the statutory text of ESA Sections 7 and 4 when criticizing the regulations. Plaintiffs instead cobble together principles they extract from caselaw to create "obligations" and "duties," and then attack the regulations as not constituting the best reading under Plaintiffs' conjured standards. This is not how statutory interpretation works.

In *Loper Bright*, the Supreme Court reaffirmed that it is the court's obligation to judge an agency regulation or statutory interpretation by applying the traditional tools of statutory construction. *Loper Bright*, 603 U.S. at 412-413. Under *Loper Bright*, statutory interpretation does not mean—as Plaintiffs argue here—looking to their policy views or prior case law that

addresses unrelated issues. Nor does it mean presenting imaginative hypotheticals, as the possibility that a "regulation may be invalid as applied" in some cases "does not mean that the regulation is facially invalid." *INS v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 188 (1991).

In stark contrast to Plaintiffs' invented standards, Plaintiffs' burden in raising an excess-of-authority claim is to show that the Services' rules themselves are inconsistent with the ESA on their face. *Bondi v. VanDerStok*, 604 U.S. ---, 145 S. Ct. 857, 865, 878 (2025) (distinguishing facial challenge from as-applied challenge); *see also Babbitt v. Sweet Home Ch. of Cmtys. for a Great Or.*, 515 U.S. 687, 714 (1995) (same). As such, the Court should not entertain Plaintiffs' speculation about whether the Services *could* apply these regulations irrationally later—*i.e.,* the basis of Plaintiffs' challenge here. Likewise, Plaintiffs' repeated references to the ESA's conservation purpose do not provide an overarching reason to set aside the Services' regulations as contrary to Congress' policy goals. *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 987 (9th Cir. 2015) (ESA statement of purposes and policy contains no substantive or procedural requirements.). The Court instead must consider *only* whether the Services can apply the regulation lawfully under the best reading of the ESA. When applying these proper standards, the Services' regulations readily pass muster.[4]

### A. The four challenged amendments to the ESA Section 7 regulations are each consistent with the ESA.

#### 1. The Services may limit Section 7 analyses to those consequences that are reasonably certain to occur and thus foreseeable.

Plaintiffs first challenge the Services' revised definition of "effects of the action," and the requirement therein that a consequence must be reasonably certain to occur to be considered an effect of a proposed agency action. Pls.' Br. 20-24. This definition guides the Services in

---

[4] Lest it go unremarked, Plaintiffs have waived claims to any regulation not challenged on summary judgment. *M. F. v. Kijakazi*, No. C 20-08742 WHA, 2022 WL 2047555, at *2 (N.D. Cal. June 7, 2022) (matters "far afield of the scope of plaintiff's original motion" are not properly raised or considered (citing *Padgett v. Wright*, 587 F.3d 983, 985 n.2 (9th Cir. 2009))).

identifying the effects and consequences to be considered in ESA Section 7 consultations.[5] Plaintiffs' several arguments (Pls.' Br. 10-14) ignore that the best reading of Section 7 requires the Services to apply principles of proximate causation in making the cause-and-effect determinations required by Section 7. The Services' definition is consistent with the best reading of all pertinent provisions within ESA Section 7. None of the snippets of statutory language Plaintiffs cite require a lessened causation standard. Plaintiffs also base their entire argument on the mistaken assertion that the Services adopted a more stringent or narrower standard than had been their past practice. The reasonable certainty causation standard has been a part of the Services' prior regulations since their inception.

In a Section 7(a)(2) interagency consultation, the Services provide expert opinions to action agencies to advise them in complying with the ESA's substantive mandate to avoid jeopardizing listed species or destroying or adversely modifying critical habitat. *City of Tacoma, Wash. v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006); *Karuk Tribe of Calif.*, 681 F.3d at 1020 (describing consultation procedure). To this end, Section 7(b)(3)(A) requires the Services to provide "a written statement setting forth the Secretary's opinion . . . detailing *how the agency action affects the species or its critical habitat*." 16 U.S.C. § 1536(b)(3)(A) (emphasis added). When a statute requires this type of cause-and-effect inquiry, proximate causation principles, including foreseeability, apply. *Sweet Home*, 515 U.S. at 696 n.9, 709-715 ("Respondents have suggested no reason why either the … statute—or the 'harm' regulation itself—should not be read to incorporate ordinary requirements of proximate causation and foreseeability."); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 647 (2007) (holding basic proximate cause principles supported the Services' interpretations contained in the Section 7 regulations).

The Services' definition of "effects of the action" thus properly incorporates the two

---

[5] 50 C.F.R. § 402.02 currently provides, in pertinent part: "Effects of the action are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action but that are not part of the action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is *reasonably certain to occur*. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action." (emphasis added)

basic elements of proximate causation. The "but for" element requires factual causation and the "reasonably certain to occur" element serves, like foreseeability, to exclude speculative consequences. 50 C.F.R. § 402.02. In developing their reasonable certainty standard, the Services correctly looked to *Sweet Home*'s adoption of proximate cause principles into the ESA. 84 Fed. Reg. at 44991.

Plaintiffs seemingly desire no causation standard, which fails because the plain meaning of "affects" requires the Services to assess causation in determining the "effects of the action." This is the ordinary meaning of such terms. *See, e.g.,* Black's Law Dictionary (12th ed. 2024) (definitions of affect and effect).[6] The reasonable certainty element of the two-part "effects of the action" test focuses the Services on describing those consequences of an agency action they can anticipate with a reasonable level of likelihood or certainty.

Contrary to Plaintiffs' arguments (Pls.' Br. 13-14), the "reasonable certainty" standard also is consistent with the requirement in ESA Section 7(a)(2) for federal agencies to insure that their actions are "not likely to jeopardize the continued existence of any [listed] species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). Plaintiffs seize on the word "likely." However, the word "likely" means "having a high probability of occurring or being true: very probable."[7] Merriam-Webster's Collegiate Dictionary (10th ed. 1993). The Services' use of a reasonable certainty standard to identify "effects of the action" is consistent with the plain meaning of "likely." Both terms—likely and reasonably certain to occur—necessarily exclude speculative future consequences, while also not requiring that future consequences be guaranteed or free from all uncertainty.

Nor is it necessary to parse exact degrees of certitude as Plaintiffs do. The Services' reasonable certainty standard intentionally encompasses a range of probability. 84 Fed. Reg. at

---

[6] Affect as a verb means: "Most generally, to produce an effect on; to influence in some way." As a noun, effect means: "Something produced by an agent or cause; a result, outcome, or consequence." As a verb, effect means: "To bring about; to make happen."

[7] Other definitions are consistent. "Likely" is defined as: "1. Apparently true or real; probable <the likely outcome>. . . . . 2. Showing a strong tendency; reasonably expected <likely to snow>" in Black's Law Dictionary (12th ed. 2024).

44993. The Services did not intend "to require a certain numerical amount of data," but only to make clear that the determination of a consequence or activity to be reasonably certain "should not be based on speculation or conjecture." *Id.*; *see also Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 684 (9th Cir. 2016) ("*AOGA*") ("We agree with the D.C. Circuit that NMFS is not required to define "likely" in terms that require specific quantitative targets."). It has been the Services' position for decades that a reasonable certainty standard requires "more than a mere possibility," but not a "guarantee" that a consequence will occur. 51 Fed. Reg. at 19933; *see also infra* at 24.

Plaintiffs also skip over important context when arguing that the word "likely" in Section 7(a)(2) supplies the singular statutory standard the Services must use in identifying the "effects of the action." To be sure, the Services must apply the statutory standard in Section 7(a)(2) to make their final determinations of jeopardy or adverse modification. And the Services have separate definitions for both of those determinations. *See* 50 C.F.R. § 402.02 (definitions of "Destruction or adverse modification" and "Jeopardize the continued existence of"). As both those definitions indicate, the Services engage in a robust analysis before determining whether jeopardy or adverse modification is or is not "likely." Thus, it makes little sense to conclude that Congress intended by its use of the one word "likely" to obligate the Services to subject every step in a causal chain between a proposed action and a final jeopardy or adverse modification determination to a "more likely than not" determination.

After all, many of the Services' analyses are qualitative, not purely quantitative, when assessing whether a species or critical habitat will be exposed to the effects of an action and how they will respond. The Services analyze impacts to species and critical habitat in (at least) a 3-step sequential analysis before making any final determination required by Section 7. 83 Fed. Reg. 35178, 35183-84 (July 25, 2018). Each of the analytical steps preceding a final determination of jeopardy or adverse modification require the Services to establish a rational basis that a causal link exists as well as to estimate the magnitude or extent of a species' exposure and response to an action, or how an action would affect the functionality of critical habitat. Consideration of the overall structure of ESA Section 7 and the technical judgments it

has assigned to the Services defeats Plaintiffs' argument that the substantive standard of "not likely to jeopardize . . ." prohibits the Services from establishing a reasonable certainty standard to guide their technical judgment in myriad factual settings.

