BENJAMIN M. LEVITAN (*pro hac vice*)
Earthjustice
48 Wall Street, Floor 15
New York, NY 10005
T: (202) 797-4317
blevitan@earthjustice.org

ANDREA A. TREECE (CA Bar #237639)
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
T: (415) 217-2000
atreece@earthjustice.org

KRISTEN L. BOYLES (CA Bar #158450)
CHARISA GOWEN-TAKAHASHI (CA Bar #342937)
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T: (206) 343-7340
kboyles@earthjustice.org
cgowentakahashi@earthjustice.org

*Counsel for Plaintiffs*
*[Additional counsel listed at end]*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB, and WILDEARTH GUARDIANS,<br><br>       *Plaintiffs*,<br><br>    v.<br><br>U.S. DEPARTMENT OF THE INTERIOR, U.S. FISH AND WILDLIFE SERVICE, U.S. DEPARTMENT OF COMMERCE, and NATIONAL MARINE FISHIERIES SERVICE,<br><br>       *Defendants*. | Case No. 4:24-cv-04651-JST<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT AND OPPOSITION TO FEDERAL DEFENDANTS' MOTIONS FOR REMAND, STAY, AND SUMMARY JUDGMENT**<br><br>Date:     October 30, 2025<br>Time:    2:00 p.m.<br>Location: Videoconference Only<br>Judge:   Hon. Jon S. Tigar |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION .......................................................................................................1

ARGUMENT ..............................................................................................................1

I.  THE COURT SHOULD NEITHER STAY THIS CASE NOR REMAND THE
    REGULATIONS...................................................................................................1

    A.  Federal Defendants Do Not Meet the *Landis* Criteria for Granting a Stay. ...........2

        1.  A stay will harm Plaintiffs' interests. ...........................................................2

        2.  The Services failed to meet their burden of establishing hardship. .............3

        3.  A stay would not serve the "orderly course of justice." ...............................4

    B.  The Court Should Also Deny Remand. ......................................................................4

II.  PLAINTIFFS HAVE STANDING...........................................................................6

    A.  Plaintiffs Have Identified Concrete and Particular Injuries for All Claims.............6

    B.  Plaintiffs Satisfy the Imminence Requirements of Standing for All Claims. ..........9

    C.  Plaintiffs' Procedural Claims Meet the Lower Standing Barrier..........................10

III.  THE 2019 AND 2024 REGULATIONS VIOLATE ESA § 7. ..........................................11

    A.  The Regulations Unlawfully Disregard Effects of Federal Actions. .....................11

    B.  The Services Cannot Rely on Speculative Mitigation Measures...........................15

    C.  The "Destruction or Adverse Modification" Definition Violates the ESA. ..........19

        1.  The addition of "as a whole" harms species in violation of the
            ESA. ...........................................................................................................19

        2.  "Destruction" and "adverse modification" must be defined
            separately. ..................................................................................................22

    D.  The Services Have Provided No Logical Reason for Eliminating Their
        Obligation to Request Reinitiation of Consultation................................................23

IV.  THE 2019 AND 2024 REGULATIONS VIOLATE ESA § 4. ..........................................24

    A.  The Services' Arbitrary Definition of "Foreseeable Future" Contravenes
        the ESA's Best Available Science Requirement. ...................................................24

    B.  The Services' Expanded Reasons to Forego Designating Critical Habitat
        Violate Clear Congressional Intent.......................................................................28

V.  THE SERVICES VIOLATED NEPA. ...................................................................31

VI.  VACATUR IS APPROPRIATE FOR THE 2019 AND 2024 REGULATIONS.............34

CONCLUSION.........................................................................................................36

## TABLE OF AUTHORITIES

**Cases**                                                                                  **Page(s)**

*Alaska Oil & Gas Ass'n v. Pritzker,*
    840 F.3d 671 (9th Cir. 2016) ................................................................... 25, 27

*All. for the Wild Rockies v. U.S. Forest Serv.,*
    907 F.3d 1105 (9th Cir. 2018) ...................................................................... 36

*Alsea Valley All. v. Dep't of Com.,*
    358 F.3d 1181 (9th Cir. 2004) ...................................................................... 34

*Ariz. Cattle Growers' Ass'n v. Salazar,*
    606 F.3d 1160 (9th Cir. 2010) ...................................................................... 25

*Arizona Yage Assembly v. Barr,*
    No. 20-cv-03098, 2020 WL 5629833 (N.D. Cal. Sept. 21, 2020) ................. 3, 6

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,*
    515 U.S. 687 (1995) ..................................................................................... 13

*Bent v. Garland,*
    115 F.4th 934 (9th Cir. 2024) ........................................................................ 4

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962) ................................................................................. 12, 26

*Butte Env't Council v. U.S. Army Corps of Eng'rs,*
    620 F.3d 936 (9th Cir. 2010) ................................................................... 21, 22

*Cal. Cmtys. Against Toxics v. EPA,*
    688 F.3d 989 (9th Cir. 2012) .......................................................................... 4

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ........................................................................ 11

*California v. Bernhardt,*
    460 F. Supp. 3d 875 (N.D. Cal. 2020) .......................................................... 11

*California v. EPA,*
    360 F. Supp. 3d 984 (N.D. Cal. 2018) ......................................................... 2, 4

*Citizens for Better Forestry v. U.S. Dep't of Agric.,*
    341 F.3d 961 (9th Cir. 2003) ..................................................................... 8, 10

*City and Cnty. of San Francisco v. Whitaker,*
    357 F. Supp. 3d 931 (N.D. Cal. 2018) .......................................................... 10

*In re Clean Water Act Rulemaking*,
    60 F.4th 583 (9th Cir. 2023) ................................................................................5, 34

*Clinton v. Jones*,
    520 U.S. 681 (1997).............................................................................................2

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015) ............................................................................6, 9

*Ctr. for Biological Diversity v. Bernhardt*,
    982 F.3d 723 (9th Cir. 2020) ..............................................................................16, 19

*Ctr. for Biological Diversity v. Bernhardt*,
    No. 19-05206-JST (N.D. Cal. filed Aug. 21, 2019)..................................1, 2, 3, 35

*Ctr. for Biological Diversity v. FWS*,
    No. 22-1877, 2025 WL 1917955 (D.D.C. July 11, 2025) ...................................29

*Ctr. for Biological Diversity v. Kempthorne*,
    588 F.3d 701 (9th Cir. 2009) ..............................................................................3, 11

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    141 F.4th 976 (9th Cir. 2025) .............................................................................14, 32

*Defenders of Wildlife v. Babbitt*,
    958 F. Supp. 670 (D.D.C. 1997) ........................................................................26

*Defs. of Wildlife v. Jewell*,
    176 F. Supp. 3d 975 (D. Mont. 2016)...........................................................27, 28, 33

*Defs. of Wildlife v. Norton*,
    258 F.3d 1136 (9th Cir. 2001) ............................................................................24

*Defs. of Wildlife v. Zinke*,
    856 F.3d 1248 (9th Cir. 2017) ............................................................................16

*Delaware v. Pennsylvania*,
    598 U.S. 115 (2023).............................................................................................29

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020).................................................................................................12

*Diamond Alt. Energy, LLC v. EPA*,
    145 S. Ct. 2121 (2025)........................................................................................8

*El Comite Para El Bienestar de Earlimart v. Warmerdam*,
    539 F.3d 1062 (9th Cir. 2008) ............................................................................21

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)..................................................................15

*Firearms Regul. Accountability Coal. v. Garland*,
    No. 23-00003, 2025 WL 1780562 (D.N.D. Apr. 14, 2025)....................34

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)....................................................................7

*Gifford Pinchot Task Force v. FWS*,
    378 F.3d 1059 (9th Cir. 2004) ...............................................19, 30, 31

*Greater Yellowstone Coal., Inc. v. Servheen*,
    665 F.3d 1015 (9th Cir. 2011) .................................................25

*Hall v. U.S. Dep't of Agric.*,
    984 F.3d 825 (9th Cir. 2020) .................................................30

*Heckler v. Chaney*,
    470 U.S. 821 (1985)..................................................................23

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936)................................................................2, 3, 4

*Li v. Keisler*,
    505 F.3d 913 (9th Cir. 2007) ...................................................4

*Lockyer v. Mirant Corp.*,
    398 F.3d 1098 (9th Cir. 2005) ................................................2, 4

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)............................................................5, 6, 26

*Lujan v. Def. of Wildlife*,
    504 U.S. 555 (1992)..................................................................7

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*,
    602 F.3d 687 (5th Cir. 2010) .................................................14

*Metro. Edison Co. v. People Against Nuclear Energy*,
    460 U.S. 766 (1983)..................................................................26

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)............................................................9, 34, 35

*Motor Vehicle Mfr. Ass'n v. State Farm*,
    463 U.S. 29 (1983)....................................................................34

*N. Coast Rivers All. v. U.S. Dep't of the Interior*,
  No. 16-cv-00307, 2016 WL 8673038 (E.D. Cal. Dec. 16, 2016) ...............................................4

*N. Spotted Owl v. Lujan*,
  758 F. Supp. 621 (W.D. Wash. 1991).....................................................................................29

*Nat. Res. Def. Council v. EPA*,
  38 F.4th 34 (9th Cir. 2022) ........................................................................................................5

*Nat. Res. Def. Council v. U.S. Dep't of the Interior*,
  113 F.3d 1121 (9th Cir. 1997) ..................................................................................................30

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007).................................................................................................................14

*Nat'l Wildlife Fed'n v. NMFS*,
  524 F.3d 917 (9th Cir. 2008) ......................................................................................15, 20, 22

*Navajo Nation v. Dep't of the Interior*,
  876 F.3d 1144 (9th Cir. 2017) ..........................................................................................10, 11

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
  625 F.3d 1092 (9th Cir. 2010) ..................................................................................................32

*Pennsylvania v. West Virginia*,
  262 U.S. 553 (1923).................................................................................................................10

*Pollinator Stewardship Council v. EPA*,
  806 F.3d 520 (9th Cir. 2015) ....................................................................................................36

*Rock Creek All. v. FWS*,
  663 F.3d 439 (9th Cir. 2011) ....................................................................................................21

*Safe Air for Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004) ....................................................................................................6

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ....................................................................................................23

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ..............................................................................................25, 27

*Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*,
  481 F.2d 1079 (D.C. Cir. 1973)................................................................................................31

*Sec. & Exchange Comm'n v. Chenery Corp.*,
  318 U.S. 80 (1943)...................................................................................................................24

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
  145 S. Ct. 1497 (2025) ............................................................................32, 36

*Sierra Club v. FWS*,
  245 F.3d 434 (5th Cir. 2001) ..............................................................28

*Sierra Club v. Marsh*,
  816 F.2d 1376 (9th Cir. 1987) ........................................................18, 19

*SKF USA Inc. v. United States*,
  254 F.3d 1022 (Fed. Cir. 2001).............................................................4, 5

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
  555 F. Supp. 3d 7390 (D. Alaska 2021) ...............................................2

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)...................................................................................11

*Util. Solid Waste Activities Grp. v. EPA*,
  901 F.3d 414 (D.C. Cir. 2018) ...............................................................5

*Vicious Brands, Inc. v. Face Co., LLC*,
  No. 24-cv-04996, 2025 WL 754068 (N.D. Cal. Mar. 10, 2025) ........2

*W. Watersheds Project v. Kraayenbrink*,
  632 F.3d 472 (9th Cir. 2011) ...............................................................7

*Wash. Toxics Coal. v. U.S. Dep't of Interior*,
  457 F. Supp. 2d 1158 (W.D. Wash. 2006)...........................................7, 8

*Wilderness Soc'y v. FWS*,
  353 F.3d 1051 (9th Cir. 2003) ............................................................29