Plaintiffs are also wrong in arguing (Pls.' Br. 10-11) that the Services' reasonable certainty standard conflicts with the separate statutory requirement that the Services use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). These two requirements are wholly consistent. "The obvious purpose of the requirement that each agency use the best scientific and commercial data available is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise." *Bennett v. Spear*, 520 U.S. 154, 176 (1997) (citation omitted). The Services consider all relevant information to identify the best available data and then apply their definition of "effects of the action" to determine what are properly considered the effects of a proposed action. 80 Fed. Reg. 26832, 26836 (May 11, 2015); 83 Fed. Reg. at 35183-84. The best available data standard works to prevent "erroneous jeopardy determination[s]" that rest on speculative projections of adverse effects. *Bennett*, 520 U.S. at 176. No reasonable reading of the requirement to "use the best scientific and commercial data available" precludes the Services from considering the foreseeability of the future consequences of a proposed action.

Nor does the best available data standard erect any specific causation standard or specify how the Services must weigh any available information. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) ("The determination of what constitutes the best scientific data available belongs to the agency's special expertise." (citation omitted)). The best available data standard instead focuses on whether agencies rationally decided which data is available for consideration, and not whether one analytical methodology is superior to another. *Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 926 n. 12 (9th Cir. 2020).

This point is reinforced by ESA Section 7(b)(3)(A). That Section instructs that the Services' biological opinions shall include only a "summary of the information on which the opinion is based." 16 U.S.C. § 1536(b)(3)(A). Congress plainly distinguished between the Services' substantive findings and their evidentiary basis for that analysis, refuting Plaintiffs'

theory that the best data available language is a *sub silentio* standard that specifies the requisite causal relationship between an agency action and consequences to listed species.

The caselaw also shows that the Services can apply their reasonable certainty standard while complying with the best available data requirement.[8] *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. 23-3624, 2025 WL 1669344, at *23-24 (9th Cir. June 13, 2025) (affirming exclusion of greenhouse gas emissions as an effect of the action on the basis that scientific data did not enable prediction of reasonably certain consequence to listed species); *see also Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 701-704 (5th Cir. 2010) (affirming finding that future development activities were not reasonably certain to occur). These two decisions affirming the use of a reasonable certainty standard disprove Plaintiffs' facial challenge and the notion that it is contrary to the ESA's best available science standard. Plaintiffs cannot meet their burden to prove "no set of circumstances exists under which the [regulation] would be valid," *Sprint Telephony PCS, L.P. v. Cnty. of San Diego*, 543 F.3d 571, 579 (9th Cir. 2008) (en banc) (citation omitted).

Plaintiffs' final theory is that the Services did not justify applying the reasonable certainty test to what (prior to 2019) had been deemed "direct effects." Pls.' Br. 14. But the Services had always evaluated the direct effects of a proposed action by considering "the likelihood of an effect or activity and not on speculation about what effects might occur." 83 Fed. Reg. at 35183. The Services merged the existing categories of indirect and direct effects to "improve and clarify interagency consultation … by eliminating confusion regarding application of terms in the existing definition, which has resulted in time being spent determining how to categorize an effect, rather than simply determining what the effects are regardless of category."

---

[8] Plaintiffs argue (Pls.' Br. 11-12) that caselaw applying the best available science standard under ESA Section 4 proves that a reasonable certainty standard is unlawful under ESA Section 7. Their argument fails because the argument is based on misstating the reasonable certainty test as requiring that a consequence be free of all uncertainty. As explained *infra*, the Services have explained that "reasonable certainty" is a much lower bar. Moreover, many of the cases Plaintiffs themselves cite uphold the Services' choice and application of the best data available to use in the Section 4 listing and other decisions at issue. This precedent indicates that the Services can apply foreseeability standards while also considering the best data available.

*Id.* at 35179; 84 Fed. Reg. at 44989 (noting the new definition clarifies that *all* the consequences of a proposed action must be evaluated). 83 Fed. Reg. at 35184; 89 Fed. Reg. at 24272 ("All the effects of the action considered since the 1986 revisions to the definition are still included in the scope of 'effects of the action'"). The Services' goal in applying a reasonable certainty standard is, as it has always been, to ensure their identification of the "effects of the action" rests on a rational basis. Plaintiffs' demand for a looser standard that would include a broader scope of speculative effects is contrary to the best reading of the ESA.

Finally, it is important to rebut Plaintiffs' mischaracterization of the reasonable certainty test. The Services have used the "reasonably certain to occur" standard in key parts of their effects analyses for many years. Plaintiffs are wrong to describe the reasonable certainty test as (1) a new position for the Services, (2) more stringent than the Services' prior approach to considering effects of the action, and (3) requiring that the consequences of an agency action be almost certain before the Services consider them in a Section 7(a)(2) consultation.

For decades, the Services have "used the causation standard of 'but for' plus an element of foreseeability (*i.e.,* reasonably certain to occur) to determine whether the consequence was caused by the action under consultation." 84 Fed. Reg. at 44977. Before the 2019 rulemaking the Services already applied a reasonable certainty standard to identify various types of "effects of the action" and related effects of concern. 83 Fed. Reg. at 35183 ("The concept of reasonable certainty . . . is explicitly applied in the context of indirect effects, cumulative effects, and incidental take."); *See* 50 C.F.R. § 402.02 (2018) ("Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur."); *See also* Endangered Species Consultation Handbook[9] (1998) 4-29, 4-31 to 4-32 (standard for cumulative effects and indirect effects). Thus, the concept of reasonable certainty is not a new or heightened standard. 83 Fed. Reg. at 35183. In their 2019 rulemaking, the Services simply applied their

---

[9] The Services jointly issued the ESA Consultation Handbook in March 1998, after public notice and comment, to provide internal guidance and policy for conducting ESA consultations. 59 Fed. Reg. 65781 (Dec. 21, 1994). It is located here: https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf.

longstanding reasonable certainty standard to all effects of a proposed agency action, explaining that the simplification would *not* change "what types of effects or activities will be considered within our consultations." *Id*. at 35183-84 (*e.g.*, citing the 1986 and 2015 rulemakings); 89 Fed. Reg. at 24271 ("We reassert our position that the retained changes in the 2019 rule and the revisions adopted from the 2023 proposed rule maintain the pre-2019 scope of the effects analysis.").

Since 1986 the Services have applied a reasonable certainty standard when assessing both the indirect effects of an agency action and the cumulative effects to be considered along with the effects of a proposed action. 50 C.F.R. § 402.02 (2018); 51 Fed. Reg. at 19933. As the Services explained then, the reasonable certainty standard required "more than a mere possibility" but "does not mean that there is a guarantee that an [effect/action] will occur." *Id.* at 19933. In carrying forward the reasonable certainty standard in a simplified definition of "effects of the action," the Services seek only to use a standard that has been in use for decades.

The Services have explained repeatedly that they intend the reasonable certainty inquiry *not* to require any guarantees, but only to require a rational basis for finding that any effects are more certain than a "mere possibility" and not speculative. *E.g.*, 83 Fed. Reg. at 35184; 89 Fed. Reg. at 24270. The Services' historical use of the reasonable certainty standard to identify various effects of an agency action refutes Plaintiffs' theory that a reasonable certainty standard enacts a new, narrow, and unlawful standard that exceeds the statutory bounds of Section 7 in every conceivable application. The Services' definition of "effects of the action" falls comfortably within the best reading of ESA Section 7. Plaintiffs' arguments to the contrary lack merit.

## 2. In Section 7 consultations, the Services may consider all mitigation measures described as part of an agency action.

In Section 7, Congress required the Services to take three steps: (1) consult over "any action" authorized, funded or carried out by agencies (16 U.S.C. § 1536(a)(2)); (2) issue an opinion on how the "agency action" affects species or critical habitat (*id*. § 1536(b)(3)(A)); and, (3) if needed, specify non-jeopardizing alternatives to the action that "can be taken" by the

agency. *Id*. These three provisions demonstrate that Congress intended consultation on the entire agency action, not parts. And so the Services' regulations require consultation on the entire agency action, not parts. 50 C.F.R. § 402.14(g)(8) ("Measures included in the proposed action . . . that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action and do not require any additional demonstration of binding plans."); 84 Fed. Reg. at 44979, 45017 (describing change to 50 C.F.R. § 402.14(g)(8)).

Plaintiffs disagree, arguing that the ESA requires an action agency to make binding commitments and plans for all mitigation measures *before* Section 7 consultation. Pls.' Br. 14-18. They would have the Services parse an action by its effects and exclude from Section 7 consultation and analysis any mitigation activities that benefit species or habitats unless the action agency proves, prior to consultation, that it has committed the resources necessary to guarantee their implementation. The result, obviously, would be a consultation where the deck is stacked, with the Services considering only adverse effects while ignoring beneficial aspects of an agency action. The plain text, structure, and legislative history of Section 7 does not restrict consultation to only those elements of a proposed agency action that are embodied in "binding plans" or have a "binding commitment" or meet other such criteria. Pls.' Br. 15.

ESA Section 7 requires consultation over the "agency action" broadly, not individual components. 16 U.S.C. § 1536(a)(2), (b)(3)(A). This plain language does not allow the Services to limit consultation to only those proposed agency actions (or beneficial elements) that are supported by binding commitments. When a Federal agency proposes to take discretionary agency action, the Services presume for purposes of Section 7 consultation that the action agency will implement its proposal. 84 Fed. Reg. at 44979 (noting presumption, but with the caveat that the action "must also be described in sufficient detail that the Services can both understand the action and evaluate its adverse and beneficial effects"); *see also id*. at 44990.