**Statutes**

5 U.S.C. § 706............................................................................................34

16 U.S.C. § 1531.......................................................................................29

16 U.S.C. § 1532...................................................................................19, 20

16 U.S.C. § 1533...................................................................................28, 29

16 U.S.C. § 1536.................................................................................*passim*

42 U.S.C. § 4332...................................................................................26, 31

1

**Regulations**

50 C.F.R. 402.02 (2018) ........................................................................................15

50 C.F.R. § 402.02 ..........................................................................................12, 14

50 C.F.R. § 424.11 ...........................................................................................27, 28

50 C.F.R. § 424.12 (2016) ...............................................................................29, 31

**Federal Register**

42 Fed. Reg. 2965 (Jan. 14, 1977) .......................................................................25

49 Fed. Reg. 38900 (Oct. 1, 1984).......................................................................28

51 Fed. Reg. 19926 (June 3, 1986) .......................................................................24

81 Fed. Reg. 7214 (Feb. 11, 2016) .......................................................................21

81 Fed. Reg. 7414 (Feb. 11, 2016) .......................................................................28

84 Fed. Reg. 44976 (Aug. 27, 2019)........................................................13, 20, 31

86 Fed. Reg. 30888 (June 10, 2021) ........................................................................2

88 Fed. Reg. 40753 (June 22, 2023) .....................................................................24

89 Fed. Reg. 24268 (Apr. 5, 2024) ........................................................6, 13, 15, 24

89 Fed. Reg. 24300 (Apr. 5, 2024) ........................................................25, 26, 30

**Other Authority**

H.R. Rep. No. 95-1625 (1978)...............................................................................28

**INTRODUCTION**

After promulgating unlawful Endangered Species Act ("ESA") implementing regulations in 2019 and failing to cure many of the defects in 2024, the U.S. Fish & Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS"; collectively, the "Services") now ask the Court to once again forestall a decision on the merits while they undertake yet another rulemaking. But there is no reason to believe that the third time will be the charm. As the Services explain, this latest rulemaking was prompted by recent Executive Orders promoting energy production and deregulation, not by any intention to strengthen ESA implementation— much less to consider Plaintiffs' arguments. The Court should reject the Services' gambit for delay.

On the merits, the Services defend their regulations by repeatedly misstating Plaintiffs' arguments, citing irrelevant case law, and spinning convoluted statutory puzzles rather than acknowledging the plain text and purpose of the ESA and controlling precedent. They also deny the impacts of their regulations, even as those impacts continue to imperil at-risk species in which Plaintiffs have an interest. The Court should vacate the unlawful 2019 and 2024 Regulations and reinstate the prior provisions.

**ARGUMENT**

**I. THE COURT SHOULD NEITHER STAY THIS CASE NOR REMAND THE REGULATIONS.**

The Services first move for voluntary remand or a stay of this litigation, based on an October 31, 2025, date for sending proposed new regulations to the Office of the Federal Register. Fed. Br. 6–9, ECF No. 43. The Services spend almost all of their argument on voluntary remand; however, as they are not seeking a remand to address issues raised in this case, their motion is more properly framed as requesting a stay. And as this Court did in Plaintiffs' challenge to the 2019 Regulations, the Court should deny a stay. Minute Entry, *Ctr. for Biological Diversity v. Bernhardt*, No. 19-05206-JST (N.D. Cal. Oct. 7, 2021), ECF No. 138 (stay motions denied, transcript serves as written order).

A.      **Federal Defendants Do Not Meet the *Landis* Criteria for Granting a Stay.**

In considering a stay request, courts must weigh "competing interests," including: (1) the possible damage which may result from a stay, (2) the hardship or inequity which a party may suffer if required to go forward, and (3) whether a stay could simplify or complicate issues, proof, and questions of law. *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). The moving party bears the burden of justifying a stay. *Clinton v. Jones*, 520 U.S. 681, 708 (1997).

1.      A stay will harm Plaintiffs' interests.

A "fair possibility" of harm suffices to meet the first factor. *Lockyer*, 398 F.3d at 1112; *see also Vicious Brands, Inc. v. Face Co., LLC*, No. 24-cv-04996, 2025 WL 754068, at *8 (N.D. Cal. Mar. 10, 2025) (requiring only a "minimal showing on this factor"). Plaintiffs have already been harmed by the promulgation and ongoing application of the 2019 and 2024 Regulations, which will remain binding until vacated by this Court or modified by the Services.

Since the challenged regulations became effective, agency actions and proposals have relied on them, to Plaintiffs' detriment. *See, e.g.*, 86 Fed. Reg. 30888, 30891 (June 10, 2021) (unoccupied critical habitat for Texas hornshell, a freshwater mussel, excluded as "not prudent"); *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 797–800 (D. Alaska 2021) (challenged section 7 mitigation regulations used to defend permits).

These examples illustrate that Plaintiffs are harmed by the continuing application of the challenged regulations, as this Court previously found in the prior challenge to the 2019 ESA Regulations. Reporter's Transcript 21, *Ctr. for Biological Diversity v. Bernhardt*, No. 19-05206-JST (N.D. Cal. Oct. 7, 2021), ECF No. 145 ("The plaintiffs contend and the government has conceded today that the Services continue to apply aspects of the challenged rules in their decisions, potentially or actually injuring the interests that plaintiffs filed this litigation to protect.").

This Court denied a stay in a similar situation in *California v. U.S. Environmental Protection Agency*, 360 F. Supp. 3d 984 (N.D. Cal. 2018). During that litigation, "EPA commenced proposed rulemaking that, in part, intend[ed] to amend the regulations at the heart of

this dispute." *Id.* at 993. Even so, the Court declined to stay the case, noting that, "[e]ven if [the federal agency] exercises complete diligence in passing the proposed regulation, that diligence does not eliminate the ordinary uncertainty in the rulemaking process, which creates at least a 'fair possibility' of harm." *Id.* (quoting *Landis*, 299 U.S. at 254–55). In *Arizona Yage Assembly v. Barr*, No. 20-cv-03098, 2020 WL 5629833 (N.D. Cal. Sept. 21, 2020), this Court denied a motion to stay under similar factual circumstances, reasoning that the agency's "timeframe is too indeterminate to grant a stay and there is no guarantee that the plaintiffs' claims would be affected, let alone mooted, by the existence of new regulations." *Id.* at *7; *see also* Reporter's Transcript 23, *Ctr. for Biological Diversity v. Bernhardt* ("But I think the uncertain promise of relief sometime in the next year and a half to two years is not enough to counter-balance the possible damage that I've just identified.").

Here, as in those cases, Plaintiffs will bear the brunt of the harm from a stay with no plausible basis for finding their claims will be mooted or narrowed by the purportedly forthcoming rules. The Services do not intend to send any proposed regulations for publication until October 2025 or final regulations for publication until October 2026—extending, at minimum, the period of harm even further, with an outcome that has little if any likelihood of rectifying Plaintiffs' injuries. The Services do not commit to revise the challenged provisions or address all or even *some* of Plaintiffs' specific challenges. In fact, the Services have provided no reason to expect that they will revise the portions of the 2019 and 2024 Regulations challenged in this case. To the contrary, the Executive Orders that the Services cite as prompting their new rulemaking pertained to energy production and deregulation, making no reference to this litigation or the subjects of Plaintiffs' claims. *See* ECF 43-1, 43-2. The ongoing harms from these regulations counsel against a stay. *See Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 708 (9th Cir. 2009) ("Hardship may result from past or imminent harm caused by the agency's adoption of the regulations.").

### 2.     The Services failed to meet their burden of establishing hardship.

Under the second stay factor, "[i]f there is even a *fair possibility* that [a] stay . . . will work damage to some one else," the party seeking the stay "must make out a clear case of

1  hardship or inequity in being required to go forward." *Landis*, 299 U.S. at 255 (emphasis added);

2  *see also Lockyer*, 398 F.3d at 1109. Here, for the reasons discussed above, there is at least a "fair

3  possibility"—if not a certainty—that a stay will harm Plaintiffs. *Id.*; *California v. EPA*, 360 F.

4  Supp. 3d at 993. Yet the Services make no case of hardship or inequity. This factor, too, weighs

5  against a stay.

6              3.      <u>A stay would not serve the "orderly course of justice."</u>

7       Because the Services have not demonstrated any intention to revisit the specific issues

8  Plaintiffs challenge, they have failed to show that a stay would promote the "orderly course of

9  justice," *Lockyer*, 398 F.3d at 1110 (citation omitted), or provide "economy of time and effort for

10  [the Court], for counsel, and for litigants," *Landis*, 299 U.S. at 254. Accordingly, no stay should

11  be granted.

12       **B.    The Court Should Also Deny Remand.**

13       The Services' remand request is equally unjustified. Courts have broad discretion to deny

14  an agency's remand request when the primary questions concern issues of statutory interpretation

15  and "the agency is either compelled or forbidden by the governing statute to reach a different

16  result" than the challenged decision. *SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed.

17  Cir. 2001); *see also N. Coast Rivers All. v. U.S. Dep't of the Interior*, No. 16-cv-00307, 2016 WL

18  8673038, at *3 (E.D. Cal. Dec. 16, 2016) (looking to *SKF USA* for guidance on voluntary

19  remand requests).

20       Contrary to the Services' contention, remand is typically granted where the requesting

21  agency acknowledges error. *See, e.g.*, *Bent v. Garland*, 115 F.4th 934, 940 (9th Cir. 2024)

22  (finding agency's request for remand not frivolous where agency conceded error in interpreting

23  state law); *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) ("Because the

24  EPA has recognized the merits of the petitioners' challenges and has been forthcoming in these

25  proceedings, there is no evidence that the EPA's request is frivolous or made in bad faith."). The

26  Services rely on *Li v. Keisler*, 505 F.3d 913 (9th Cir. 2007), for the proposition that they need not

27  concede error to obtain a remand. Fed. Br. 7. But *Li* addressed attorney's fees, not voluntary

28

1   remand, and the language quoted by the Services comes from the opinion's brief procedural

2   history. *See id.* at 916.

3          Here, the Court should deny a remand because the Services are compelled by the ESA,

4   National Environmental Policy Act ("NEPA"), and Administrative Procedure Act ("APA") to

5   reach a different result than the 2019 and 2024 Regulations on both substantive and procedural

6   grounds. *See SKF USA*, 254 F.3d at 1029. Given the mandates of these governing statutes, which

7   the Services continue to ignore, denial of remand is appropriate. The 2019 and 2024 Regulations

8   are in effect now; by continuing to the merits of Plaintiffs' summary judgment claims, which are

9   almost fully briefed, all parties will benefit from the Court's reasoning.

10         Additionally, as explained above, denial of remand without vacatur is necessary to avoid

11  undue prejudice to Plaintiffs. *See, e.g.*, *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414,

12  436 (D.C. Cir. 2018) (denying voluntary remand where it would prejudice environmental

13  petitioners). The Services' sworn declarations pointedly make no firm commitments to address

14  the issues Plaintiffs are litigating here, and there is little reason to expect the new rulemakings to

15  address Plaintiffs' claims.

16         The Services' motion for remand constitutes little more than an attempt to avoid an

17  adverse ruling with no serious, binding commitment to actually address the substantive issues.

18  *See Nat. Res. Def. Council v. EPA*, 38 F.4th 34, 61 (9th Cir. 2022) (finding force in the non-

19  moving party's argument that EPA's motion for remand was a "bad-faith attempt to avoid

20  judicial review" because EPA made "no binding commitment to . . . actually change its

21  decision."); *In re Clean Water Act Rulemaking*, 60 F.4th 583, 596 (9th Cir. 2023) (holding denial

22  of voluntary remand warranted where court suspects "the agency does not actually intend to

23  reconsider the challenged regulation" or "the agency seeks a voluntary remand simply to

24  forestall judicial review").