The ESA also requires the Services to provide a biological opinion at the conclusion of consultation that details "how the agency action," not piecemeal components of an agency

action, affect species and critical habitat.[10] 16 U.S.C. § 1536(b)(3)(A). This language provides a plain description of the Services' task that refutes Plaintiffs' claim. Caselaw likewise establishes that an inclusive description of the agency action, including all mitigation measures that are related to an action, is critical to effective implementation of Section 7. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1116 (9th Cir. 2012) (excluding mitigation measures from an agency action "profoundly affects the ESA scheme").

Though Plaintiffs cite (Pls.' Br. 16) to ESA Section 7(b)(3), that provision contains additional textual signposts and reasons to reject their argument. Section 7(b)(3)(A) provides that, when the Services conclude in a biological opinion that a proposed action is likely to jeopardize a species or destroy or adversely modify critical habitat in violation of Section 7(a)(2), the Services shall specify a "reasonable and prudent alternative" action that would not violate Section 7(a)(2). 16 U.S.C. § 1536(b)(3)(A). That is, Congress intended, in such situations, for the Services to identify additional activities or alternatives to the action initially proposed. This provision cuts sharply against Plaintiffs' argument for three reasons.

First, this provision indicates that Congress wanted the Services to be able, where necessary, to offer alternatives to a proposed action during consultation, with the *only* requirement that such alternative action "can be taken" by the agency. *Id.* § 1536(b)(3)(A). The Services develop such reasonable and prudent alternatives in consultation with the action agency. Consultation Handbook at 4-43, 4-44. Because Congress set a standard of "can be taken," Plaintiffs err in creating new, more stringent standards to limit the agency action proposals subject to consultation. *King v. Burwell*, 576 U.S. 473, 486 (2015) (The words of a statute must be read in their context and with a view to their place in the overall statutory scheme.).

Second, Congress intended the agencies to have flexibility to consider *revisions to* proposed actions during consultation, such as by identification of reasonable and prudent alternative actions when necessary. Thus, Congress intended that Section 7 consultation would work to resolve conflicts between proposed actions and listed species, and the consultation

---

[10] 51 Fed. Reg. at 19928 (purpose of the ESA consultation process is "to assist the Federal agencies in conforming their proposed actions to the requirements of section 7.").

process would "assist in the development of alternatives to the proposed action," where the alternatives are "reasonable and prudent." H.R. Rep. No. 95-1625, at 20 (1978). Congress envisioned iterative "consultations" on proposed actions, not consultations on actions that an agency has already committed, or is otherwise bound, to take. *Id*. at 12-13, 16, 20; S. Rep. No. 95-874, at 5-6 (1978). Action agencies decide, after consultation concludes, whether to voluntarily incorporate alternative measures into their final decision such that they become part of the agency action.[11] 50 C.F.R. § 402.15.

Third, under Plaintiffs' view, the Services must screen out an action agency's proposed mitigation measures that lack heightened assurances and disregard them during consultation. Under Section 7(b)(3)(A), the Services might then be obligated to propose beneficial "alternative" activities or actions back to an action agency at the end of consultation. It would be no surprise if such alternatives mirrored the mitigation measures the Services would be obligated to disregard in analyzing the action agency's own proposal.[12] That circular process would artificially skew and complicate the Services' substantive analyses of jeopardy and adverse modification. It would also disrupt and slow the Section 7 consultation process with duplicative steps in contravention of Congress' expectation that consultations move expeditiously. 16 U.S.C. § 1536(b)(1) (imposing default 90-day consultation period). These inefficiencies show that Plaintiffs' demand for binding commitments prior to consultation makes no sense and is inconsistent with the statutory context and structure of Section 7. Congress' intention that the Services have the discretion to consult upon alternatives to a proposed action, including alternative mitigation activities, necessarily means an action agency need not commit to a fixed mitigation plan before consultation begins because that plan might change.

This conclusion is also compelled by Section 7(a)(3)'s "early consultation" provisions. *Id*. § 1536(a)(3). "The clear intent of Congress in developing a pre-project consultation system

---

[11] The Services' findings in a Biological Opinion about a reasonable and prudent alternative are then contingent on an action agency carrying out the reasonable and prudent alternative it selects.

[12] A biological opinion need not address whether the action agency can or will implement any alternative proposed by the Services or its economic or technological feasibility. *Jewell*, 747 F.3d at 636.

was to allow private parties to modify or alter their project plans at an earlier, more flexible point in the design phase of the project." H.R. Rep. No. 99-124 (1985). Congress recognized that such efficiencies would be realized by authorizing the Services to establish guidelines to avoid consultations over prospective actions that are too speculative or insufficiently described to allow for a meaningful consultation. 16 U.S.C. § 1536(a)(3); H.R. Rep. No. 97-835 (1982) ("The guidelines should require the prospective applicant to provide sufficient information describing the project, its location, and the scope of activities associated with it to enable . . . a meaningful consultation."). It makes no sense to construe ESA Section 7(a)(2) as requiring that an agency and applicant make binding commitments to mitigation measures prior to consultation when Congress has instead granted the Services discretion in Section 7(a)(3) to establish guidelines on the amount of detail necessary for a meaningful consultation.

A similar structural problem with Plaintiffs' argument is that Congress expressly prohibited action agencies from making certain resource commitments during consultation in Section 7(d). *Id.* § 1536(d). Plaintiffs do not explain how ESA Section 7 is properly construed to require an action agency to commit some resources to an action before consultation, while also prohibiting other resource commitments during consultation, without knowing in advance which commitments are mandatory, and which are prohibited.

All these provisions of Section 7 demonstrate that action agencies should be able to revise their action at the conclusion of consultation to best ensure their compliance with Section 7(a)(2) and benefit from the recommendations and findings of the Services. Plaintiffs' view that certain actions and activities must be set in stone *before* the Services analyze the actions in a consultation is inconsistent with Section 7 and should be rejected. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008) (Statutory construction must "to the extent possible, ensure that the statutory scheme is coherent and consistent.").

Plaintiffs' arguments to the contrary are unpersuasive and rest on a misunderstanding of the Services' approach, Section 7 itself, and their cited case law. They use unduly negative terms to describe (Pls.' Br. 15-16) the mitigation measures proposed to the Services, as "insufficiently concrete," "speculative," "amorphous," "without evidence," "uncertain," and "unlikely." They

would require the Services to disregard an action agency's statements about its own proposal as inaccurate. Plaintiffs offer no evidence this is a significant problem in Section 7 consultation. However, their pejoratives obscure several critical issues.[13]

To begin with, none of the caselaw Plaintiffs cite construes any specific language in ESA Section 7 as obligating the Services to require a binding commitment only for mitigation measures, in contrast to all other elements of a proposed action. The primary case Plaintiffs rely upon (Pls.' Br. 15) is *National Wildlife Federation v. NMFS*, 524 F.3d 917, 935-36 (9th Cir. 2008). The principles they draw from the decision—that measures to minimize or avoid adverse impacts must be backed with "specific and binding plans" and "a clear [and] definite commitment of resources"—are drawn from a single paragraph that does not discuss or even cite any specific provision of the ESA.[14] *Id.* at 935-36. The better understanding of this decision concerns *how* the Services analyzed the mitigation measures in that agency action and the conclusions drawn, not whether Section 7 requires the Services to exclude certain mitigation measures from analysis. In *National Wildlife Federation*, the Ninth Circuit determined that the agencies' record required more factual detail about actual plans to make "structural improvements to aid safe passage" for fish before NMFS could make a non-arbitrary finding that these activities would suffice to offset "certain immediate negative effects." *Id.* at 935. Thus,

---

[13] Plaintiffs err in conflating the "effects of the action" with the scope of a proposed action. Pls.' Br. 16-17. The Services do *not* assume without analysis that the beneficial effects of a mitigation measure are reasonably certain to occur. The Services require sufficient information regarding mitigation measures to meaningfully analyze them. 50 C.F.R. § 402.14(c)(1). But they presume that an action agency will implement its proposed action as described, including any proposed mitigation measures. Plaintiffs challenge that specific presumption. By contrast, in the effects analysis, the Services apply their "effects of the action" definition to the proposed action, *inter alia*, to determine how the species and critical habitats will respond to the action, if implemented as proposed.

[14] The district court decision in that case likewise did not specify any legal basis for a rule that project improvements had to be uniquely guaranteed, but instead only found NMFS' analysis arbitrary and capricious for failing to adequately assess impacts to fish. *Nat'l Wildlife Fed'n v. NMFS*, No. CV 01-640-RE, 2005 WL 1278878, at *16 (D. Or. May 26, 2005), *aff'd sub nom. Columbia Snake River Irrigators Ass'n v. Nat'l Wildlife Fed'n*, 230 F. App'x 659 (9th Cir. 2007), and aff'd, 481 F.3d 1224 (9th Cir. 2007), opinion amended and superseded, 524 F.3d 917 (9th Cir. 2008).

later courts have found that "binding mitigation measures . . . must describe, in detail, the action agency's plan to offset the environmental damage caused by the project." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743, 746-47 (9th Cir. 2020).

The Services already have a separate solution to the problem of inadequately detailed mitigation plans. They now require that, before initiation of formal consultation, an action agency "shall provide sufficient detail to assess the effects of the action on listed species and critical habitat," including sufficient detail for "any measures intended to avoid, minimize, or offset effects of the action." 50 C.F.R. § 402.14(c)(1)(i). "If the description of proposed measures fails to include the level of detail necessary for the Services to understand the action and evaluate its effects to listed species or critical habitat, then the Services will be unable to take into account those effects when developing our biological opinion." 84 Fed. Reg. at 45003; *see also* 84 Fed. Reg. at 44979 (requiring sufficient detail, not binding plans). However, as to the issue of binding commitments, the Services view submission of an adequate description of a proposed action as a sufficient agency commitment to taking the described steps.[15] 83 Fed. Reg. at 35187 ("By describing what is included in the proposed action, the Federal agency has made a commitment.").