25         The Services' citation of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024),

26  also fails to justify remand. The Services claim that remand will enable them to arrive at the

27  "best reading" of the Endangered Species Act, or in the alternative facilitate the Court's review

28  should a dispute remain after new rulemaking. Fed. Br. 8. This is again based on the fanciful

1    notion that the Services will revisit the issues raised by Plaintiffs. Moreover, *Loper Bright* no

2    longer requires courts to defer to agency interpretations of ambiguous statutory provisions. 603

3    U.S. at 400. And contrary to the Services' assertion, Fed. Br. 9, adjudicating these claims now

4    could provide needed clarity to the legal issues in this case and save the Services from wastefully

5    engaging in multiple rounds of rulemaking if the Court disagrees with their interpretation. *See*

6    *Ariz. Yage*, 2020 WL 5629833, at *8 ("If the plaintiffs' claims are ultimately meritless,

7    resolution of this litigation will not affect the rulemaking. And if the plaintiffs' claims are

8    ultimately correct, [the agency] will have the guidance of an additional judicial ruling.").

9    **II.    PLAINTIFFS HAVE STANDING.**

10           The Services launch a rambling attack on Plaintiffs' standing, focused on the first prong

11    of the standing test,[1] requiring a plaintiff to show "it has suffered an 'injury in fact' that is (a)

12    concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."

13    *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1079 (9th Cir. 2015) (quoting

14    *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

15    They assert that Plaintiffs' allegations are insufficient on their face to invoke this Court's

16    jurisdiction—a facial attack on standing. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039

17    (9th Cir. 2004).

18           **A.    Plaintiffs Have Identified Concrete and Particular Injuries for All Claims.**

19           The Services' attack on Plaintiffs' showing of injury fails. This case challenges both the

20    2019 and 2024 ESA Regulations. First Amended Complaint ¶ 7–8, Prayer for Relief (1) and (2),

21    ECF 23. As an initial matter, the Services insist that Plaintiffs have no standing to challenge the

22    2019 Regulations because the 2024 Regulations replaced them. Fed. Br. 11–12. To the contrary,

23    as the Services themselves stated, the 2024 Regulations revised only "portions of the [2019]

24    regulations," 89 Fed. Reg. 24268, 24269 (Apr. 5, 2024), leaving many sections untouched. The

25    Services seem to think that the 2024 Regulations fully replaced those from 2019 (which they did

26

27    _____

28    [1] The Services do not advance causation and redressability arguments, *Cottonwood*, 789 F.3d at
     1079.

1    not), and Plaintiffs have no standing to challenge even those provisions of the 2019 Regulations

2    that remain exactly the same. This is illogical at best, and an attempt to prevent claims from ever

3    being heard at worst.

4         Plaintiffs submitted declarations with the First Amended Complaint that establish their

5    standing to challenge provisions of both the 2019 and 2024 Regulations. ECF 23-2 to 23-12.

6    These declarations demonstrate injuries that create standing to challenge actions that fail to

7    protect threatened and endangered species, species that may become threatened or endangered,

8    and habitats crucial for species' survival and recovery, in turn injuring Plaintiffs' members'

9    recreational, aesthetic, and scientific interests in those species. *See Laidlaw Env't Servs.*, 528

10   U.S. at 183; *Lujan v. Def. of Wildlife*, 504 U.S. 555, 562 (1992). "[E]nvironmental plaintiffs

11   adequately allege injury in fact when they aver that they use the affected area and are persons for

12   whom the aesthetic and recreational values of the area will be lessened by the challenged

13   activity," *Laidlaw Env't Servs.*, 528 U.S. at 183 (cleaned up), and when they demonstrate a threat

14   to their interest in "us[ing] or observ[ing] an animal species," *Lujan*, 504 U.S. at 562. To

15   demonstrate standing to bring a procedural claim—such as one alleging a NEPA violation or

16   arbitrary decision making—a plaintiff "must show that the procedures in question are designed

17   to protect some threatened concrete interest of his that is the ultimate basis of his standing." *W.*

18   *Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011).

19        Environmental organizations often bring facial challenges to regulations that

20   fundamentally change the way federal agencies carry out the law. *See Wash. Toxics Coal. v. U.S.*

21   *Dep't of Interior*, 457 F. Supp. 2d 1158, 1168, 1173 (W.D. Wash. 2006) (invalidating regulations

22   implementing ESA Section 7, stressing "the regulation here *is* the action being challenged"). In

23   Plaintiffs' prior facial challenge to the 2019 ESA Regulations, this Court found that "an

24   enhanced risk of biodiversity loss and degradation of fish and wildlife natural resources clearly

25   follows from the Services' alleged weakening of ESA safeguards." Order Den. Mot. Dismiss 9,

26   *California v. Bernhardt*, No. 19-06013-JST (N.D. Cal. May 18, 2020), ECF No. 98 (cleaned up).

27   This Court also noted that plaintiffs need not wait for "declines in species populations and

28

1   extinction of species" to occur "before challenging the government action leading to the potential

2   destruction." *Id.* at 10 (citation omitted). The same conclusions apply here.

3        The Services' argument, Fed. Br. 10–11, that the Court lacks jurisdiction over past

4   actions makes no sense, given that examples of the regulations being applied to their detriment

5   are exactly what Plaintiffs need to show as injury. Plaintiffs are not challenging the examples

6   discussed in their declarations. Rather, the declarations demonstrate the kinds of injuries caused

7   by the 2019 and 2024 Regulations to Plaintiffs' interests, which will continue absent relief from

8   this Court. *Cf. Wash. Toxics Coal.*, 457 F. Supp. 2d at 1173 ("The regulation itself effects a

9   significant change in the Services' involvement in FIFRA actions, and it is *this* change that is

10  protested by Plaintiffs."). Nor do Plaintiffs rely on "guesswork about how third parties will

11  respond to the ESA regulations." Fed. Br. 10. It requires no guesswork to conclude "that lower

12  environmental safeguards at the national programmatic level will result in lower environmental

13  standards at the site-specific level," *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d

14  961, 975 (9th Cir. 2003), and this Court may appropriately draw such "commonsense inferences"

15  in resolving standing issues, *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2136 (2025).

16       As the declarations aver, Plaintiffs' members have undisputed concrete interests in

17  imperiled species and their habitat that go well beyond generalized harm. The declarations

18  document members' use and enjoyment of imperiled species and their habitat throughout the

19  country—interests that have been, and will continue to be, harmed by the 2019 and 2024 ESA

20  Regulations.

21       Declarants attest to their personal interests and actions to protect and recover imperiled

22  species; they also describe the numerous specific geographical areas and habitats they regularly

23  visit to see threatened and endangered wildlife. *See, e.g.*, Arthur Decl. ¶ 11; Foster Decl. ¶¶ 6–8;

24  Freeman Decl. ¶ 4; Greenwald Decl. ¶¶ 4, 15–19; Hartl Decl. ¶ 15; Larris Decl. ¶¶ 12–13;

25  Ritzman Decl. ¶¶ 10–11; Smith Decl. ¶¶ 7, 11; Webb. Decl. ¶ 11; Whitehurst Decl. ¶¶ 5, 15.

26       The declarants also recount the link between their harm and impending or ongoing

27  agency action that relies on the new regulations. *See, e.g.*, Foster Decl. ¶¶ 18–19 (mitigation,

28  effects of the action); Freeman Decl. ¶¶ 11–13 (foreseeable future); Greenwald Decl. ¶¶ 10–17

1   (foreseeable future, listing, critical habitat "not prudent" and "as a whole"); Hartl Dec. ¶¶ 12–14

2   (reinitiation of consultation); Ritzman Decl. ¶¶ 30, 32, 44 (consultation, mitigation, critical

3   habitat); Smith Decl. ¶ 10 (listing); Whitehurst Decl. ¶¶ 11–13 (consultation, mitigation, "as a

4   whole"). This testimony establishes Plaintiffs' injury.

5       **B.    Plaintiffs Satisfy the Imminence Requirements of Standing for All Claims.**

6           In an anomalous attempt to undercut Plaintiffs' standing declarants, the Services accuse

7   Plaintiffs of improperly looking to both the past *and* the future. As discussed above, the

8   Services' argument that Plaintiffs improperly rely on past actions to support their standing is

9   undercut by the fact that the regulations that harmed Plaintiffs have not changed. Yet, the

10  Services also scold Plaintiffs for explaining how ongoing use of the regulations will cause them

11  harm. Fed. Br. 13. Plaintiffs are not guessing "how, when, and where," *id.*, the regulations will

12  be applied—these regulations are currently in force and binding upon the Services' staff.

13          Moreover, plaintiffs seeking to enjoin or vacate government action satisfy the imminence

14  component of standing not only when they have sustained an actual injury, as Plaintiffs here

15  have, but also when they demonstrate a "substantial risk" of harm. *Monsanto Co. v. Geertson*

16  *Seed Farms*, 561 U.S. 139, 153–54 (2010). Additionally, in this Circuit, plaintiffs have standing

17  "to challenge programmatic management direction [even] without also challenging an

18  implementing project that will cause discrete injury." *Cottonwood*, 789 F.3d at 1081. The

19  Services' argument is contrary to law.

20          Plaintiffs' standing declarants explained not only how the challenged regulations have

21  been used, but how and where they will continue to be used and how that use injures each

22  declarant. The declarations called out by the Services, Fed. Br. 10–11, amply explain how the

23  challenged sections of the regulations injure the declarants' interests. For example:

24  • Noah Greenwald discussed how the Services' two-step requirement for defining
       "foreseeable future" had been used to deny species protections in 2020 and 2022, and that
25     the same risk exists for pending species petitions. ECF 23-2, ¶ 12. Mr. Greenwald further
       explained that the Services used the expanded "not prudent definition" as a reason to
26     forego designating critical habitat for eleven species since the 2019 Regulations went into
       effect. *Id.* ¶ 13. Mr. Greenwald explained the harm to the interests of the members of the
27     Center for Biological Diversity, including himself. *Id.* ¶ 19.

28  • Cooper Freeman set out the history of seeking ESA protection for Pacific walrus and the

1    pending listing decision, expected in 2025, for Pacific walrus. ECF 23-5, ¶¶ 11–13. Mr.

2    Freeman also described his personal trips within Alaska and definite plans for future
     travel related to walrus. *Id.* ¶¶ 5–8, 10.

3    • William L. Foster II addressed a 2020 biological opinion for oil drilling in the Gulf of
       Mexico where NMFS relied on non-binding mitigation measures and the regulatory "not

4      reasonably certain to occur" language challenged here. ECF 23-3, ¶¶ 17–19. He also
       described his volunteer work on turtle patrols in Texas during the Kemp's ridley turtle

5      nesting season that he has shared with his daughter. *Id.* ¶ 8.

6    • Andrew Whitehurst discussed not only the process leading up to a prior biological
       opinion for the One Lake Project in Mississippi on Gulf Sturgeon and Ringed sawback

7      turtles, ECF 23-4, ¶¶ 7–10, but how the challenged addition of "as a whole" to the
       definition of destruction or adverse modification of critical habitat has been used in a

8      2019 biological opinion and a 2024 biological assessment and will be used in an updated
       biological opinion and how that will harm his interests. *Id.* ¶¶ 11–14.

9

10   The Services are now using and applying the challenged sections of 2019 and 2024

11   Regulations in listing and delisting decisions, designation of critical habitat, and interagency

12   consultations. The injuries from application of these regulations are "certainly impending."

13   *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923).

14        **C.    Plaintiffs' Procedural Claims Meet the Lower Standing Barrier.**

15        The Services briefly state that "[f]or similar reasons, plaintiffs fail to establish standing

16   for their NEPA claim." Fed. Br. 14. This is not the law.