Plaintiffs' other cites are likewise unavailing. In *Defenders of Wildlife v. Zinke*, the panel simply cited to *National Wildlife Federation,* but did *not* require guarantees of mitigation measures. 856 F.3d 1248, 1258 (9th Cir. 2017). The Services' view of the proper understanding as to how Section 7(a)(2) operates is demonstrated by *Sierra Club v. Marsh*, 816 F.2d 1376, 1385-86 (9th Cir. 1987). There, the action agency took a different course of conduct than it proposed to the Services. The Court found the action agency the Army Corps had violated its own obligations under section 7(a)(2), but did not fault FWS for its Biological Opinion based on

---

[15] The Services explained in issuing the 2019 rule that they tailor their opinions to make clear that activities necessary to avoid jeopardy to a species must occur when appropriate, and not after the adverse consequences they are meant to counteract. 84 Fed. Reg. at 45006 ("[T]he Services do not rely on promises of future actions to offset present adverse effects in a manner that would be inconsistent with Federal agencies ensuring that their actions are consistent with the substantive requirements of section 7.").

the Corps' proposed acquisition of the mitigation property in a timely manner. *Id*. at 1386.

Finally, Plaintiffs offer the sweeping point (Pls.' Br. 17) that the word "insure" in Section 7(a)(2) requires the Services to exclude from a Section 7 consultation any consideration of a mitigation measure not backed by a binding and definite commitment of resources. This interpretation is overbroad and unreasonable considering the statute's text and structure. That sentence in Section 7(a)(2) imposes a substantive duty on *action agencies*, not the Services, to avoid jeopardy when undertaking their own discretionary actions. Moreover, an action agency's duty is to insure its action is "not likely" to result in jeopardy or adverse modification. 16 U.S.C. § 1536(a)(2). The term "not likely" affords an action agency leeway to determine what planning and funding is necessary to ensure that their substantive duties under section 7 are satisfied. The sentence does not impose Plaintiffs' requirement for binding plans and commitments on the consultation obligations of the Services. Rather, when mitigation is analyzed as part of the proposed action and that mitigation does not occur, that change to the proposed action could trigger the requirement to reinitiate consultation, as demonstrated by the *Marsh* decision. *Id*.

Plaintiffs' arguments about the scope of the agency action the Services are allowed to consult upon are inconsistent with the text and structure of Section 7. As such, they are not the best reading of Section 7(a)(2) and should be rejected.

### 3. The Services may consider consequences to critical habitat as a whole when determining whether agency action would result in its destruction or adverse modification.

The ESA requires the Services to make findings on how an agency action impacts the relevant ESA-listed "species" and its designated "critical habitat." *Id*. § 1536(a)(2), (b)(3)(A). The Services thus apply the statutory mandates to the "species," not individual animals, and to the "critical habitat," not individual parcels. *See* 50 C.F.R. § 402.02 (explaining the Services apply the mandate to critical habitat "as a whole"). Plaintiffs argue (Pls.' Br. 18-22) the Services violated Section 7(a)(2) by adding the phrase "as a whole" because they contend the Service should make the "destruction or adverse modification" determination as applied to some smaller portion of a critical habitat. They also argue (*id.* at 22-23) that the ESA requires the Services to

separately define the terms destruction and adverse modification. Neither argument is supported by the text of Section 7(a)(2). Both also ignore settled interpretations that confirm the legality of the Services' definition of "Destruction or adverse modification" at 50 C.F.R. § 402.02.

ESA Section 7(a)(2) provides that: "Each Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to . . . result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical." 16 U.S.C. § 1536(a)(2). Congress also addressed application of the adverse modification prohibition in Section 7(b)(3) of the Act. That Section provides that, following completion of the consultation process, the Services "shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." *Id.* § 1536(b)(3)(A). Several critical points can be gleaned from the statutory language in these two critical subsections.

First, these provisions indicate that the adverse modification prohibition must be applied to the entirety of a species' critical habitat. In ESA Section 7, Congress described the "jeopardy" and "adverse modification" prohibitions in the same statutory section, and in the same statutory phrase. *Id.* § 1536(a)(2). On that score, the statutory "jeopardy" inquiry provides that Federal agencies shall insure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species." *Id.* Thus, Congress framed the jeopardy inquiry around protecting "species," which includes all individual animals that are part of the taxonomic "species" or "subspecies," or part of the distinct population segment listed under the Act. *See id.* § 1532(6), (16), (20) (defining "endangered species," "species," and "threatened species"). Under the plain language of the ESA, the Services therefore ask whether the agency action under review is likely to jeopardize the "species," not individual animals. Because Congress framed the parallel jeopardy and the adverse modification mandates in a like manner, there is ample textual basis to conclude that Congress also intended that the adverse modification mandate be applied to an entire "critical habitat" designation, not individual parcels within the broader designation.

Second, this same language conveys that the "adverse modification" prohibition is

considered in relation to a singular critical habitat designation. ESA Section 7 speaks in terms of a species' "critical habitat" or, alternatively, the "habitat of such species which is determined … to be critical." *Id.* § 1536(a)(2), (b)(3)(A). Congress's use of the statutorily defined term "critical habitat" is vitally important. Congress defined "critical habitat" using inclusive language as: "(i) the specific areas within the geographical area occupied by the species, at the time it is listed ...., on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and (ii) specific areas outside the geographical area occupied by the species at the time it is listed ... upon a determination by the Secretary that such areas are essential for the conservation of the species." *Id.* § 1532(5)(A)(i), (ii). The definition of "critical habitat" thus establishes that *all* the "specific areas" of habitat that the Services designate as critical habitat are collectively a single unit.

Viewing the adverse modification prohibition in context with the definition of critical habitat, in turn, leads to the conclusion that the Services must, for each agency action under review, make a single determination of whether that agency action is likely to result in adverse modification as a whole of the "specific areas" collectively designated by the Services as the species' critical habitat. Congress did not, by contrast, instruct the Services to issue separate "destruction or adverse modification" determinations for each "specific area" of a critical habitat designation that may be affected by the agency action.

The Services have long interpreted and implemented the "destruction or adverse modification" in this same way, as shown by a 2016 amendment to the same regulatory definition of "destruction or adverse modification." The Services explained that their determination of destruction or adverse modification "places an emphasis on the value of the designated critical habitat *as a whole* for the conservation of a species, in light of the role the action area serves with regard to the function of the overall designation." 81 Fed. Reg. at 7221-22 (emphasis added). The Consultation Handbook also makes the same point. Consultation Handbook at 4-36. That is, the Services make a final destruction or adverse modification determination "at the scale of the entire critical habitat designation" after considering how any impacts at the smaller scale of an action area, critical habitat unit, or other more limited scale

translate to the whole designated critical habitat and the specific functions it serves. 83 Fed. Reg. at 35180-81.

The Services thus comply with Section 7 by making two comparable findings: (1) a jeopardy determination "at the scale of the entire listed entity," and (2) a determination of destruction or adverse modification "at the scale of the entire critical habitat designation." 81 Fed. Reg. at 7222; *see also* 83 Fed. Reg. at 35181 (same); 84 Fed. Reg. at 44984 (same). In adding the phrase "as a whole" to the regulatory definition in 2019, the Services sought only to express what had always been the Services' approach. 83 Fed. Reg. at 35181. In other words, the 2019 rule provided an incremental clarification of its 2016 rule and prior practice, but did not make any substantive change. 84 Fed. Reg. at 44982. The 2024 regulations continue this approach. 89 Fed. Reg. at 24290-91.

This approach has been upheld by the Ninth Circuit, which cited favorably to the Services' Consultation Handbook in holding that a "determination that critical habitat would be destroyed was thus not inconsistent with [a] finding of no 'adverse modification.'" *Butte Env't Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 947-48 (9th Cir. 2010). This affirmation of the Services' analysis of impacts to critical habitat at both local and national scales demonstrates that the Services' regulation and their scaling-up approach is consistent with ESA Section 7. *See also Rock Creek All. v. U.S. Fish & Wildlife Serv.*, 663 F.3d 439, 442 (9th Cir. 2011) (Agency "did not err by conducting a large-scale analysis."). This case law refutes the proposition that any small-scale or localized destruction of critical habitat is necessarily prohibited by the Act. While such destruction is an issue to be considered, it can be reasonably considered in the context of its impact on the critical habitat of the species as a whole. And this case law disproves Plaintiffs' facial argument that analysis of critical habitat as a whole always violates Section 7.

Plaintiffs raise several complaints (Pls.' Br. 22) that are more properly raised in an as-applied challenge to a specific consultation. They argue that the Services' focus on critical habitat as a whole may lead them to overlook multiple localized impacts or the importance of small areas, or harm to migratory or wide-ranging species with expansive critical habitat. But the Services explained that their analytical framework properly considers each of these issues but

also considers how each smaller-scale impact affects the ability of critical habitat overall to satisfy essential requirements of the species. 84 Fed. Reg. at 44983; *see also* 89 Fed. Reg. at 24290-91.