17        Plaintiffs asserting procedural injury must establish that "(1) the [defendants] violated

18   certain procedural rules; (2) these rules protect [plaintiffs'] concrete interests; and (3) it is

19   reasonably probable that the challenged action will threaten their concrete interests." *Citizens for*

20   *Better Forestry*, 341 F.3d at 969–70. Plaintiffs satisfy this standard by alleging that the Services

21   violated procedural rules requiring environmental analysis under NEPA and rational

22   explanations for revisions in the 2019 and 2024 ESA Regulations. *City and Cnty. of San*

23   *Francisco v. Whitaker*, 357 F. Supp. 3d 931, 942 (N.D. Cal. 2018) ("[W]here plaintiffs allege

24   that an agency's action is arbitrary and capricious under § 706(2)(A) because of the agency's

25   failure to follow the basic procedural requirement . . . a procedural standing analysis is

26   appropriate." (cleaned up)).

27        Where plaintiffs allege that the government's violation of a procedural requirement

28   impairs their interests, "the normal standards for the immediacy of injury are relaxed." *Navajo*

1    *Nation v. Dep't of the Interior*, 876 F.3d 1144, 1160 (9th Cir. 2017) (cleaned up) (quoting *Lujan*,

2    504 U.S. at 572 n.7). Under the relaxed standards, Plaintiffs need only demonstrate "(1) that

3    [they have] a procedural right that, if exercised, could have protected [their] concrete interests,

4    (2) that the procedures in question are designed to protect those concrete interests, and (3) that

5    the challenged action's threat to [their] concrete interests is reasonably probable." *California v.*

6    *Azar*, 911 F.3d 558, 570 (9th Cir. 2018). To satisfy the first two of these prongs, "environmental

7    plaintiffs must allege that they will suffer harm by virtue of their geographic proximity to and

8    use of areas that will be affected by" the challenged action. *California v. Bernhardt*, 460 F. Supp.

9    3d 875, 890 (N.D. Cal. 2020) (citing *Citizens for Better Forestry*, 341 F.3d at 971). As discussed,

10    Plaintiffs have done so here.

11        The Services misrepresent *Summers v. Earth Island Institute*, 555 U.S. 488 (2009). Fed.

12    Br. 10. In *Summers,* conservation groups settled the part of their case that presented as-applied

13    harm and then continued to challenge the "regulation in the abstract" based on a standing

14    declaration that failed to identify any connection between areas that plaintiffs used and the

15    nationwide application of regulations that would purportedly impair the plaintiffs' procedural

16    rights to comment *in the future. See Summers*, 555 U.S. at 494–97; *Ctr. for Biological Diversity*

17    *v. Kempthorne*, 588 F.3d at 707 (citing *Summers*, 555 U.S. at 494). In contrast, Plaintiffs here

18    claim that the challenged regulations have *already* caused procedural injury by violating NEPA

19    and the APA's requirement for non-arbitrary decision making, and have demonstrated the

20    regulations' threat to specific imperiled species and habitats in which Plaintiffs have a concrete

21    interest.

22        Plaintiffs do not allege a "procedural right *in vacuo*," but instead identify extant

23    procedural injuries that "threaten[] imminent and concrete harm to the interests of their

24    members." *Summers*, 555 U.S. at 495–96. This satisfies Article III.

25   **III.**     **THE 2019 AND 2024 REGULATIONS VIOLATE ESA § 7.**

26        **A.**     **The Regulations Unlawfully Disregard Effects of Federal Actions.**

27        By defining "effects of the action" to include only effects that are "reasonably certain to

28    occur," the Services violated the ESA's requirement to "insure" that an action "is not likely to

1    jeopardize the continued existence of any endangered species or threatened species or result in

2    the destruction or adverse modification of [critical] habitat," as well as the requirement to "use

3    the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). Plaintiffs have shown

4    that the definition leads to the exclusion of effects that bear directly on whether an action is

5    "likely" to have a prohibited impact. Pls. Br. 13–14, ECF No. 37. Plaintiffs have also shown that

6    the definition results in the exclusion of effects that reflect the best scientific information. *Id.* at

7    10–13. The Services offer no direct answer to these arguments.

8         The Services accuse Plaintiffs of ignoring that ESA "Section 7 requires the Services to

9    apply principles of proximate causation," Fed. Br. 16–17, but that argument fails for two reasons.

10   First, Plaintiffs are not challenging the causation element of the definition.[2] Instead, Plaintiffs

11   object that certain adverse effects attributable to an action under any plausible causation standard

12   will be ignored by the Services. For example, consider a situation where a federal agency seeks

13   to permit a mine uphill from a stream where endangered fish live. There is a 49 percent

14   probability that the excavation will cause a landslide into the stream and a 49 percent probability

15   that the mine will leach toxic chemicals into the stream. Either effect would jeopardize the fish,

16   and either effect would be caused by the mine. As a matter of probability, there is a 74 percent

17   outcome that at least one of the effects will occur, which means that jeopardy is "likely."[3] But

18   since neither effect in itself is "reasonably certain," the Services will consider neither to be an

19   "effect of the action," exclude both from their analysis, and erroneously deem jeopardy unlikely.

20   That violates the ESA.

21        Second, the Services' proximate cause argument differs starkly from the rationale they

22   provided for the definition during the rulemaking. The Supreme Court has repeatedly prohibited

23   courts from accepting "counsel's *post hoc* rationalizations for agency action." *Burlington Truck*

24   *Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962); *see also Dep't of Homeland Sec. v.*

25   *Regents of the Univ. of Cal.*, 591 U.S. 1, 23 (2020) ("Permitting agencies to invoke belated

26

27   [2] Notably, Plaintiffs are not in this case challenging the prong of the definition that requires "but for" causation. *See* 50 C.F.R. § 402.02.

28   [3] *See* Pls. Br. 11 n.3 (methodology for calculating the probability of independent events).

1    justifications . . . can upset 'the orderly functioning of the process of review.'" (quoting *Sec. &*

2    *Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 94 (1943))).

3            This doctrine precludes the Services from arguing that their decision was based on

4    proximate cause. In 2019, when responding to comments about the relationship of "proximate

5    cause" to the definition of "effects of the action," the Services rejected a proximate causation

6    standard, stating that "proximate cause can differ if used for assigning liability in criminal action

7    as compared to civil tort matters, neither of which consideration is directly relevant in the section

8    7(a)(2) context of evaluating the anticipated effects of proposed Federal actions on listed species

9    and critical habitat. . . . [T]he Services decline to impose an additional proximate causation

10   requirement applicable in the NEPA context for effects of the action under section 7(a)(2)." 84

11   Fed. Reg. 44976, 44991 (Aug. 27, 2019). The Services reiterated that conclusion in the 2024

12   rulemaking: "We declined to include a proximate cause element in our definition of 'effects of

13   the action' in 2019 and do so again here." 89 Fed. Reg. at 24273.

14           Both of the Supreme Court cases the Services now cite to support a proximate causation

15   standard, Fed. Br. 16, were previously discussed by the Services when they chose *not* to adopt

16   such standard—and neither case supports the Services' new position. To the extent that *Babbitt*

17   *v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995), arguably

18   applies proximate cause principles to the ESA, it does so in the context of civil and criminal

19   violations under Section 9—the precise contexts that the Services deemed not "directly relevant"

20   to Section 7(a)(2). 84 Fed. Reg. at 44991. The Services' attempt to bootstrap *Sweet Home* into

21   Section 7(a)(2) by homing in on the word "affects" in Section 7(b)(3)(A) fails because that

22   section describes the Services' obligations "*after conclusion* of consultation" under Section

23   7(a)(2) and cannot be used to reverse engineer a proximate causation standard *during*

24   consultation. 16 U.S.C. § 1536(b)(3)(A) (emphasis added). But even if, for the sake of argument,

25   "notions of foreseeability" derived from proximate causation apply to Section 7(a)(2),

26   "foreseeable" does not mean "reasonably certain." *See* 84 Fed. Reg. at 44991 (quoting *Sweet*

27   *Home*, 515 U.S. at 709 (O'Connor, J., concurring)); Dictionary.com,

28   https://www.dictionary.com/browse/foreseeable (defining foreseeable as "as far as can be seen,"

"able to be known or seen in advance"). Contrary to the Services' claims, Plaintiffs do not object to considering foreseeability but rather to filtering out foreseeable effects.[4]

Shortly after accusing Plaintiffs of "seemingly desir[ing] no causation standard," the Services reverse course and accuse Plaintiffs of trying to introduce a "*sub silentio* standard that specifies the requisite causal relationship" through the statutory requirement that the Services utilize the "best scientific and commercial data available." Fed. Br. 17, 19–20; 16 U.S.C. § 1536(a)(2). In fact, Plaintiffs simply make the point that a scientifically supported determination of whether an action is "likely" to cause a prohibited outcome may require consideration of effects that are not "reasonably certain to occur."

The two cases the Services cite, Fed. Br. 20, to demonstrate compliance with the best available science requirement cannot salvage their definition. In *Center for Biological Diversity v. U.S. Bureau of Land Management*, the action agency and FWS agreed that, even using the best available science, they were not able to describe the effects that the project's greenhouse gas emissions would inflict on listed species. 141 F.4th 976, 1013–14 (9th Cir. 2025). But under the challenged regulations, the Services can ignore even clearly described effects by deeming them not "reasonably certain." And the cited passage in *Medina County Environmental Action Association v. Surface Transportation Board* does not address scientific information at all but rather uncertainty about whether a project applicant will proceed with future phases of the development. 602 F.3d 687, 701–04 (5th Cir. 2010). Moreover, *Medina County* addressed "cumulative" (as opposed to "direct") effects, which have a separate regulatory definition that is not at issue here. 50 C.F.R. § 402.02.

The Services suggest that Plaintiffs unnecessarily "parse exact degrees of certitude," Fed. Br. 17, but Plaintiffs have simply relied on plain statutory language and provided multiple illustrations—none of which the Services contest—of how the definition of "effects of the

---

[4] The Services' citation to *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 647 (2007), is even more perplexing, as that case addresses whether *nondiscretionary* agency actions are subject to Section 7(a)(2)—which has no bearing here. Fed. Br. 16.

1    action" violates the law. Conversely, the Services have yet to publish any examples of how the

2    definition is supposed to operate, despite committing to do so. *See* 89 Fed. Reg. at 24273.

3         Finally, the Services refuse to acknowledge that the "reasonably certain" standard

4    changes a longstanding position, defying the minimum requirements for reasoned decision-

5    making. *See Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)

6    ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily

7    demand that it display awareness that it *is* changing position."). Before 2019, the Services had

8    never applied that standard to *direct* effects of agency actions. *See* Pls. Br. 14; *see also* 50 C.F.R.

9    402.02 (2018) (distinguishing between types of effects and applying the "reasonably certain"

10   standard to indirect and cumulative effects—but explicitly *not* to direct effects.) The Services

11   posit that, because they previously applied that standard to *some* types of effects, applying it to

12   *all* effects is not a change in position. Nowhere do the Services address their prior rationale for

13   applying the standard to only certain categories of effects. Oblivious changes in policy signal the

14   absence of a reasoned explanation for agency action. *See Fox Television*, 556 U.S. at 515.

15        **B.    The Services Cannot Rely on Speculative Mitigation Measures.**

16        The Services' main defense of their regulation allowing the use of speculative mitigation

17   measures is to re-write Plaintiffs' arguments. Fed. Br. 23–26. Plaintiffs do not argue for

18   piecemeal consultation—far from it. Plaintiffs simply echo what the Ninth Circuit has repeatedly

19   underscored: reliance on uncertain minimization and mitigation measures cannot meet the

20   statutory command to "insure" protection for imperiled species and habitat. The Services'

21   defense of the regulation misinterprets case law and violates the plain language and structure of

22   the ESA.

23        The Services' arguments defy the controlling precedents of the Ninth Circuit. Courts

24   have uniformly held that action agencies must demonstrate clear commitment and ability to carry

25   out proposed mitigation measures included as part of the action or in reasonable and prudent

26   alternatives (RPAs). Pls. Br. 15. The Services' attempts to distinguish these cases fail. The

27   Services first brush aside *National Wildlife Federation v. NMFS*, 524 F.3d 917 (9th Cir. 2008),

28   complaining that the opinion did not reference a specific ESA provision, Fed. Br. 27, but fail to

1    acknowledge that the Ninth Circuit has repeated and expanded upon this holding numerous

2    times. For example, the court in *Center for Biological Diversity v. Bernhardt* held that FWS may

3    not use a list of potential mitigation measures as the basis for a no jeopardy determination, and

4    instead must show a "clear, definite commitment of resources," to implement specific measures.