Plaintiffs also argue (Pls.' Br. 21) that the Services' focus prevents analysis of the role affected critical habitat may play in recovery of a species. This point ignores that the regulatory definition of "destruction or adverse modification" expressly requires consideration of "the value of critical habitat as a whole for the conservation of a listed species," a concept defined by statute as implicating recovery. 50 C.F.R. § 402.02; 16 U.S.C. § 1532(3) (defining "conservation"); 84 Fed. Reg. at 44982 (discussing how consequences for recovery feature in a "destruction or adverse modification" determination). Consideration of consequences for recovery have been, and continue to be, part of the Services' analyses.

The complexities in a determination of "destruction or adverse modification" provide no reason to set aside the Services' clarification to their existing approach. Plaintiffs' concerns about hypothetical applications of the regulatory definition in future consultations do not support their facial attack on this narrow amendment, especially where the Ninth Circuit has already upheld instances where the Services considered impacts to a critical habitat designation as a whole.

In short, reading the "adverse modification" inquiry as focused on consequences for portions or discrete areas of a larger critical habitat is at odds with Section 7's plain language and the broader statutory scheme. Additionally, Plaintiffs offer no coherent alternative to the Services' approach. If the proper unit is not the entire designation, what principled alternative is there, and what statutory text supports this hypothetical subdivision? Plaintiffs have no answers. Congress provided that the Services shall make a "destruction or adverse modification" determination as applied to a species' entire critical habitat designation, not individual parcels of habitat within that broader designation.

Plaintiffs also make the alternative argument (Pls.' Br. 22-24) that the Services erred in not providing separate definitions for "destruction" and "adverse modification," asserting that the existing definition is unlawful under Section 7 because it fails to provide separate meanings for

the two terms. Yet Plaintiffs ignore the plain wording of the definition, which provides that "destruction or adverse modification means a direct or indirect *alteration*." 50 C.F.R. § 402.02 (emphasis added). The term "alteration" fully captures the complementary concepts of destruction and adverse modification as a range of impacts from permanent loss to a diminished value. A permanent alteration might be considered a "destruction" of critical habitat while a temporary alteration might be considered an "adverse modification." Both types of alteration are covered under the regulatory definition.

And there is nothing impermissible in the Services' use of a broader term like "alteration" to capture both statutory concepts. Indeed, Congress itself treated both concepts as largely synonymous in ESA Section 7(b)(3)(A) when it made no mention of the term "destruction" in its instructions to the Services regarding reasonable and prudent alternatives. There, it stated only "if jeopardy or adverse modification is found . . . ." 16 U.S.C. § 1536(b)(3)(A). This shorthand reference indicates that adverse modification necessarily includes destruction, albeit at one end of a sliding scale. Plaintiffs cannot point to any meaningful consequence to critical habitat that would be excluded from the term "alteration."

The Services' longstanding interpretation is sufficiently flexible to include consideration of how destruction of smaller tracts of critical habitat may impair the overall function of critical habitat for a species and its recovery. In both the 2016 and 2019 rules, the Services responded to a comment seeking separate definitions, explaining that the "key distinction is whether the action appreciably diminishes the value of critical habitat for the conservation of the species, not whether the action destroys critical habitat or adversely modifies it." 81 Fed. Reg. at 7221; 84 Fed. Reg. at 44981 (same).

Finally, Plaintiffs overlook that the Services have defined "destruction or adverse modification" in essentially the same comprehensive fashion since 1978. 43 Fed. Reg. at 875; 84 Fed. Reg. at 44981 (recounting regulatory history). Following these early regulatory interpretations, Congress amended the ESA in 1978. The 1978 amendments provided that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action .... does not ... result in the destruction or adverse modification of habitat of such

species which is determined by the Secretary ... to be critical." Pub. L. No. 95-632, 92 Stat. 3752 (1978). In adopting this language, the House Conference Report explained that the "destruction or adverse modification" language was intended to "retain existing law," i.e., the regulatory interpretation adopted by the Services. H. Conf. Rep. No. 95-1804, at 18 (1978).[16] This history shows Plaintiffs' claim is not only fifty years too late, but more importantly their challenges to the definition of "destruction or adverse modification" lack merit and warrant summary denial.

### 4. The Services have no mandatory duty to request reinitiation of Section 7 consultation.

The Services also amended the regulation governing reinitiation of consultation at 50 C.F.R. § 402.16 to clarify that they are under no mandatory duty to request reinitiation of consultation. Contrary to Plaintiffs' contention (Pls.' Br. 24-26), this change flows from the ESA's text. As a matter of first principles, ESA Section 7 requires action agencies to consult with the Services and obtain their expert opinion. The Services fulfill their obligation when they complete a consultation; they have no independent procedural obligation to "request" or otherwise force consultations. This fact is shown by 16 U.S.C. § 1536(b)(4), which defines the Services' obligations "after consultation," and does not include a procedural reinitiation obligation.

The Services have provided guidance in 50 C.F.R. § 402.16 that the action agencies' obligations to ensure those agencies remain in compliance with the ESA can be met by reinitiating consultation when certain conditions are present. Because the statutory and regulatory focus remains on the action agencies, the Services have now removed a requirement from Section 402.16 that the Services too shall "request" reinitiation of consultation.

Plaintiffs object to this change but cite no language in the ESA requiring the Services to request that other agencies consult with them. Without a statutory hook, Plaintiffs' catalogue of

---

[16] The report explains that the language in Section 7(a) "essentially restates section 7 of existing law ... The Conferees felt that the Senate provision by retaining existing law, was preferable since regulations governing section 7 are now familiar to most Federal agencies and have received substantial judicial interpretation." *Id.*

reasons why they believe the Services should continue the previous regulatory scheme is no more than a policy preference. Absent a procedural duty requiring the Services to force ESA Section 7 consultation, neither Plaintiffs nor the courts can impose such an obligation. *Jewell*, 747 F.3d at 636 (Courts may not impose procedural requirements without a statutory basis); *Cf. Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (agency enforcement decisions are typically unreviewable).

Plaintiffs seek to reverse the regulatory change by arguing the Services failed to provide a rational explanation. The Services explained the change was to make clear that they "lack the authority to require either the initiation of consultation or reinitiation of a completed consultation," and to counteract recent erroneous case law interpreting the prior language as requiring the Services to compel reinitiation. 88 Fed. Reg. 40753, 40756-57 (June 22, 2023); 89 Fed. Reg. at 24280. Under ESA Section 7(a)(2), the federal action agency has the responsibility to insure its action is not likely to jeopardize or result in adverse modification and, therefore, the ultimate decision to initiate or reinitiate consultation rests with the action agency. *See* 51 Fed. Reg. at 19928 ("The Service performs strictly an advisory function under section 7 by consulting with other Federal agencies to identify and help resolve conflicts between listed species and their critical habitat and proposed actions."); *Marsh*, 816 F.2d at 1386 (the ESA "does not give the FWS the power to order other agencies to comply with its requests"); *Def. of Wildlife v. Flowers*, 414 F.3d 1066, 1070 (9th Cir. 2005) (same). Not only is such a duty inconsistent with the Services' role under the statute but it also exposes the Services to needless litigation. This rational explanation suffices to defeat Plaintiffs' argument here. The Services' modest change is reasoned decision making within the boundaries of the Services' authority under Section 7. *Loper Bright*, 603 U.S. at 395.

**B. The Services' regulations for listing species and designating critical habitat are reasonable and consistent with ESA Section 4.**

**1. The Services may define the "foreseeable future" based on their ability to make reasonably reliable predictions.**

The ESA defines "threatened species" as "any species which is likely to become

an endangered species within the foreseeable future . . ." 16 U.S.C. § 1532(20). In 2019, the Services issued a regulation explaining how they apply the "foreseeable future" language. 84 Fed. Reg. at 45052. In the 2024 rulemaking, the Services revised just the second sentence of this same foreseeable future regulation to state: "[t]he foreseeable future extends as far into the future as the Services can make reasonably reliable predictions about the threats to the species and the species' responses to those threats." 89 Fed. Reg. at 24302.

Plaintiffs purport to challenge both the 2019 and 2024 versions of 50 C.F.R. § 424.11(d). Pls.' Br. 27-30. But they quote (Pls. Br. 27) only the one-sentence revision made by the 2024 amendment and offer no argument why any other portion of 50 C.F.R. § 424.11(d)—either contained in the 2019 or 2024 rules—is unlawful. We therefore focus on the one operative provision from 2024 that Plaintiffs specifically challenge.

The 2024 amendment clarified the Services' long-held interpretation of the term "foreseeable future" as that interpretation was stated in an M-Opinion issued by the Solicitor of the Department of the Interior in 2009 as M-37021. 83 Fed. Reg. at 35195; 89 Fed. Reg. at 24302, 24308-09; ESA S4 AR-000364-000379. The Services specifically crafted their 2024 amendment in the second sentence to "track[] closely with the text on page 13 of the M-Opinion, which the Services have relied on since 2009." 89 Fed. Reg. at 24307, 24308-09.

Statutory commands to consider "foreseeable" consequences encompass normal proximate cause principles and require reasonable judgments and line drawing. *Cf. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 766 (2004) (applying proximate causation principles to NEPA regulation requiring consideration of reasonably foreseeable indirect effects); *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. ---, 145 S. Ct. 1497, 1516 (2025) (same). The M-Opinion and, in turn, the 2024 regulation adopt these principles; they focus the "foreseeable future" inquiry on making *predictions* that, in turn, are *reasonable* (or reasonably reliable).