5    982 F.3d 723, 746 (9th Cir. 2020) (quoting *Nat'l Wildlife Fed'n*, 524 F.3d at 936). Similarly, the

6    court in *Defenders of Wildlife v. Zinke* expressly noted, "We have held that an action agency may

7    consider the impact of mitigation measures on a proposed action only when the measures are the

8    result of 'specific and binding plans' and show 'a clear, definite commitment of resources.'" 856

9    F.3d 1248, 1258 (9th Cir. 2017) (quoting *Nat'l Wildlife Fed'n*, 524 F.3d at 936). The court

10   upheld the biological opinion at issue in that case because "the BiOp did not rely on mitigation

11   measures to make its 'no jeopardy' determination." *Id.*

12       The Services misconstrue these holdings as simply requiring action agencies to draft

13   sufficiently detailed mitigation plans, and they assert that their regulations "have a separate

14   solution to the problem of inadequately detailed mitigation plans." Fed. Br. 28. But a "detailed"

15   plan will only satisfy Section 7 if it demonstrates the agency can and will carry out the mitigation

16   measures. When determining whether a mitigation measure is properly part of the action for

17   consultation purposes, courts look at how certain and reliable it is. "An indefinite mitigation

18   measure is less likely to trigger re-consultation because it will be difficult to know at which point

19   or whether the action agency has failed to comply. For this reason, measures that are too vague,

20   or do not commit resources, or are otherwise insufficiently integrated into the proposed action

21   are generally unenforceable under the ESA, and thus cannot be properly relied upon." *Ctr. for*

22   *Biological Diversity*, 982 F.3d at 743–44.

23       Contrary to the Services' assertions, these holdings are firmly grounded in the language

24   and structure of the ESA. Section 7's core requirement is elegantly straightforward: the action

25   agency must "insure that any action authorized, funded, or carried out by [the action agency] is

26   not likely to jeopardize the continued existence of any endangered species or threatened species

27   or result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2).

28   This goal is largely accomplished by the action agency and the Services engaging in rigorous

consultation over the effects of the action. Two aspects of this provision bear emphasis. First, the consultation process must "insure"—that is, guarantee—against the likelihood of jeopardy and destruction or adverse modification. Pls. Br. 17. Second, the action at issue for which that guarantee must be made is the one ultimately "authorized, funded, or carried out"—not a theoretical, proposed action subject to change.

The Services' arguments flatly contradict the statutory language. Waving off Congress's use of the term "insure" and leaning on the term "likely," the Services argue that Congress really meant to give action agencies "leeway" to decide what funding and planning is necessary to comply with their Section 7 duties. Fed. Br. 29. Unsurprisingly, the Services do not point to a single case that supports that position. The Services also attempt to distract the Court from the central question of what mitigation measures may lawfully be considered part of the "action" under consultation by protesting that Congress intended consultation to cover entire actions, not parts of them. Fed. Br. 24. Yet Plaintiffs have never advocated for piecemeal consultation. Plaintiffs' position simply reflects the statutory requirement to insure that the action the agency ultimately funds, authorizes, or carries out avoids jeopardy and destruction or adverse modification. 16 U.S.C. § 1536(a)(2). The consultation process necessarily requires the action agency to make binding plans and commitments for mitigations—and demonstrate its ability to carry those out—so that the consultation accurately reflects the action's true effects on listed species.

The Services' attempts to contort the structure of the ESA to fit their interpretation fare no better. The statute contemplates an iterative consultation process that ensures that the information used to determine jeopardy and destruction or adverse modification accurately reflects the scope of the proposed action and its effects at the time the Services make that final determination. For example, Section 7(b)(3)(B) provides that an opinion issued after early consultation under 7(a)(3) may be treated as a final opinion under 7(a)(2) if the relevant Service "reviews the action before it is commenced by the Federal agency and finds . . . that no significant changes have been made with respect to the action." 16 U.S.C. § 1536(b)(3)(B). This makes sense in light of consultation's purpose to "insure" that the agency action being

authorized—including all aspects that will actually be carried out as part of that action—will not impair the survival or recovery of any listed species.

The Services similarly ignore Section 7's protective function when they assert that requiring action agencies to commit to spending resources on mitigation measures as part of the consultation process is inconsistent with Section 7(d). Section 7(d) prevents agencies from prematurely making irretrievable and irreversible commitments of resources with respect to the agency action that would *foreclose* their ability during consultation to formulate or implement RPAs that avoid jeopardy and destruction or adverse modification. 16 U.S.C. § 1536(d). That is entirely consistent with requiring the action agency to commit resources to implement measures necessary to insure the action the agency ultimately funds, authorizes, or carries out after consultation avoids jeopardy and destruction or adverse modification.

The Services protest that Plaintiffs' reading leads to a "circular" process in which action agencies would have to identify and commit to RPAs and RPMs *before* consultation even begins, Fed. Br. 23, and the Services would have to "screen out" beneficial proposals only to re-propose them at the conclusion of consultation. Fed. Br. 25.[5] Quite the opposite. The best reading of the statute is that it requires the agencies to identify minimization measures and reasonable and prudent alternatives *during* consultation and include them in the consultation to the extent the action agency demonstrates that it can and will implement them as part of the action the agency ultimately authorizes, funds, or carries out. If a mitigation measure cannot be relied on, the Services would have more options than to disregard it and repropose it in an RPA—they could, for example, suggest how the action agency make a demonstrable commitment to implement the measure, as Ninth Circuit case law requires.

The Services' use of *Sierra Club v. Marsh*, 816 F.2d 1376, 1385–86 (9th Cir. 1987), as an example of "the proper understanding as to how Section 7(a)(2) operates," Fed. Br. 28,

---

[5] The legislative history the Services cite in support of their argument, Fed. Br. 24–25, has to do with identifying RPAs early to avoid any need to seek an exemption from the Endangered Species Committee. If anything, it reinforces Congress's intent for the agencies to resolve conflicts and make commitments *before* consultation concludes.

highlights their confusion. In that case, the Army Corps of Engineers indicated to FWS that it would obtain 188 acres of wetlands to compensate for the loss of habitat for listed birds. FWS relied on that mitigation as part of its no jeopardy determination, even though there were signs that the purchase might not happen. After consultation concluded, the purchase did not happen, but the Corps moved ahead with the habitat-destroying work and refused to reinitiate consultation—despite FWS's warning that the wetland mitigation project was necessary to prevent jeopardy. *Marsh*, 816 F.2d at 1379–80. *Marsh* supports the best reading of the ESA by requiring that the action as it will *in fact be carried out*—not as it may exist in theory—must avoid a likelihood of jeopardy. *See id.* at 1385 ("The [Corps'] actions fall far below insuring that the project is not likely to jeopardize the continued existence of the birds. . . . The [Corps] is allowing the project's adverse effects to accumulate without implementing the mitigation measures or making certain they will occur."). The Services' interpretation would invite more fiascos like this one; this is not what the statute demands. *See Ctr. for Biological Diversity*, 982 F.3d at 746 (citing *Marsh* in support of ESA requirement for a "clear, definite commitment of resources" for mitigation measures (citation omitted)).

### C.    The "Destruction or Adverse Modification" Definition Violates the ESA.

#### 1.    The addition of "as a whole" harms species in violation of the ESA.

The Services' insertion of "as a whole" into the statutory prohibition on "destruction or adverse modification" of critical habitat improperly enables the Services to "mask" significant harm to critical habitat from "material local effects" in violation of the ESA. *Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059, 1075 (9th Cir. 2004). It authorizes piecemeal diminution of critical habitat, which, by definition, has already been deemed "essential." 16 U.S.C. § 1532(5)(A). The Services' arguments to the contrary obscure and contradict the language of the ESA.

The Services argue that the statute only prohibits destruction or adverse modification "as a whole" because the prohibition against jeopardy appears in the same statutory provision and applies to "the continued existence of any" listed species. 16 U.S.C. § 1536(a)(2). However, the statutory language points in the opposite direction. The different language pertaining to jeopardy

1    and destruction or adverse modification demands a different analysis for each: while the

2    jeopardy prohibition calls for evaluation of impacts to the entirety of a listed species, the

3    destruction or adverse modification prohibition notably does *not* contain any similar direction.

4    *See id.* The addition of "as a whole" undercuts this statutory distinction, rendering the separate

5    inquiries meaningless, for any action that destroys or adversely modifies *all* critical habitat must

6    also jeopardize the species. *See* 1998 Consultation Handbook at 4-35 ("[i]ndependent analyses

7    are made" for jeopardy versus destruction or adverse modification).

8         If the Services are to take a cue from the jeopardy context, the relevant lesson is the

9    importance of avoiding an analysis that allows for the piecemeal destruction of smaller, localized

10   portions of critical habitat. *See Nat'l Wildlife Fed'n*, 524 F.3d at 930 (warning against the "slow

11   slide into oblivion" in which "a listed species could be gradually destroyed, so long as each step

12   on the path to destruction is sufficiently modest," in the context of a jeopardy analysis). The "as

13   a whole" language allows for such piecemeal degradation, requiring destruction or adverse

14   modification to rise to the "considerable level" of affecting the "entire critical habitat

15   designation," instead of accounting for destruction of portions of critical habitat as the law

16   mandates. 84 Fed. Reg. at 44986.

17        The Services argue that, because "critical habitat" is statutorily defined as the "specific

18   areas" essential to conservation, the term must refer to all such areas collectively as a single

19   unit.[6] This argument also fails. The statutory definition of "critical habitat" provides for the

20   designation of multiple areas as critical habitat based on the specific characteristics of each

21   area—critical habitat is not designated as a whole, but rather as units and subunits, although each

22   must be recognized as "essential." 16 U.S.C. § 1532(5)(A). The use of the phrase "critical

23   habitat" is easily understood to mean one, multiple, or all such "specific areas." And since

24

25

26   _____

27   [6] Moreover, the Services puzzlingly emphasize that Congress did not instruct the Services to
     issue separate destruction or adverse modification determinations for each "specific area." Fed.
28   Br. 31. But even if the Services produce a single determination about an action, that does not
     mean that the action cannot destroy or adversely modify specific areas.

1    various units of critical habitat do not need to be designated based on their value "as a whole,"

2    that is the wrong lens for analyzing their destruction or adverse modification.

3         The Services emphasize that their "as a whole" approach was endorsed in the preamble

4    for the 2016 regulation[7] but fail to mention that in 2016, the Services explicitly *declined* to add

5    the words "as a whole" to the regulatory definition. 81 Fed. Reg. 7214, 7222 (Feb. 11, 2016).

6    While the "as a whole" language previously appeared in the regulatory preamble, now that the

7    offending language has been codified in the regulation itself, the definition is unlawful. *See El*

8    *Comite Para El Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062, 1070 (9th Cir. 2008)

9    (noting that a regulatory preamble is not "an operative part" of the regulation) (quoting *Wyo.*

10   *Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999)).

11        Language in the preambles to the proposed and final rules suggesting that the "as a

12   whole" analysis still recognizes particularly damaging localized impacts cannot save the

13   definition. If, as the Services claim, such impacts are factored into the analysis, they should have

14   been included in the regulatory definition instead of language that causes such impacts to be

15   disregarded.