Plaintiffs do not even cite the M-Opinion. Yet their argument (Pls.' Br. 27-29) primarily relies on a Ninth Circuit decision affirming a listing decision made in express reliance on the principles in that Opinion and now embodied in the regulation at issue. *See, e.g., AOGA*, 840

F.3d at 682 ("NMFS's decision to adopt a foreseeability analysis [based on Opinion No. M–37021] that is responsive to new, reliable research while accounting for species-, threat-, and habitat-specific factors is well-reasoned and consistent with the ESA's mandate."). The *AOGA* decision demonstrates that the Services can, and will, apply their "foreseeable future" regulation in a lawful manner based on (a) the best scientific and commercial data available and (b) consideration of "threats to the species, how the species is affected by those threats, and how the relevant threats operate over time." *Id*. at 682; *see also In re Polar Bear Endangered Species Act Listing*, 709 F.3d 1, 15 (D.C. Cir. 2013) (affirming FWS's selection of forty-five years as appropriate foreseeable future period to assess the effect of threats on the species). The *AOGA* case demonstrates that the Services' interpretation is a permissible construction of the ESA. That decision alone compels denial of Plaintiffs' facial challenge under the "no set of circumstances" test directed by *Flores*, 507 U.S. at 301 (citing *Salerno,* 481 U.S. at 745).

*AOGA* also shows that the Services act within their authority under ESA Section 4 in focusing on reasonably reliable predictions about the foreseeable future. *AOGA*, 840 F.3d at 680-81 (explaining that the agency did not require "ironclad evidence" of climate change projections but instead used the "best and most reliable" data, while disclosing the limits of the available data and analysis). Plaintiffs object (Pls.' Br. 28) to using "reasonably reliable" as a standard and imply that the Services now require a high level of certainty. But they ignore that the phrase "reasonably reliable" describes the "predictions" the Services make in their listing determinations. "Reliable does not mean certain; it means sufficient to provide a reasonable degree of confidence in the prediction, in light of the conservation purposes of the Act." 89 Fed. Reg. at 24302-303. The Services' use of "predictions" makes clear this standard does not require conclusive proof of a species' future condition. After all, a prediction is a forecast of the future, not a certainty.

The *AOGA* decision also refutes Plaintiffs' argument (Pls.' Br. 28) that the Services imposed an "extra-statutory standard" in considering future predictions of both threats to a species and a species' response to those threats with its holding that "accounting for species-, threat-, and habitat-specific factors is well-reasoned and consistent with the ESA's mandate." *Id*.

at 682. The ESA does not compel—and may not even permit—the Services to list a species when data indicates that a threat exists, but no reliable information exists about the species' responses.

The fact that previous listing decisions have been set aside for various reasons, including failure to consider relevant available data, is beside the point. None of the cases cited by Plaintiffs (Pls.' Br. 27-30) show any listing decisions set aside for relying on any categorical principle drawn from the M-Opinion, or for any reason like the one sentence from section 424.11(d) under review here. For example, one district court found a listing rule arbitrary because FWS had bent its analysis to "immense political pressure," not in applying any foreseeability principles of the sort required under this regulation. *Defs. of Wildlife v. Jewell*, 176 F. Supp. 3d 975, 1000 (D. Mont. 2016). Another listing decision was vacated because FWS had not explained a change in position. *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061 (9th Cir. 2021).[17] Yet other listing decisions have been set aside for failing to reasonably address relevant scientific studies and data. *WildEarth Guardians v. Haaland*, 561 F. Supp. 3d 890, 900 (C.D. Cal. 2021); *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011). The foreseeable future regulation is not undermined by listing decisions that are set aside for the wholly different reason of failing to reasonably address the available scientific information within agency records. Plaintiffs' failure of proof demonstrates the weakness of their facial attack.

The Services explained repeatedly that, regardless of the foreseeable future regulation, they were still required to fully explain their evaluation of the available information when determining whether a species meets the definition of a threatened species. 88 Fed. Reg. 40764, 40766-67 (June 22, 2023) ("The Services would still be required to document and explain in their listing determinations how the best available data support decisions with respect to species' status over the foreseeable future."); 89 Fed. Reg. at 24303 (principle #7); *id.* at 24307 (response to comment 13); *id.* at 24309 (response to comments 18, 19, 20, 22). Likewise, the foreseeable

---

[17] This decision even quoted the M-Opinion as supplying the Services' interpretation of the "foreseeable future." *Ctr. for Biological Diversity v. Haaland*, 998 F.3d at 1063, 1069.

future regulation does not require anything like Plaintiffs' caricature (Pls.' Br. 28) that it will limit the Services to only listing species when they are able to predict future population trends with confidence approaching near certainty. The Services do not demand either near or absolute certainty. *See* 88 Fed. Reg. at 40766 ("Consistent with the best available information standard, we do not need to have absolute certainty about the information we use; rather, we need to have a reasonable degree of confidence in the prediction."). Instead, the Services will interpret the foreseeable future as extending as far as the "best available data" enable "reasonably reliable" predictions about threats and the species' responses to those threats. 89 Fed. Reg. at 24302 (explaining that Services may have to decide where "the extent or nature of the best data available" limits reliability of predictions "and that to extrapolate [a] trend beyond that point would constitute speculation.").

The Services have reasonably explained how they intend to comply with the best available science standard in determining what constitutes the foreseeable future. Plaintiffs, however, provide no competing interpretation of the statutory requirement to identify the foreseeable future in determining whether a species is a threatened species. Their interpretation treats this phrase as essentially a surplusage, with listing decisions subject only to the best available data requirement. Such an approach is not the best reading of the ESA, especially if it means the Services should base listing decisions on speculative predictions.

Plaintiffs' resort to the ESA's conservation purpose does not save this argument. Pls.' Br. 30. A generalized policy goal cannot compel a reading of the Act that would require species to meet the definition of "threatened" based on speculation or surmise. *Bear Valley Mut. Water Co.*, 790 F.3d at 987 (ESA statement of purposes and policy contains no substantive or procedural requirements.). In contrast, the Services' interpretation is based on fifteen years of experience implementing the interpretation of the foreseeable future standard provided by the 2009 M-Opinion and aligns with the best available science standard.

## 2. The Services may define general circumstances when a determination of critical habitat may not be prudent.

Section 1533(a)(3) of the Act requires that, "to the maximum extent prudent and

determinable," the Services will designate a species' critical habitat concurrently with listing the species. The statute does not define or further clarify the term "prudent." In 2024, the Services revised 50 C.F.R. § 424.12(a)(1) to provide a non-exhaustive list of specific scenarios where the Services may, but are not required to, find it is not prudent to designate critical habitat in a future decision on a particular species.

The 2024 regulation marked a change from the pre-2019 regulation that set forth several scenarios where critical habitat may not be prudent. That pre-2019 version allowed for a determination that critical habitat is not prudent for a species if such designation would: (1) increase the degree of threat to the species through the identification of critical habitat, or (2) "not be beneficial to the species," listing several non-exhaustive factors the Services could consider in determining whether a designation would not be beneficial. 81 Fed. Reg. at 7425. Subsequently, the Services determined that the second circumstance of "would not be beneficial to the species" was "difficult to understand and apply." 83 Fed. Reg. at 35197; 89 Fed. Reg. at 24318 (noting difficulty in applying the "not beneficial" standard). The Services thus modified subsection 424.12(a)(1) to set forth a non-exhaustive list of scenarios in which the Services might find it not prudent to designate critical habitat as contemplated in ESA Section 4(a)(3)(A).

The Services explained that they preferred to base "not-prudent determinations on whether particular circumstances are present, rather than on whether a designation would not be 'beneficial'" because their new interpretation is "clearer, more transparent, and more straightforward." 89 Fed. Reg. at 24318; 83 Fed. Reg. at 35197 (explaining preference for stating particular circumstances rather than broad test); 84 Fed. Reg. at 45040 (same).

Plaintiffs resist this change in approach by insisting that the ESA requires the Services to equate "not prudent" with "no benefit," as provided in the pre-2019 regulatory language and in certain statements in the ESA's legislative history. Pls.' Br. 31-32. This argument ignores that Congress declined to include the "no benefit" language in the statute. "Legislative history is not the law." *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019). Indeed, the fact that Congress considered but failed to adopt more stringent language or Plaintiffs' preferred language, cuts against Plaintiffs' construction. *United States v. Tan*, 16 F.4th 1346, 1352 (9th Cir. 2021).

Moreover, the plain text of ESA Section 4(a)(3)(A) shows that Congress instead conferred discretion on the Services to use their judgment and discretion, as shown by its choice of the word "prudent." This term is used in many contexts, statutes, and common law to convey discretion. *E.g.*, *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (en banc) (duty of prudent investment in trust law requires "exercising reasonable care, skill, and caution."). And it is commonly understood to mean "well thought out; thoughtfully planned or cautiously considered." Black's Law Dictionary (12th ed. 2024). Such a broad term necessarily confers discretion on the Services "to determine the circumstances when designating critical habitat may not be prudent." 89 Fed. Reg. at 24317.