16        The Services also repeatedly mischaracterize Plaintiffs' arguments distinguishing *Butte*

17   *Environmental Council v. U.S. Army Corps of Engineers*, 620 F.3d 936 (9th Cir. 2010).[8]

18   Plaintiffs do not argue that *any* small-scale or localized destruction of critical habitat inherently

19   violates the ESA. *See* Fed. Br. 32. Instead, Plaintiffs' argument is that the addition of "as a

20   whole" prevents the Services from analyzing destruction or adverse modification at the

21   appropriate scale, when rational analysis would so require. *Butte Environmental Council*'s

22   recognition that *every* encroachment on critical habitat does not necessarily constitute destruction

23

24   ⎯⎯⎯⎯⎯⎯⎯⎯
     [7] The Services cite their Consultation Handbook for a similar point, but neglect to note that the
25   Handbook also states that: "[w]hen multiple units of critical habitat are designated for particular
     purposes, these units may serve as the basis of the analysis if protection of different facets of the
26   species' life cycle or its distribution is essential." Consultation Handbook at 4-36.
     [8] The Services also quote language condoning the use of a "large-scale analysis" in *Rock Creek*
27   *Alliance v. U.S. Fish & Wildlife Service*, ignoring the fact that the Ninth Circuit explicitly
     assessed whether FWS "masked 'some localized risk . . . by [the] use of large scale analysis.'"
28   663 F.3d 439, 443 (9th Cir. 2011) (quoting *Gifford Pinchot Task Force*, 378 F.3d at 1075).

1    or adverse modification does not amount to an endorsement of the "as a whole" approach. 620

2    F.3d at 948.

3         Moreover, in *Butte Environmental Council*, the court did not address how an "as a

4    whole" requirement could be reconciled with the plain statutory language. Further, whether the

5    Services could adopt an approach that excludes truly trivial or de minimis impacts to critical

6    habitat is not at issue here. The sole question is whether, consistent with the statute, the Services

7    can impose their own "as a whole" hurdle and, on that basis, allow the piecemeal loss and

8    degradation of habitat deemed "essential" to the conservation of imperiled species. Nothing in

9    *Butte Environmental Council*—or any other ruling—endorses that unlawful result. And neither

10   should this Court.

11              2.         "Destruction" and "adverse modification" must be defined separately.

12        Contrary to the Services' characterization, Fed. Br. 33, Plaintiffs' argument about the

13   failure to separately define destruction versus adverse modification is part and parcel with the

14   unlawful addition of the "as a whole" language discussed above. By combining the two

15   infirmities, the Services created a regulation that conflates the destruction of the entire critical

16   habitat designation with the adverse modification of the entire critical habitat designation—

17   ignoring, for instance, that destruction of a smaller portion of critical habitat may cause more

18   appreciable diminishment of the value of that habitat than adverse modification on a larger scale.

19        First, the Services' argument that the use of the word "alteration" in the challenged

20   regulation defines *both* "destruction" and "adverse modification" is unconvincing. As a matter of

21   plain language, "alteration" is not a synonym for "destruction." Second, the Services contend

22   that use of only the term "adverse modification" in *Section 7(b)(3)(A)* (describing the contents of

23   a biological opinion) establishes that adverse modification "necessarily includes" destruction and

24   the two need not be separately defined. Fed. Br. 34. But if that were indeed the case, it would

25   make the use of "destruction" in *Section 7(a)(2)*—the provision that actually establishes the

26   destruction or adverse modification analysis—superfluous. *See Nat'l Wildlife Fed'n*, 524 F.3d at

27   932 (explaining that textual interpretations that "give no significance" to portions of the statute

28   are "disfavored"). There is no indication that Congress intended the provision describing the

contents of a biological opinion to inform the interpretation of "destruction of adverse modification" as used in Section 7(a)(2). A single use of a "shorthand reference" for an unwieldy phrase does not make all the terms in that phrase "largely synonymous," contrary to the Services' claim. Fed. Br. 34.

**D.    The Services Have Provided No Logical Reason for Eliminating Their Obligation to Request Reinitiation of Consultation.**

The Services failed to justify their renunciation of the duty to request that action agencies reinitiate consultation when certain triggering events occur. The Services historically shared that obligation with action agencies, but in 2024, the Services placed it exclusively on action agencies. Because the Services have unique expertise in determining when reinitiation is warranted, their abandonment of any requirement to request reinitiation places imperiled species at further risk without any rational explanation.

The Services now counter that, absent a clear statutory directive requiring the Services to request reinitiation, "neither Plaintiffs nor the courts can impose such an obligation." Fed. Br. 36. But that argument misses the point: it is *the Services themselves*—not Plaintiffs or courts—that imposed the obligation through a regulation in the first place, and therefore they must rationally explain their decision to discard that obligation. The primary case cited by the Services only reinforces that distinction, finding that FWS need not explain why it changed a policy that had never appeared in its regulations or Consultation Handbook. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 635–36 (9th Cir. 2014). To the contrary, here *both* the Services' regulations *and* Handbook imposed the obligation to request reinitiation, and the Services cannot renounce that requirement without a reasoned explanation. Pls. Br. 24–26.

The Services' citation to *Heckler v. Chaney*, 470 U.S. 821, 832 (1985), for the proposition that "agency enforcement decisions are typically unreviewable" is equally inapt. Fed. Br. 36. At no point in the rulemaking did the Services suggest that requesting reinitiation is an enforcement measure. Quite the opposite: the Services repeatedly emphasized that they lacked the authority to compel (as opposed to merely ask) an action agency to reinitiate consultation. *See, e.g.*, 88 Fed. Reg. 40753, 40757 (June 22, 2023); 89 Fed. Reg. at 24280. Their belated

1    appeal for enforcement discretion is both unfounded and precluded. *See Chenery*, 332 U.S. at

2    196.

3        The Services contend that they wished to clarify their lack of authority to compel an

4    agency to reinitiate consultation and to "counteract recent erroneous case law interpreting the

5    prior language as requiring the Services to compel reinitiation." Fed. Br. 36. There are two

6    problems with that reasoning. First, the Services have always been aware that they lack authority

7    to *compel* reinitiation, but they nonetheless embraced an obligation to *request* it. When

8    promulgating their obligation in 1986, they stated, "[T]he Service notes its lack of authority to

9    require Federal agencies to reinitiate consultation if they choose not to do so. Nevertheless, the

10   Service shall request reinitiation when it believes that any condition described in this section

11   applies." 51 Fed. Reg. 19926, 19956 (June 3, 1986). In sum, the Services' prior statement left

12   nothing to clarify.

13       Relatedly, the Services have not identified any erroneous case law or other confusion that

14   they needed to "counteract." As Plaintiffs explained in their opening brief and the Services have

15   not contested, the only case law that the Services cite required that they *request*—not *compel*—

16   reinitiation. Pls. Br. 25–26.

17   **IV.    THE 2019 AND 2024 REGULATIONS VIOLATE ESA § 4.**

18       **A.    The Services' Arbitrary Definition of "Foreseeable Future" Contravenes the
             ESA's Best Available Science Requirement.**

19       The Services' definition of "foreseeable future" in the ESA Section 4 listing process

20   infringes upon the ESA's requirement to use the best available science when considering

21   whether a species warrants listing as threatened in two ways: (1) by impermissibly excluding

22   science that does not meet a vague standard of reasonable reliability, and (2) by requiring the

23   science for *both* the threats to the species *and* the species' response be reasonably reliable. These

24   revisions contravene Congress's intent that the Services "not only . . . protect the last remaining

25   members of the species but . . . take steps to insure that species which are likely to be threatened

26   with extinction never reach the state of being presently endangered." *Defs. of Wildlife v. Norton*,

27   258 F.3d 1136, 1142 (9th Cir. 2001) (citation omitted).

28

1    The Services seek to portray the "reasonable reliability" limitation as innocuous. But the

2    problem is that there are often threats to a species that, while known, may not meet this arbitrary

3    standard and thus will be disregarded from the Services' analysis rather than being weighed in

4    the listing determination. For instance, available data may show that a species is faced with a

5    threat that may be hard to quantify, but which is not speculative and, if it were to occur, would be

6    devastating. In such situations, "[a]lthough the [Services] cannot act on pure speculation or

7    contrary to the evidence, the ESA accepts agency decisions in the face of uncertainty." *Ariz.*

8    *Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1164 (9th Cir. 2010). FWS has recognized the

9    appropriateness of listing a species in such circumstances. For instance, it listed the southern sea

10   otter "substantially" due to the threat of a major oil spill, noting that while "the chances of an oil

11   spill c[ould] not be predicted . . . the *possibility* of such a disaster and its consequences" merited

12   the otter's listing. 42 Fed. Reg. 2965, 2967 (Jan. 14, 1977) (emphasis added).

13   It is because of threats such as this that the best available science standard does not allow

14   the Services to reject science for failing to meet some undefined "reasonable degree of

15   confidence," 89 Fed. Reg. at 24307; s*ee Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d

16   1015, 1028 (9th Cir. 2011) (Services cannot "invoke 'scientific uncertainty'" to disregard

17   available science). Instead, the ESA requires the Services to consider all of the available science,

18   even "if the only available data is weak, and thus not dispositive," and does not permit the

19   Services to "ignore available studies, even if it disagrees with or discredits them." *San Luis &*

20   *Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014); *see also Alaska Oil &*

21   *Gas Ass'n v. Pritzker*, 840 F.3d 671, 681 (9th Cir. 2016) ("*AOGA*") (holding that the ESA does

22   not require the Services to base listing decisions on "ironclad evidence").

23   The requirement to base listing decisions on the best available science does not render the

24   "foreseeable future" language surplusage. Fed. Br. 40. Instead, it infuses it with the requirement

25   to consider all available data, rather than inappropriately cabining the Services' analysis when

26   faced with uncertainty. Yet that is exactly what the Services' new definition does by allowing the

27   best available science to be dismissed as insufficiently "reliable."

28

The Services assert that "[s]tatutory commands to consider 'foreseeable' consequences encompass normal proximate cause principles and require reasonable judgments and line drawing," citing two NEPA cases. Fed. Br. 37.[9] However, unlike the ESA's provisions regarding listing, NEPA explicitly cabins its analysis to "*reasonably* foreseeable environmental effects." 42 U.S.C. § 4332(c)(i) (emphasis added). The Supreme Court has found that "the congressional concerns that led to the enactment of NEPA" suggest that these terms are to "be read to include a requirement of a reasonably close causal relationship between a change in the physical environment and the effect at issue." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983).

Congress did not similarly cabin the Services' review of the best available science in the ESA. Instead, because extinction is irreversible, "the congressional concerns" that led to the enactment of the ESA make clear that Congress intended the Services to list species as threatened "before the danger becomes imminent," *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 680 (D.D.C. 1997) (citation omitted), and that those determinations be based on the best available scientific data.

The Services fault Plaintiffs for not citing M–37021 ("M-Opinion"), which guided the Services' regulatory definition of "foreseeable future." *See, e.g.*, 89 Fed. Reg. 24300, 24302 (Apr. 5, 2024). But regardless of whether the Services' new definition of foreseeable future aligns with the analysis in the M-Opinion, both must bow to the term's "single, best meaning" determined by "the traditional tools of statutory construction." *Loper Bright*, 603 U.S. at 400–01. And the statute is clear that the best available science requirement compels the agencies to extrapolate from available data even when their ability to forecast or predict the future is uncertain. As the M-Opinion notes, the definition of "foreseeable" spans "the range for which forecasts are possible," and is not limited to those that are probable. *See* M-Opinion 7–8. Indeed,

---

[9] As neither the regulations nor the M-Opinion discuss principles of proximate cause, the Court cannot accept agency counsels' "*post hoc* rationalizations for agency action." *Burlington Truck Lines*, 371 U.S. at 168–69.

1  the Services must consider available data even if it "is weak, and thus not dispositive." *San Luis*

2  *& Delta-Mendota Water Auth.*, 776 F.3d at 995 (cleaned up).