Plaintiffs' assertion (Pls.' Br. 32, 34) that the recent amendments substantially expand the exceptions misstates the sweep of both the old and new versions of Section 424.12(a)(1). Plaintiffs ignore that the old standard of "not beneficial" was not limited to any specific scenarios and might have been applied to any circumstances not specifically listed. *See* 81 Fed. Reg. at 7439 ("In determining whether a designation would not be beneficial, the factors the Services may consider include but are not limited to…"). Specifying in the regulation additional circumstances previously described in the 2016 preamble were not substantive changes. 89 Fed. Reg. at 24317; *see also* 84 Fed. Reg. at 45040, 45041. The fact that the Services have now identified the most likely scenarios for considering whether a determination might not be prudent was "not intended to expand the circumstances in which the Services determine that designation of critical habitat is not prudent." 84 Fed. Reg. at 45040.

Nor did the Services create a new broad exception by acknowledging that the "not prudent" exception is "not limited" to the circumstances now articulated in Section 424.12(a)(1). That language is a simple recognition that the Services "cannot foresee all possible circumstances in which critical habitat may not be prudent, and making the list of circumstances non-exhaustive provides for the ability to address those circumstances should they arise." 89 Fed. Reg. at 24317; *see also* 88 Fed. Reg. at 40768. "Making the list of circumstances non-exhaustive does not allow the Services to circumvent the clear direction of the Act (i.e., to designate critical habitat) without adequate and rational justification." 89 Fed. Reg. at 24317.

And Plaintiffs can seek to challenge any future rule that makes a not prudent determination.

Plaintiffs also complain (Pls.' Br. 32) that two of the specific scenarios are unlawfully broad expansions of the not prudent exception. Neither charge sticks. The first circumstance, when "present or threatened destruction . . . . of a species' habitat or range is not a threat to the species," appeared in identical language in the 2016 regulation that Plaintiffs concede is lawful. 81 Fed. Reg. at 7439, adopting Section 424.12(a)(1)(ii) (2016). Moreover, even back in 2016, the Services provided an example of that scenario—where the sole threat to a species was disease—that might lead to the conclusion that a designation of critical habitat would provide no conservation benefit to a species (*e.g.*, if the species were a habitat generalist), but would create a regulatory burden and drain the Services' limited resources. 81 Fed. Reg. at 7425, 7432; *See also* 83 Fed. Reg. at 35197 (discussing example). This example shows how this general circumstance could be applied lawfully and defeats Plaintiffs' facial attack.

Plaintiffs also challenge as unlawful the general circumstance where areas within the jurisdiction of the United States provide no more than negligible conservation value for a species that occurs primarily outside U.S jurisdiction. 50 C.F.R. § 424.12(a)(1)(iii). Plaintiffs err in equating "no more than negligible conservation value" with "small impact." Pls.' Br. 33. The Services explained that negligible means insignificant, and "negligible conservation value" means "the conservation value of habitats under U.S. jurisdiction would be insignificant to the conservation of the listed entity." 89 Fed. Reg. at 24317. A designation with insignificant benefit to a species is not meaningfully distinguishable from Plaintiffs' preferred standard of "no benefit to the species." 81 Fed. Reg. at 7436. The Services stated they might find these circumstances apply when "no areas under U.S. jurisdiction contain features essential to the conservation of the species" or where no areas within the United States met the definition of critical habitat for the species. 84 Fed. Reg. at 45041. These examples again show potential lawful applications of this general circumstance that disprove Plaintiffs' facial attack.

This point is not undercut by Plaintiffs' citation (Pls.' Br. 33) to *Natural Resources Defense Council v. United States Department of the Interior*, 113 F.3d 1121 (9th Cir. 1997). The scenario in section 424.12(a)(1)(iii) about the value of habitat under U.S. jurisdiction focuses on

whether such domestic habitat would provide more than negligible conservation value, not whether a designation would benefit most of the species or most of the habitat. The decision in *Natural Resources Defense Council* is inapplicable because it addresses a different situation.

Plaintiffs rely (Pls.' Br. 31) on statutory language that requires the Services to designate critical habitat "to the maximum extent prudent and determinable." 16 U.S.C. § 1533(a)(3)(A). But "maximum extent" and "prudent" announce different principles for the Services to apply. "Often at the time of listing when we are developing a designation of critical habitat for a species, we may have only limited data concerning the . . . [species] that can inform the identification of features or specific areas essential to the conservation of the species." 81 Fed. Reg. at 7418. Thus the "maximum extent" language instructs the Services' approach to the scope of designation, not the decision whether a designation is prudent. After all, "Congress wrote into the Act the fundamental requirement to designate critical habitat 'to the maximum extent'" while still allowing the "not prudent" and "not determinable" exceptions. 89 Fed. Reg. at 24318.

The question here is whether the Services have exceeded the boundaries of their discretionary authority or engaged in reasoned decision-making within those boundaries. *Loper Bright*, 603 U.S. at 395, 404. It is well within the Services' discretion to flesh out several general circumstances where they could, though they would not be obligated to, consider finding the designation of critical habitat not prudent for a particular species. And it is also within the Services' discretion to replace a vague and unworkable regulatory standard with a more concrete and useful approach to guide their analysis in future rulemakings. Plaintiffs' argument here sets too narrow a boundary for Congress' use of the term "prudent." Plaintiffs' challenge to 50 C.F.R. 424.12(a)(1) lacks merit.

## IV.    THE SERVICES COMPLIED WITH THE NATIONAL ENVIRONMENTAL POLICY ACT (NEPA).

The Services complied with NEPA in issuing the Section 4 regulations at issue here.[18]

---

[18] Plaintiffs' complaint challenged the Services' NEPA compliance with respect to the Section 7 regulations as well as the Section 4 regulations, *see* ECF 23 ¶¶ 113-15. But Plaintiffs' summary judgment motion did not challenge the environmental assessment that the Services prepared for

NEPA is a modest "procedural cross-check" designed to "inform agency decisionmaking." *Seven Cnty.*, 145 S. Ct. at 1507. "The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.* at 1515. Thus, "the role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978).

NEPA requires agencies to prepare an environmental impact statement for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Agencies do not have to prepare environmental impact statements for every final action they take. If an action "does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," the agency may prepare an environmental assessment. *Id.* § 4336(b)(2). In other circumstances, "[a]n agency is not required to prepare an environmental document" at all. *Id.* § 4336(a). Those include circumstances where, as here, "the proposed agency action is excluded pursuant to one of the agency's categorical exclusions, another agency's categorical exclusions consistent with section 4336c of this title, or another provision of law." *Id.* § 4336(a)(2).

Here, the Services determined that they were not required to prepare an environmental impact statement or environmental assessment for the Section 4 regulations because those regulations fell within the Services' respective categorical exclusions for actions that are administrative, financial, legal, technical or procedural in nature. ESA_S4_AR-0000030; ESA_S4_AR-0000707. The Services documented their analyses and conclusions in detailed memoranda signed in March 2024. ESA_S4_AR-0000012-30 (NMFS Categorical Exclusion Memorandum); ESA_S4_AR-0000697-720 (FWS Environmental Action Statement). Those memoranda discussed the proposed changes to the Section 4 regulations from 2019 and 2024, assessed the likely effects of those changes relative to the categorial exclusion's provisions, analyzed the applicability of the respective categorical exclusions, and considered whether any

---

their Section 7 regulations. *See* Pls.' Br. 36-39. They have waived any NEPA claim for the Services' Section 7 regulations. We only address the Services' NEPA compliance in issuing the Section 4 regulations.

exceptional circumstances applied. *Id.* The Services' analyses are well-reasoned and entitled to significant deference. *See Seven Cnty.*, 145 S. Ct. at 1512 ("Black-letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'" (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983))).

Plaintiffs contend that the Services' reliance on categorical exclusions was arbitrary and capricious for two reasons: (i) that the Section 4 regulations "substantively weakened protections for endangered and threatened species," Pls.' Br. 37, and (ii) that extraordinary circumstances precluded the Services' reliance on a categorical exclusion, *id.* at 38. Plaintiffs are incorrect.

First, Plaintiffs offer just one explanation for how the Section 4 regulations substantively weakened protections for listed species: the provision in the regulations on "not-prudent determinations" that provides that the Services may deem designation of critical habitat not prudent where "present or threatened" habitat destruction or modification "is not a threat to the species." Pls.' Br. 37 (citing 50 C.F.R. § 424.12(a)(1)(ii)). But Plaintiffs ignore that the regulations contained that same language *prior to 2019*. Thus, neither the 2019 rule nor the 2024 rule altered that portion of the regulations. *See* ESA_S4_AR-0000018 n.6 (explaining that changes to 424.12(a)(1)(ii) (among others) "were already primarily captured in the preceding version of the rule"); ESA_S4_AR-0000704 n.7 (same); *see also* ESA0000164 (displaying proposed 2019 changes to § 424.12(a)(1)(ii), which did not alter the phrase "threat to the species"). Plaintiffs cannot be correct that the 2024 regulations substantively weakened protections for listed species by retaining language that was already in effect before 2019.

Apart from that single example, Plaintiffs offer no other explanation of how the Section 4 regulations allegedly weakened the regulations. They have not carried their burden to show that the agencies' contrary determinations were arbitrary and capricious.