3      The Services' arguments about the Ninth Circuit's citation to the M-Opinion in *AOGA*

4  overstate its import. Fed. Br. 37–38 (citing 840 F.3d at 682). While the court referred to the M-

5  Opinion, it did not address the Services' disregard for available science if it does not meet an

6  undefined threshold of reliability. Instead, the court highlighted that "[u]ncertainty regarding the

7  speed and magnitude of [an] adverse impact . . . does not invalidate data." *AOGA*, 840 F.3d at

8  683. The Services' regulatory requirement for reasonable reliability, drawn from the M-Opinion,

9  contradicts the Ninth Circuit's clear directives.

10      Nor does *AOGA* support the Services' demand for reasonably reliable information about

11  *both* "the threats to the species and the species' responses to those threats." Fed. Br. 37–38; 50

12  C.F.R. § 424.11(d). The relevant portion of *AOGA* addresses the plaintiffs' assertion that NMFS

13  failed to provide "sufficient evidence to demonstrate a nexus between the loss of sea ice and the

14  bearded seal's risk of future extinction." 840 F.3d at 682–83. Rejecting this, the Ninth Circuit

15  was clear that "effort[s] to impose requirements for which data is unavailable or does not exist is

16  at odds with the ESA." *Id.* at 683. The Services now do just that, introducing the same kind of

17  impermissible reliability requirement sought by plaintiffs in *AOGA* to allow themselves to

18  invoke scientific uncertainty to deny protections to a species if either the threats themselves *or*

19  the species' reaction to those threats are less than "reasonably reliable."

20      The flaws with this approach are clear in *Defenders of Wildlife v. Jewell*, in which the

21  District of Montana rejected FWS's determination not to list the North American wolverine

22  because the Service asserted that it could not state "with an acceptable degree of certainty" how

23  wolverines would respond to the loss of their deep snow denning habitat as a result of climate

24  change. 176 F. Supp. 3d 975, 996 (D. Mont. 2016). There was no doubt that wolverines used

25  deep snow for denning and that climate change would eliminate deep snow habitat, but FWS

26  asserted uncertainty because "the wolverine's reaction to climate change relative to denning

27  cannot be postulated." *Id.* at 1005. In essence, FWS required what its regulatory definition of the

28  "foreseeable future" now enshrines: "reasonably reliable predictions about . . . the species'

responses to . . . threats," 50 C.F.R. § 424.11(d), even if the best available science cannot provide

such a link. The district court rejected this insistence on further certainty than the best available

science provided, holding FWS's "demand for conclusiveness contrary to the law." *Jewell*, 176

F. Supp. 3d at 1005 (citing *Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1164; *Alaska Oil & Gas*

*Ass'n v. Jewell*, 815 F.3d 544, 555 (9th Cir. 2016)).[10]

### B. The Services' Expanded Reasons to Forego Designating Critical Habitat Violate Clear Congressional Intent.

The ESA requires the Services to designate critical habitat concurrent with listing "to the

*maximum extent* prudent and determinable." 16 U.S.C. § 1533(a)(3)(A) (emphasis added).

Congress was clear: the Services are to designate critical habitat for each and every endangered

or threatened species except in "'rare' or 'limited' circumstances." *Sierra Club v. FWS*, 245 F.3d

434, 443 (5th Cir. 2001); *see also* H.R. Rep. No. 95-1625, at 17 (1978) (expressing Congress's

intent that this exception be strictly limited to "rare circumstances where the specification of

critical habitat . . . would not be beneficial to the species"). In line with this congressional

command, from 1984 through 2019, the Services limited not-prudent findings to those infrequent

situations where the designation would increase the threats facing the species or where "[s]uch

designation of critical habitat would not be beneficial to the species." 49 Fed. Reg. 38900, 38909

(Oct. 1, 1984); *see also* 81 Fed. Reg. 7414, 7432 (Feb. 11, 2016).

The Services fail to justify their challenged decision to replace this longstanding "no

benefit" standard with an alternative formulation that contains *no* limiting principle cabining the

Services' ability to forego designating critical habitat, even if doing so would benefit the species.

---

[10] The Services falsely assert that the district court in *Jewell* found the "listing rule arbitrary because FWS had bent its analysis to 'immense political pressure.'" Fed. Br. 39. To the contrary, the district court speculated only that "immense political pressure" was a "possible answer" for why FWS had denied protections for the wolverine. *Jewell*, 176 F. Supp. 3d at 1000. That speculation ultimately played no part in the district court's holding, which called out FWS's rejection of the best available science for seeking "certainty beyond what is required by the ESA and case law interpreting it when it demanded the precise mechanism behind the wolverine's established need for snow for reproductive denning purposes." *Id.* at 1003.

1    In their defense, the Services assert that the ESA does not "further clarify the term

2  'prudent,'" Fed. Br. 41, ignoring both the ESA's conservation purpose and the modifying

3  language "maximum extent" immediately before "prudent." 16 U.S.C. § 1533(a)(3). "The word

4  'prudent' connotes 'sound judgment,' 'cautio[n],' and 'far-sighted[-ness].'" *Ctr. for Biological*

5  *Diversity v. FWS*, No. 22-1877, 2025 WL 1917955, at *10 (D.D.C. July 11, 2025)

6  (quoting *Prudent*, Oxford English Dictionary 1382 (2007)). "Read in context, this means that the

7  FWS 'shall' designate critical habitat to the 'maximum extent' that it can do so, consistent with

8  sound judgment, caution, and foresight." *Id.* Thus, exercising prudency to the maximum extent

9  requires the Service to presumptively favor designating critical habitat "absent extraordinary

10  circumstances." *N. Spotted Owl v. Lujan*, 758 F. Supp. 621, 626 (W.D. Wash. 1991). The

11  Services' new expansive interpretation of the "not prudent" exception is also contrary to

12  Congress's intent that the Services designate critical habitat consistent with the ESA's purpose to

13  provide "a means whereby the ecosystems upon which endangered species and threatened

14  species depend may be conserved." 16 U.S.C. § 1531(b); *see also Wilderness Soc'y v. FWS*, 353

15  F.3d 1051, 1060 (9th Cir. 2003) (en banc) (noting "the structure and purpose of a statute may

16  also provide guidance in determining the plain meaning of its provisions").

17    The Services defend their expansive approach by dismissing the relevant legislative

18  history and arguing that Congress did not include the "no benefit" language in the statute. Fed.

19  Br. 41. However, Congress was as clear as it needed to be: critical habitat is to be designated "to

20  the maximum extent prudent." 16 U.S.C. § 1533(a)(3)(A). And while legislative history is not

21  the law, "clear evidence of congressional intent may illuminate ambiguous text." *Delaware v.*

22  *Pennsylvania*, 598 U.S. 115, 138–39 (2023) (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 572

23  (2011)).

24    Further, the Services argue that their current approach did not expand the circumstances

25  in which the not-prudent exception will be invoked because their prior approach was not limited

26  to any specific scenarios. Yet the Services' prior approaches, even after the regulatory

27  amendments in 2016, were all still limited to circumstances where the "designation of critical

28  habitat would not be beneficial to the species," 50 C.F.R. § 424.12(a)(1)(ii) (2016). The

1    Services' new approach struck this limitation, allowing them to forego designation even if it

2    would benefit the species with *no* limiting principles, instead only identifying "the most likely

3    scenarios" for foregoing designation.

4          Turning to those "most likely scenarios," the Services fail to substantively engage with

5    the point that the new regulations allow the Services to forego designation if habitat loss is not a

6    threat to the species, even though governing case law underscores that critical habitat serves not

7    only to stave off threats to a species' survival, but also to "carve out territory that is . . . essential

8    for the species' recovery." *Gifford Pinchot Task Force*, 378 F.3d at 1070. The Services'

9    hypothetical example of a situation where designation would not provide a benefit to a habitat

10   generalist threatened solely by disease ignores the other recognized benefits of designation

11   beyond merely alleviating threats, such as "through informing management partners of important

12   habitats, stimulating scientific surveys or research, promoting voluntary conservation actions,

13   and raising public awareness of habitats that are essential." 89 Fed. Reg. at 24317.

14         Similarly, although the Services' regulation authorizes them to sidestep critical habitat

15   designation when "the conservation value of habitats under U.S. jurisdiction would be

16   insignificant to the conservation of the listed entity," *id.*, the Ninth Circuit rejected the notion

17   that a critical habitat designation must be "beneficial to *most of* the species" before it becomes

18   prudent. *See Nat. Res. Def. Council v. U.S. Dep't of the Interior*, 113 F.3d 1121, 1126 (9th Cir.

19   1997). Even if a species occurs primarily outside of the United States, the Services cannot forgo

20   protecting what habitat the species does have within their jurisdiction. To find otherwise would

21   "expand[] the narrow statutory exception for imprudent designations into a broad exemption for

22   imperfect designations." *Id.*

23         The Services conclude by arguing that "maximum extent" does not modify "prudent," the

24   next immediate word in the statute, but instead "instructs the Services' approach to the scope of

25   designation." Fed. Br. 44. However, a plain reading of the statute indicates that "maximum

26   extent" modifies "the nearest reasonable referent," *Hall v. U.S. Dep't of Agric.*, 984 F.3d 825,

27   838 (9th Cir. 2020) (citation omitted)—i.e., "prudent." The Services' tortured reading to the

28   contrary should be rejected.

1    **V.    THE SERVICES VIOLATED NEPA.**

2        The Services offer no legitimate defense of their failure to conduct any environmental

3    analysis of their weakening of the ESA Section 4 regulations. NEPA requires such analysis for

4    "major Federal actions" with significant environmental impacts, such as the Services' regulatory

5    "revision of ongoing programs" for ESA implementation. 42 U.S.C. § 4332(C); *Scientists' Inst.*

6    *for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1088 (D.C. Cir. 1973) (citation

7    omitted). The Services undertook a truncated environmental review for their ESA Section 7

8    revisions, but sidestepped this obligation for ESA Section 4 by arbitrarily invoking a categorical

9    exclusion ("CE"). *See* Pls. Br. 34–39.

10        The Services first deny that their 2019 revision threatened significant impacts by

11    substantively weakening the ESA Section 4 listing regulations. *See* Fed. Br. 46. Specifically,

12    they claim their revision allowing the Services to deem designation of critical habitat for listed

13    species imprudent where existing or threatened habitat destruction is "not a threat to the species,"

14    84 Fed. Reg. 44976, 45053 (Aug. 27, 2019) (50 C.F.R. § 424.12(a)(1)(ii)), merely "retain[ed]

15    language that was already in effect" as of 2016. Fed. Br. 46. To the contrary, as explained *supra*

16    Section IV.B, the 2016 regulatory language identified the "not a threat" rationale as only one

17    factor for the Services to consider in addressing the over-arching question whether "designation

18    of critical habitat would not be beneficial to the species." 50 C.F.R. § 424.12(a)(1)(ii) (2016).

19    This "no benefit" formulation preserved the Services' requirement to consider, for example,

20    whether a critical habitat designation would still benefit the species by preserving habitat needed

21    for recovery, even if not needed to address a threat of extinction. *See Gifford Pinchot Task*

22    *Force*, 378 F.3d at 1070 (recognizing role of critical habitat in advancing species recovery). By

23    contrast, the Services' 2019 revision elevates the "not a threat" factor to a stand-alone reason for

24    avoiding critical habitat designation, stripping away any requirement for the Services to consider

25    whether designating critical habitat might still benefit the species. *See* 84 Fed. Reg. at 45053 (50

26    C.F.R. § 424.12(a)(1)(ii)).

27        The Services claim that Plaintiffs have not explained "how the Section 4 regulations

28    allegedly weakened" the ESA Section 4 regulatory framework, Fed. Br. 46, despite Plaintiffs'

1    opening brief devoting nine pages to this explanation. Pls. Br. 26–34; *see also supra* Section IV.

2    As these arguments demonstrate, the Services removed substantive protections that disqualified

3    their regulations from a CE that covers only administrative, technical, or procedural actions.