Second, Plaintiffs contend that extraordinary circumstances prohibited the Services from

relying on a categorical exclusion.[19] But Plaintiffs merely assert without any support that the Section 4 rules will have "readily apparent significant effects on threatened and endangered species." Pls.' Br. 38. Plaintiffs do not identify what those significant effects are, much less explain how they could be considered reasonably foreseeable. *See id.* By contrast, the Services analyzed in depth the applicability of their respective extraordinary circumstances requirements and explained their conclusions that no such circumstances were present. ESA_S4_AR-0000025-26 (NMFS); ESA_S4_AR-0000714-17 (FWS). Plaintiffs fail to engage with the Services' analyses. Instead, Plaintiffs cite only FWS's 2019 environmental action statement, without acknowledging the Services' 2024 analyses. Pls.' Br. 38 (citing ESA0000159). As explained above, the 2024 rules superseded the 2019 rules, rendering Plaintiffs' challenges to the 2019 rules moot. *Supra* at 12. Thus, Plaintiffs cannot ignore the Services' detailed analyses from 2024.

The same is true of Plaintiffs' argument that the Section 4 regulations will "establish a precedent for future action or represent a decision in principle about future actions with potentially significant effects." Pls.' Br. 38-39. Plaintiffs' only support for that argument is that the regulations would apply prospectively. *Id.* at 38. That fact alone is plainly insufficient to show that the Section 4 regulations would establish precedent for future decisions or represent a decision in principle about those future decisions. The Services considered this question, and each determined that the Section 4 regulations would not set precedent for future decisions. *See* ESA_S4_AR-000027-28 (NMFS); ESA_S4_AR-0000713 (FWS). For the "not prudent determinations" in particular, the Services concluded that those revisions "would not affect the standards or outcomes" for future critical habitat determinations. ESA_S4_AR-0000710 (FWS); *see also* ESA_S4_AR-0000024 (NMFS). That was so because, among other things, "not-prudent determinations are not compulsory for any of the circumstances identified by [the] regulation,

---

[19] Plaintiffs cite only to the Department of the Interior's regulations setting forth the circumstances that preclude reliance on categorical exclusions. Pls.' Br. 38-39. Those regulations apply only to FWS, not to NMFS. NMFS adhered to the NEPA procedures set forth in its own agency manual. ESA_S4_AR-000020 (citing NOAA Administrative Order (NAO) 216-6A and Companion Manual for NAO 216-6A); 89 Fed. Reg. at 24334 (same). Regardless, both Services complied with their respective procedures in concluding that no extraordinary circumstances prevented reliance on a categorical exclusion.

and whether designation of critical habitat is not prudent for a particular species is also a highly fact-specific determination." ESA_S4_AR-0000024 (NMFS); ESA_S4_AR-0000710 (FWS) (same). The Services' conclusions for NEPA purposes about the effect of their regulations on future critical habitat determinations are entitled to significant deference, *Seven Cnty.*, 145 S. Ct. at 1512, and Plaintiffs offer no reasoned critique of the Services' analysis.

Plaintiffs have not established that the Services' reliance on their respective categorical exclusions for the Section 4 regulations were arbitrary or capricious. The Court should deny summary judgment on Plaintiffs' NEPA claim and enter summary judgment on behalf of Defendants.

## V. THE COURT SHOULD NOT VACATE THE 2024 ESA REGULATIONS.

Plaintiffs neither have standing to challenge the 2024 ESA regulations nor have identified any legal defect with them. Absent dismissal for lack of jurisdiction or a stay, the Court should uphold the 2024 ESA Regulations.

If the Court finds in Plaintiffs' favor, however, it should limit relief to the specific 2024 ESA regulations that Plaintiffs challenge *and* that the Court holds are unlawful. Of the six challenged regulations, each of them is severable. *See* 89 Fed. Reg. at 24268-69 (explaining that each regulation "stands on its own" and is intended to operate "independently"); 89 Fed. Reg. at 24301 (same); *see also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988) (test for finding a regulation severable). Further, any remedy must be tailored to the specific violations shown, "rather than to enjoin all possible breaches of the law." *Zepeda v. U.S. INS*, 753 F.2d 719, 728 n.1 (9th Cir. 1983) (citation omitted). As a result, the Court should focus any remedy on specific provisions found to be unlawful.

When performing this regulation-specific inquiry, the Court should exercise its discretion to, at most, remand *without* vacating the specific regulation at issue.[20] *See California*

---

[20] Federal Defendants also dispute that vacatur is an appropriate remedy, and they preserve for appeal the argument that the APA's provision for courts to "set aside" unlawful agency actions, 5 U.S.C. § 706(2), does not authorize vacatur, as Section 706(2) should not be read as authorizing remedies. Remedies are governed by Section 703, which, in the absence of a "special statutory

*Communities Against Toxics v. U.S. EPA*, 688 F.3d 989, 992, 994 (9th Cir. 2012) (allowing remand without vacatur, after considering the seriousness of the agency's errors and the "disruptive consequences of an interim change that may itself be changed").

As a threshold matter, vacatur would be particularly inappropriate here if the Court were to find only a violation of NEPA. *See Seven Cnty.*, 145 S. Ct. at 1514.

As for the challenged 2024 ESA regulations, the Services are actively reconsidering the 2024 ESA regulations, which show that they can readily address any errors found by the Court without undue delay. Further, any interim change in the ESA regulations during these rulemakings would be unnecessarily disruptive to both the Services' administration of the ESA and the ongoing rulemaking processes.

Plaintiffs argue, for example, that vacating the 2024 ESA regulations means the Court must also vacate the 2019 ESA regulations. Not so. Plaintiffs lack standing to challenge the 2019 ESA regulations, and the Court thus lacks jurisdiction to set them aside. *In re Clean Water Act Rulemaking*, 60 F.4th at 594 (APA forecloses "any authority of courts to vacate agency actions not first held unlawful"); *Firearms Reguls. Accountability Coal., Inc. v. Garland*, No. 1:23-CV-00003, 2025 WL 1780562, at *1 (D.N.D. Apr. 14, 2025) (declining to reach out and address prior decisions that are "not before this Court."). Nor would it be proper to entertain an anticipatory challenge to the 2019 ESA regulations now, merely because they might become operative later. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 161 (2010) (holding that courts should not create a remedy as a "prophylactic measure needed to guard against the possibility" of harm from future agency actions).

Thus, it does not follow that vacatur of the 2024 ESA regulations means the Court should vacate the 2019 ESA regulations. Nor would it be inequitable to limit relief to the 2024 regulations, without also addressing the 2019 ESA regulations. Should the Court find a specific regulation unlawful, the Services can still implement the ESA by relying solely on the statutory provision and disregarding any regulation the Court determines to be unlawful. *Butte Envt'l*

review proceeding," provides only for declaratory or injunctive relief. *See United States v. Texas*, 599 U.S. 670, 693-99 (2023) (Gorsuch, J., concurring in the judgment).

*Council*, 620 F.3d at 947 (affirming FWS's analysis of consequences to critical habitat based on statutory requirements and caselaw).

Even so, if the Court were to vacate the 2024 *and* 2019 regulations, it would create uncertainty on the applicable regulatory regime during the rulemaking process. If the Court addresses the pre-2019 regulatory framework, it will be imposing obligations on the agencies during the rulemaking, which is improper. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015) (rejecting judicial constructs that impose "on agencies an obligation beyond the 'maximum procedural requirements' specified in the APA"). If the Court does not address the pre-2019 regulatory framework that applies, the Services may have to fill the void in the middle of an ongoing rulemaking process, either with rules or guidance. Either way, vacatur of the 2024 and 2019 regulations casts uncertainty into the operative regulatory landscape, which interferes with how the Services may administer the ESA, how regulatory proposals in active rulemaking are viewed and considered, and how the public may respond to any regulatory proposals during the rulemaking processes.

None of these disruptive consequences are required or justified under the circumstances, which supports—at most—remand without vacatur in this case. *Cf. Winter v. Natural Resources Defense Council*, 555 U.S. 7, 33 (2008) (courts need not resort to more drastic remedies when lesser remedial tools at their disposal, like "declaratory relief" or orders to complete additional agency reviews, can suffice).

## CONCLUSION

The Services are in the middle of a rulemaking process to reconsider the 2024 ESA regulations, and the Court should allow this rulemaking to proceed unimpeded. It can do so through a voluntary remand or a stay of this litigation pending completion of the ongoing rulemaking. This result is particularly warranted here, when Plaintiffs cannot show any serious consequences to them from a remand or stay, given the 2024 ESA regulations have been operative in largely their present form since 2019. As a result, Federal Defendants respectfully request that the Court should remand or stay this litigation or, alternatively, grant their motion for summary judgment and dismiss this case.

Dated: July 18, 2025

*/s/ John H. Martin*
MICHAEL R. EITEL, Acting Assistant Chief
JOHN H. MARTIN, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, North Terrace 600
Denver, Colorado 80202
Tel: 303-844-1479 (Eitel); 303-844-1383 (Martin)
Email: Michael.Eitel@usdoj.gov;
Email: John.h.martin@usdoj.gov

ANGELA N. ELLIS, Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
150 M Street NE
Washington, D.C. 20002
Tel:  (202) 305-0479
Email: Angela.Ellis@usdoj.gov

*Attorneys for Federal Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 18, 2025, I electronically filed the foregoing document with

the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the

attorneys of record and all registered participants.

*/s/ John H. Martin*
JOHN H. MARTIN
Trial Attorney
U.S. Department of Justice