4         The Services' invocation of *Seven County Infrastructure Coalition v. Eagle County*, 145

5    S. Ct. 1497 (2025) (quoted in Fed. Br. 45–46, 48), does not justify their failure to consider

6    environmental impacts from this rollback. The Services argue that *Seven County* mandates

7    "[d]eference" to their NEPA determinations. Fed. Br. 45. However, while *Seven County* sought

8    to "reiterate and clarify" the role of deference in NEPA litigation, it did so by reaffirming that the

9    "arbitrary-and-capricious" test, focusing on whether an agency decision was "reasonable and

10   reasonably explained," remained the governing standard. 145 S. Ct. at 1511. *Seven County* also

11   reaffirmed that the judicial role under NEPA remains "to confirm that the agency has addressed

12   environmental consequences and feasible alternatives as to the relevant project." *Id.* And the

13   Ninth Circuit has since made clear that fulfilling that judicial role still means that courts must

14   demand "reasoned analysis" to justify an agency's NEPA determinations. *Ctr. for Biological*

15   *Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 998–99 (9th Cir. 2025) (cleaned up)

16   (applying *Seven County* and rejecting agency NEPA determination). The Services offered no

17   such reasoned analysis here.

18        Indeed, the circumstances here are a far cry from those that underlay the Supreme Court's

19   discussion of deference in *Seven County*. The agency defendant in *Seven County* "prepared an

20   extraordinarily lengthy" EIS "spanning more than 3,600 pages." 145 S. Ct. at 1507. The agency

21   finalized that analysis only after circulating a draft for a 106-day public review period and

22   holding six public meetings to gather comment on its proposal. *See id.* at 1508. By contrast, the

23   Services here prepared no environmental analysis at all, provided no analysis for the public to

24   comment upon, and attempted to shoehorn their action into an inapplicable CE. This shortcutting

25   of NEPA procedures affords no basis for judicial deference. As the Ninth Circuit has explained,

26   "[w]e cannot defer to a void." *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092,

27   1121 (9th Cir. 2010).

28

1      The Services also err in claiming that they "analyzed in depth" the potential for

2  "extraordinary circumstances" that would disqualify their action from CE treatment. Fed. Br. 47;

3  *see* Pls. Br. 38–39. But these 2024 analyses addressed only the Services' CE determinations *for*

4  *the 2024 revisions* to the Section 4 rules, not the 2019 revisions. *See* ESA_S4_AR-0000697–720

5  (FWS); ESA_S4_AR-0000012–30 (NMFS) (both addressing 2024 revisions). They did not

6  reexamine the substantive impact of the 2019 revisions' removal of the "no benefit" test for

7  deeming designation of critical habitat imprudent. To the contrary, the 2024 analyses' only

8  specific reference to this issue—in a footnote contained only in the 2024 NMFS CE document—

9  merely stated in conclusory fashion that the agency's "prior conclusions" from its cursory 2019

10  NEPA document "remain valid." ESA_S4_AR-0000019 n.8; *see also* ESA_S4_0000718 (FWS

11  2024 CE document generally affirming "prior assessment" of 2019 revisions).

12      Even as to elements of the 2019 Section 4 revisions that were further modified in 2024—

13  such as the Services' substitution of a "reasonably reliable predictions" requirement for the

14  statutory best available science standard in assessing a species' imperilment within the

15  foreseeable future, *see* Pls. Br. 27–30—the Services' 2024 CE analyses failed to rationally

16  address extraordinary circumstances. The Services claimed this foreseeable-future revision

17  "would not change processes, standards, or outcomes of species classification determinations."

18  ESA_S4_AR-0000715 (FWS); *see also* ESA_S4_AR-0000025–28 (NMFS). However, this facile

19  treatment of the issue ignored the key point that courts have rejected the Services' prior efforts to

20  impose a specific threshold of reliability for threats, and a species' response to such threats, to be

21  considered in ESA listing determinations. *See, e.g.*, *Jewell*, 176 F. Supp. 3d at 1004–05

22  (discussed *supra*). The Services' attempt to override the principles established in those judicial

23  rulings through a revision of the Section 4 rules *does* change applicable processes and standards

24  for listing determinations, with an apparent objective to generate different outcomes from the

25  Services' previous litigation losses.

26      This weakening of the rules for ESA listing determinations threatens adverse effects on

27  potentially threatened and endangered species, triggering the Services' extraordinary

28  circumstances criteria covering such impacts. *See* ESA_S4_AR-0000025–28 (NMFS);

1   ESA_S4_AR-0000712 (FWS) (discussing extraordinary circumstances). By the same token, the

2   Services' Section 4 revisions threaten to establish a precedent for future agency actions,

3   triggering additional extraordinary circumstances criteria that cover such precedential actions,

4   *see id.*—not simply because the Services' revisions "would apply prospectively," Fed. Br. 47,

5   but because they change the rules for future listing determinations in a manner that threatens to

6   foreclose recognition of important issues affecting species preservation. This threat is not

7   alleviated by the Services' mere commitment "to have an administrative record that supports its

8   determination," as their 2024 analysis claimed, ESA_S4_AR-0000027–28. Because the Services

9   completely disregarded such factors, their analyses of extraordinary circumstances were

10  unlawfully arbitrary. *See Motor Vehicle Mfr. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983)

11  (agency acted arbitrarily where it "entirely failed to consider an important aspect of the

12  problem").

13  **VI.    VACATUR IS APPROPRIATE FOR THE 2019 AND 2024 REGULATIONS.**

14          The Court should vacate the challenged provisions. *See Alsea Valley All. v. Dep't of*

15  *Com.*, 358 F.3d 1181, 1185 (9th Cir. 2004) ("[V]acatur of an unlawful agency rule normally

16  accompanies a remand."); *see also* 5 U.S.C. § 706(2) (providing for a "reviewing court" to "hold

17  unlawful and set aside" illegal agency action).

18          The Services' claim that the Court lacks jurisdiction to vacate the 2019 Regulations

19  because Plaintiffs lack standing to challenge them is unsupported. As explained above, *supra*

20  Section II, Plaintiffs have adequately demonstrated standing to challenge these rules. The

21  Services' citation of *Firearms Regulations Accountability Coalition v. Garland*, Fed. Br. 49, in

22  which plaintiffs sought vacatur of an agency action that they had not challenged in their

23  complaint, is inapposite. *See Firearms*, No. 23-00003, 2025 WL 1780562, at *1 (D.N.D. Apr.

24  14, 2025).[11] And contrary to the Services' implication, Plaintiffs do not seek a prophylactic

25  remedy for possible future regulations. Fed. Br. 49 (citing *Monsanto Co.*, 561 U.S. at 161). In

26

27  [11] It is unclear why the Services also cite *In re Clean Water Act Rulemaking*, which addressed
    vacatur of a regulation absent a ruling on the merits—a remedy that no party has requested here.
28  60 F.4th at 593–94.

*Monsanto*, the Supreme Court faulted the district court for enjoining *future* regulations. 561 U.S. at 161. Here, Plaintiffs seek vacatur of *currently effective* regulations, many of which have been effective for six years.

In addition, the Services' claim that the 2019 Regulations are immune from challenge is a bait and switch that undermines their earlier arguments for remanding those rules. As the Court is aware, the Services requested remand of the 2019 Regulations in 2021 to address their "substantial concerns with the 2019 ESA Rules," promote "judicial economy," and "reconsider [their] previous position." Mot. for Voluntary Remand 20–21, *Ctr. for Biological Diversity v. Bernhardt*, No. 19-05206-JST (N.D. Cal. Dec. 10, 2021), ECF 146 (citation omitted). But after asking the Court to "allow the Services to resolve these issues *in the first instance*," *id.* at 26 (emphasis added), the Services now claim to have definitively shielded the issues from judicial review. The Services also urge the Court not "to entertain an anticipatory challenge to the 2019 ESA Regulations now, merely because they might become operative later." Fed. Br. 49. This undermines the Services' prior appeal to "judicial economy"—the Services apparently would have Plaintiffs file *another lawsuit* challenging the 2019 Regulations after prevailing in this one.[12] If the Services' logic extends to the forthcoming 2026 Regulations, would Plaintiffs then need to file three successive future lawsuits against the 2026, 2024, and 2019 Regulations, in addition to the two lawsuits they have already filed? That sounds less like judicial economy than Sisyphean toil.

No one disputes that vacating the 2024 Regulations and leaving the 2019 Regulations in place would deprive Plaintiffs of relief. Of the six provisions that Plaintiffs seek to vacate, five were substantially carried over from the 2019 Regulations (only the renunciation of the duty to request reinitiated consultation was new in 2024). The provisions regarding the definition of "effects of the action," the prudence of critical habitat designations, and the definition of "foreseeable future" in threatened species listings were modified in 2024, but the core defects

---

[12] Lest it go unremarked, the Services' logic hinges on their waiver of any statute-of-limitations defense in a future challenge to the 2019 Regulations.

1   stem from 2019. The provisions regarding the definition of "destruction or adverse modification"

2   and unchecked reliance on mitigation promises were issued in 2019 and were neither modified

3   nor reissued in 2024—there was literally nothing promulgated in 2024 that the Court could

4   vacate. If the Court declined to vacate the 2019 provisions, relief for Plaintiffs would not only be

5   incomplete—it would be nonexistent.

6         For the reasons discussed in the context of stay and remand, *supra* Section I, the

7   environmental harm of leaving these unlawful regulations in place far outweighs any disruptive

8   consequences of vacating them. *See Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532

9   (9th Cir. 2015). The Services' contention that vacating both the 2024 and 2019 Regulations

10  would cause "uncertainty" and "disruptive consequences" is overstated. Fed. Br. 50. Vacatur

11  would return to a familiar, preexisting status quo with an established record of implementation

12  and compliance. In contrast, the Services' suggestion not to vacate the unlawful provisions and

13  instead leave the Services not to implement them while "relying solely on the statutory

14  provision," Fed. Br. 49, is an obvious recipe for chaos, where the Services could approach every

15  situation as a matter of *de novo* statutory interpretation—an incessant guessing game for federal

16  agencies, regulated actors, and anyone with an interest in imperiled species.

17        Finally, the Services' cursory admonition that vacatur on the basis of a NEPA violation

18  would be "particularly inappropriate" is groundless. *Id*. *Seven County* stated that, under some

19  circumstances, a deficiency in an environmental impact statement "may not necessarily require a

20  court to vacate the agency's ultimate approval of a project." 145 S. Ct. at 1514. Nothing in that

21  case can save the Section 4 regulations, for which the Services prepared nothing—neither an

22  environmental impact statement nor even a shorter environmental assessment.

23        Because there is no compelling need to leave these unlawful regulations in place, the

24  Court should adhere to the "presumption of vacatur." *All. for the Wild Rockies v. U.S. Forest

25  Serv.*, 907 F.3d 1105, 1121–22 (9th Cir. 2018).

26                      **CONCLUSION**

27        For the reasons stated above and in their opening brief, Plaintiffs ask the Court to grant

28  their motion for summary judgment and deny the Services' motions.

Respectfully submitted this 18th day of August, 2025.

*/s/ Benjamin M. Levitan*
Benjamin M. Levitan (*pro hac vice*)
Earthjustice
48 Wall Street, Floor 15
New York, NY 10005
T: (202) 797-4317
blevitan@earthjustice.org

Andrea A. Treece (CA Bar #237639)
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
T: (415) 217-2000
atreece@earthjustice.org

Kristen L. Boyles (CA Bar #158450)
Charisa Gowen-Takahashi (CA Bar #342937)
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T: (206) 343-7340
kboyles@earthjustice.org
cgowentakahashi@earthjustice.org

*Counsel for Plaintiffs Center for Biological*
*Diversity, Sierra Club, and WildEarth Guardians*

*/s/ Ryan Adair Shannon*
Ryan Adair Shannon (OSB #155537)
(*pro hac vice*)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
T: (971) 717-6407
rshannon@biologicaldiversity.org

*Counsel for Plaintiff Center for Biological*
*Diversity*